No. 23-15179

# In the United States Court of Appeals for the Ninth Circuit

────────

STATE OF NEBRASKA, ET AL.,

*Plaintiffs-Appellants,*

*v.*

MARTIN WALSH, ET AL.,

*Defendants-Appellees.*

────────

On Appeal from the United States District Court
for the District of Arizona, Phoenix Division
No. 2:22-cv-00213
Hon. John J. Tuchi

────────

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

────────

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297

Additional counsel listed
with signature block

ERIC J. HAMILTON
Solicitor General
eric.hamilton@nebraska.gov

LINCOLN J. KORELL
Assistant Attorney General

Counsel for Plaintiffs-Appellants

# TABLE OF CONTENTS

Page

Table of Authorities .............................................................................. iii

Introduction ...................................................................................... 1

Jurisdictional Statement ...................................................................... 3

Statement as to Addendum .................................................................. 3

Issues Presented ................................................................................. 3

Statement of the Case ........................................................................ 3

    I.  Background ............................................................................... 3

    II.  Procedural History ................................................................. 10

Summary of the Argument ................................................................. 11

Standard of Review .......................................................................... 13

Argument ....................................................................................... 14

    I.  The Wage Mandate Is Likely Ultra Vires .............................. 14

        A.  The Wage Mandate does not promote economy and efficiency ...................................................................... 15

        B.  The Procurement Act does not authorize the President to override state minimum wage laws ....................... 20

        C.  The Procurement Act does not apply to subcontractors, lessors, licensees, and permittees .............................. 24

        D.  The Wage Mandate is invalid for additional reasons rejected in *Mayes* .............................................. 28

    II.  The Wage Mandate Likely Violates The Major Questions Doctrine ....................................................................... 33

        A.  The major questions doctrine applies to the Procurement Act ...................................................................... 34

        B.  The Wage Mandate is a regulation of vast economic and political significance ..................................... 36

        C.  The Procurement Act lacks a clear statement ................... 38

    III.  The Wage Mandate Rule Violates The Administrative Procedure Act ...................................................................... 39

        A.  The APA applies to the Wage Mandate Rule ..................... 39

B. The Wage Mandate Rules violates the APA ........................ 45

IV. Plaintiffs Are Entitled To A Preliminary Injunction ............... 54

Conclusion ........................................................................ 58

Statement of Related Cases Pursuant to Circuit Rule 28-2.6 ......... 60

Certificate of Compliance ................................................... 61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 497 (1935) ................................................................. 31

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ................................................................. 43

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ............................................................. 56

*Ala. Ass'n of Realtors v. DHHS,*
141 S. Ct. 2485 (2021) ........................................................ 33, 35

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .............................................. 14, 55

*Am. Fed'n Lab. Cong. Indus. Orgs. v. Kahn,*
618 F.2d 784 (D.C. Cir. 1979) ......................... 16, 18, 24, 32

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) ............................. 55, 56, 57

*Arc of Cal. v. Douglas,*
757 F.3d 975 (9th Cir. 2014) .................................................. 55

*Ass'n of Am. Railroads v. Costle,*
562 F.2d 1310 (D.C. Cir. 1977) .............................................. 29

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) .................................................... 48

*Bassidji v. Goe,*
413 F.3d 928 (9th Cir. 2005) .................................................. 44

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................. 40

*Bond v. United States,*
572 U.S. 844 (2014) ................................................................. 32

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ............................................................. 45

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) .............................................................. 57

*California v. Trump,*
963 F.3d 926 (9th Cir. 2020) .............................................................. 21

*Ctr. for Biological Diversity v. Haaland,*
998 F.3d 1061 (9th Cir. 2021) ............................................................ 47

*Chamber of Commerce of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ...................................................... 40, 41

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ........................................................................... 15

*City & Cnty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ...................................................... 44, 45

*City of Brookings Mun. Tel. Co. v. F.C.C.,*
822 F.2d 1153 (D.C. Cir. 1987) ......................................................... 46

*Crawford Fitting Co. v. J.T. Gibbons, Inc.,*
482 U.S. 437 (1987) ........................................................................... 21

*Dalton v. Specter,*
511 U.S. 462 (1994) ...................................................................... 41, 42

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) .................................................................. 53, 54

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ....................................................................... 43

*Diebold v. United States,*
947 F.2d 787 (6th Cir. 1991) ............................................................. 51

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................... 29

*Donahue v. United States,*
870 F. Supp. 2d 97 (D.D.C. 2012) ..................................................... 45

*E. Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ............................................................. 55

*E. Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) ...................................................... 40, 41

iv

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,*
485 U.S. 568 (1988) ............................................................. 31

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ............................................................. 50

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ....................................................... 23, 33

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................ 35, 39, 41, 43

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ............................................................. 35

*Georgia v. President of the United States,*
46 F.4th 1283 (11th Cir. 2022) ..................................... *passim*

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ............................................................. 32

*Hawaii v. Trump,*
878 F.3d 662 (9th Cir. 2017) ............................................. 40

*In re MCP No. 165,*
20 F.4th 264 (6th Cir. 2021) ............................................. 38

*Int'l Ladies Garment Workers Union v. Donovan,*
722 F.2d 795 (D.C. Cir. 1983) ............................................ 47

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014) ............................................. 14

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ....................................... *passim*

*Kentucky v. Biden,*
57 F.4th 545 (6th Cir. 2023) ............................................. 29

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) (en banc ............................. 14

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ............................................... 57

*Liberty Mut. Ins. Co. v. Friedman,*
639 F.2d 164 (4th Cir. 1981) ....................................... 15, 25

v

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ........................................... 19, 34, 36, 37

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................................... 57

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ..................................................... *passim*

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001) .................................................... 48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................. 49, 50, 51, 52

*NASA v. Nelson*,
  562 U.S. 134 (2011) ..................................................................... 37

*Nat'l R.R. Pass. Corp. v. Nat'l Ass'n of R.R. Pass.*,
  414 U.S. 453 (1974) ..................................................................... 21

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  142 S. Ct. 661 (2022) .............................................. 33, 34, 35, 36, 38

*Nat'l Urb. League v. Ross*,
  977 F.3d 770 (9th Cir. 2020) ................................................... 46, 50

*Nat. Res. Defense Council, Inc. v. U.S. E.P.A.*,
  683 F.2d 752 (3d Cir. 1982) ..................................................... 48, 49

*New Mexico v. Dep't of Interior*,
  854 F.3d 1207 (10th Cir. 2017) ..................................................... 23

*Noel v. N.Y.C. Taxi & Limousine Comm'n*,
  687 F.3d 63 (2d Cir. 2012) ........................................................... 27

*Pillai v. Civ. Aeronautics Bd.*,
  485 F.2d 1018 (D.C. Cir. 1973) ..................................................... 47

*Pub. Citizen v. U.S. Trade Representative*,
  5 F.3d 549 (D.C. Cir. 1993) ......................................................... 42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ..................................................................... 21

*S. Packaging & Storage Co. v. United States*,
  618 F.2d 1088 (4th Cir. 1980) ..................................................... 22

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) ................................................ 49

*Selia Law LLC v. Consumer Fin. Prot. Bureau,*
140 S. Ct. 2183 (2020) ..................................... 34, 43

*Sinclair v. City of Seattle,*
61 F.4th 674 (9th Cir. 2023) ............................... 13

*Taylor v. Westly,*
488 F.3d 1197 (9th Cir. 2007) .............................. 55

*Teva Pharms. USA, Inc. v. FDA,*
441 F.3d 1 (D.C. Cir. 2006) ................................. 49

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994) ............................................ 55

*U.S. Telecom Ass'n v. FCC,*
855 F.3d 381 (D.C. Cir. 2017) .............................. 33

*UAW-Labor Emp. & Training Corp. v. Chao,*
325 F.3d 360 (D.C. Cir. 2003) .............................. 15

*United States v. Easterday,*
564 F.3d 1004 (9th Cir. 2009) .............................. 28

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022) .............................. 33, 35, 38

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................... 54

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.,*
475 U.S. 282 (1986) ............................................ 38

*Woods Petroleum Corp. v. U.S. Dept. of Interior,*
18 F.3d 854 (10th Cir. 1994) ................................ 53

**Statutes**

5 U.S.C.:

§ 551(13) ............................................................ 41

§ 701(a) ............................................................. 43

§ 704 ................................................................. 39

§ 706(2) ...................................................................................... 45

§ 706(2)(A) ............................................................................... 39

28 U.S.C.:

§ 1291 ........................................................................................ 3

§ 1331 ........................................................................................ 3

29 U.S.C.:

§ 206(a)(1)(C) .......................................................................... 32

§ 218(a) ................................................................................... 32

40 U.S.C.:

§ 101 ................................................................................. *passim*

§ 101(1) ............................................................................ *passim*

§ 121(a) ............................................................................ *passim*

§ 3142(b) ........................................................................... 22, 32

41 U.S.C.:

§ 1707(a)(1) ............................................................................ 42

§ 6502(1) .......................................................................... 22, 32

§ 6703(1) .......................................................................... 22, 32

Fair Labor Standards Act of 1938,
    Pub. L. No. 75-718, 52 Stat. 1060 ..................................... 37

Federal Property and Administrative Services Act of 1949,
    Pub. L. No. 81-152, 63 Stat. 377 ..................................... 1, 3

**Rules**

Fed. R. App. P. 4(a)(1) ............................................................. 3

Ninth Circuit Rule 28 ............................................................... 3

**Regulations**

29 C.F.R. § 23.20 ............................................................... 24, 26

29 C.F.R. § 23.40(f) ................................................................ 25

29 C.R.R. § 23.220(a) .............................................................. 25

viii

Determination of the Acting OMB Director Regarding the Revised Safer
  Federal Workforce Task Force Guidance for Federal Contractors and
  the Revised Economy & Efficiency Analysis,
  86 Fed. Reg. 63418 (Nov. 16, 2021) ....................................................20

Establishing a Minimum Wage for Contractors,
  79 Fed. Reg. 60634 (Oct. 7, 2014) .............................................5, 18, 52

Minimum Wage for Contractors; Updating Regulations to Reflect
  Executive Order 13838, 83 Fed. Reg. 48537 (Sept. 26, 2018).........6, 19

Minimum Wage for Federal Contractors,
  86 Fed. Reg. 67126 (Nov. 24, 2021) ....................................1, 8, 29, 42

Minimum Wage for Federal Contractors,
  87 Fed. Reg. 59464 (Sept. 30, 2022) ..............................................1, 16

Notice of Rate Change in Effect as of January 1, 2022,
  86 Fed. Reg. 51683 (Sept. 16, 2021) ......................................................9

## Other Authorities

Bolton, Alexander, *The Eight Democrats Who Voted 'No' on $15
  Minimum Wage*, The Hill (Mar. 5, 2021),
  https://tinyurl.com/neoog1141 ..............................................................7

Commission on Organization of the Executive Branch of the
  Government, Office of General Services 1 (1949) .................................4

Exec. Order No. 13658, 79 Fed. Reg. 9851 (2014) ...........................1, 5, 9

Exec. Order No. 13838, 83 Fed. Reg. 25341 (2018) .............................6, 9

Exec. Order No. 14026, 86 Fed. Reg. 22835 (2021) ........................ *passim*

H.R. 603, 117th Cong. (2021) ...................................................................6

Joe Biden Campaign Speech Transcript Atlanta, GA, Rev (Oct. 27,
  2020), https://tinyurl.com/ksvspddc.......................................................6

Newman, Meredith & Baker, Karl, *Joe Biden Calls For $15 Minimum
  Wage, Medicare Public Option at First 2020 Campaign Stop*, The
  News Journal (Apr. 29, 2019), https://tinyurl.com/2mhtm9u7.............6

Niedzwiadek, Nick, *The Minimum Wage Fight That Will Define the
  Decade*, POLITICO (Mar. 22, 2023), https://tinyurl.com/4kzchj6a ....36

S. Rep. No. 89-798 ...................................................................................21

Scalia, Antonin & Garner, Bryan, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ........................................................................ 21

Statement by President Biden on $15 Minimum Wage for Federal Workers and Contractors Going into Effect, The White House (Jan. 28, 2022), https://tinyurl.com/e3wf8s2f .......................................... 8, 54

Webster's New International Dictionary (2d ed. 1959) .......................... 30

# INTRODUCTION

Seventy-four years ago, Congress enacted the Federal Property and Administrative Services Act (the "Procurement Act") to centralize federal government procurement in a new agency. Pub. L. No. 81-152, 63 Stat. 377 (1949). The Act gives the President supervisory powers over the procurement system, and until nine years ago, no President thought this authority included the power to make federal contractors raise their wages. That changed in 2014 when the Obama Administration cited the statute in mandating a $10.10 per hour minimum wage for federal contractors that included annual inflation-based increases. Exec. Order No. 13658, 79 Fed. Reg. 9851 (2014).

Shortly after taking office, President Biden made a 33-percent overnight increase in this minimum wage, raising it to $15.00. Exec. Order No. 14026, 86 Fed. Reg. 22835 (2021) (the "Wage Mandate Executive Order"); Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 67126, 67126 (Nov. 24, 2021). Earlier this year, the minimum wage jumped another eight percent to $16.20 due to inflation. Minimum Wage for Federal Contractors Covered by Executive Order 14026, 87 Fed. Reg. 59464 (Sept. 30, 2022). It now exceeds the minimum wage required in every state. *Compare id. with* State Minimum Wage Laws, U.S. Department of Labor (last accessed June 19, 2023), https://tinyurl.com/3cxjutrn.

The Procurement Act does not authorize the President to force a minimum wage on the Government's contracting partners. This Court

requires a nexus between Procurement Act policies and economy and efficiency, *Mayes v. Biden*, 67 F.4th 921, 940 (9th Cir. 2023), but the federal contractor minimum wage ("Wage Mandate") makes contractors less economical and efficient. It burdens federal contractors with $1.7 billion in extra expenses every year. *See* p. 8, *infra*. And those expenses are not offset by efficiency benefits accruing to either contractors or the Government. The policy is also invalid under the major questions doctrine. Nothing in the Act signals congressional approval for the Executive to decide a question of such significance. In addition, the Department of Labor's rule implementing the Wage Mandate violated the Administrative Procedure Act ("APA"). The Department acted arbitrarily and capriciously and contrary to law in failing to explain its decision, not considering alternatives, and not substantiating its judgment that the policy furthers economy and efficiency.

A share of the Wage Mandate's annual cost will be absorbed by States, which partner with the Government through contracts. The States of Nebraska, Idaho, Indiana, and South Carolina ("Plaintiffs") sued in the U.S. District Court for the District of Arizona to vindicate their right to set their own employees' wages. The district court dismissed Plaintiffs' claims and should be reversed. Plaintiffs are entitled to a preliminary injunction enjoining Defendants' enforcement of the Wage Mandate.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on January 6, 2023. ER-28. Plaintiffs filed a timely notice of appeal on February 7, 2023. ER-125; *see* Fed. R. App. P. 4(a)(1).

## STATEMENT AS TO ADDENDUM

As permitted by Ninth Circuit Rule 28-2.7, Plaintiffs set forth pertinent statutes and an executive order verbatim and with appropriate citation in an addendum.

## ISSUES PRESENTED

The issues presented are:

1.  Whether the Wage Mandate exceeds the Executive's Procurement Act authority.

2.  Whether the Wage Mandate violates the major questions doctrine.

3.  Whether the Department of Labor's rule implementing the Wage Mandate violates the APA.

4.  Whether Plaintiffs are entitled to a preliminary injunction.

## STATEMENT OF THE CASE

## I.  Background

A.  Congress enacted the Procurement Act in 1949 as a response to inefficiency in federal government contracting. Pub. L. No. 81-152, 63 Stat. 377 (1949); *cf.* 40 U.S.C. § 101. During World War II, the "lack of centralized coordination" caused "many agencies [to] enter [into]

duplicative contracts supplying the same items and creat[ed] a massive post-war surplus." *Kentucky v. Biden*, 23 F.4th 585, 606 (6th Cir. 2022). A congressional commission studied the problem and concluded the federal procurement process suffered "from a lack of central direction." *Georgia v. President of the United States*, 46 F.4th 1283, 1293 (11th Cir. 2022) (op. of Grant, J.) (quoting Commission on Organization of the Executive Branch of the Government, *Office of General Services* 1 (1949)). The Commission proposed a new agency to coordinate purchasing and other housekeeping activities to minimize waste. *Id.* Congress accepted that recommendation and created the General Services Administration in passing the Act. *Id.*

While centralizing procurement authority in a new agency, the Act gives the President supervisory responsibility. It provides: "The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle." 40 U.S.C. § 121(a). "[T]his subtitle" refers to almost two hundred code sections in Titles 40 and 41. *Georgia*, 46 F.4th at 1293. As is relevant to this dispute, one referenced code section memorializes the Act's purpose. It states: "The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities: Procuring and supplying property and nonpersonal services, and performing related functions including contracting . . . ." 40 U.S.C. § 101.

4

B.     Relying on a connection between the Act's presidential powers and purpose sections, President Obama signed an executive order in 2014 directing the Department of Labor to impose a minimum wage on federal contractors. Exec. Order No. 13658, 79 Fed. Reg. 9851. The order explained it "s[ought] to increase efficiency and cost savings in the work performed by parties who contract with the Federal Government by increasing to $10.10 the hourly minimum wage paid by those contractors." *Id.* § 1. The Department of Labor (the "Department") engaged in notice-and-comment rulemaking to implement the order. *See* Establishing a Minimum Wage for Contractors, 79 Fed. Reg. 60634, 60636 (Oct. 7, 2014). In response, it received positive comments as well as "submissions . . . expressing strong opposition to the Executive Order and questioning its legality and stated purpose." *Id.*

Ultimately, the Department promulgated regulations requiring federal agencies to insert terms into their contracts obligating contractors to pay a federal contractor minimum wage. *Id.* at 60724-25. These regulations also required agencies to force contractors to make certain subcontractors pay the same minimum wage. *Id.* at 60724-25, 60731. Consistent with the order, the Department set the initial minimum wage at $10.10 per hour and provided for annual inflation-based increases. *Id.* at 60724. The Department estimated its rule would cost federal contractors $100.2 million in its first year and $501 million per year once fully implemented in 2019. *Id.* at 60693.

Four years later, President Trump partially reversed course. He issued an executive order exempting certain recreational services providers from the Obama Administration's minimum wage. Exec. Order No. 13838, 83 Fed. Reg. 25341 (2018). A final rule issued several months later implemented that order. Minimum Wage for Contractors; Updating Regulations to Reflect Executive Order 13838, 83 Fed. Reg. 48537 (Sept. 26, 2018).

C.    As a candidate for President, Joe Biden promised to raise the nationwide minimum wage to $15.00. He unveiled the policy the same day he announced his candidacy and campaigned on the position until the end. Meredith Newman & Karl Baker, *Joe Biden Calls For $15 Minimum Wage, Medicare Public Option at First 2020 Campaign Stop*, The News Journal (Apr. 29, 2019), https://tinyurl.com/2mhtm9u7. Days before the election, Candidate Biden told a Georgia audience: "We're going to pass a national $15 an hour minimum wage." *Joe Biden Campaign Speech Transcript Atlanta, Georgia*, Rev (Oct. 27, 2020), https://tinyurl.com/ksvspddc.

After taking office, delivering on the $15.00 minimum wage promise became an immediate legislative priority for the White House. The Raise Wage Act of 2021 was introduced in the U.S. House eight days after President Biden's term began. *See* H.R. 603, 117th Cong. (2021). However, the effort collapsed about five weeks later when the U.S. Senate "resoundingly defeated" a $15.00 minimum wage in a bipartisan 58-42

vote. Alexander Bolton, *The Eight Democrats Who Voted 'No' on $15 Minimum Wage*, The Hill (Mar. 5, 2021), https://tinyurl.com/neoog1141.

Undeterred, President Biden issued an executive order the next month raising the Obama Administration federal contractor minimum wage to $15.00. Exec. Order No. 14026, 86 Fed. Reg. 22835. The order also revoked President Trump's exemptions. *Id.* § 6. Similar to the Obama executive order, President Biden's order concluded that the policy "promote[d] economy and efficiency in Federal procurement by increasing the hourly minimum wage paid by the parties that contract with the Federal Government to $15.00." *Id.* § 1. For support, the order added: "Raising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.*

Under the Wage Mandate Executive Order, the Department had final responsibility for deciding the Wage Mandate's scope. The order made itself applicable to "contracts and contract-like instruments" "as defined in regulations" issued by the Department. *Id.* at § 2(a). The Department's regulations were required to "include both definitions of relevant terms and, as appropriate, exclusions from the requirements of this order." *Id.* § 4(a). The order expressed a preference for the "definitions, principles, procedures, remedies, and enforcement processes" in certain statutes and President Obama's order but did not mandate their

incorporation. *Id.* § 4(c). Highlighting the Department's authority, the order reiterated that it "shall not apply to . . . any contracts or contract-like instruments expressly excluded by the regulations issued" by the Department. *Id.* § 8(c).

The Department of Labor engaged in notice-and-comment rulemaking. 86 Fed. Reg. at 67126. As with the Obama Administration rulemaking, the Department received a mix of comments including multiple comments "expressing strong opposition" to the executive order and "questioning its legality and stated purpose." *Id.* at 67129. In the end, the Department promulgated a rule (the "Wage Mandate Rule") increasing the federal contractor minimum wage to $15.00 and providing for annual inflation-based increases. *Id.* at 67227. This increase more than tripled the policy's cost for federal contractors relative to the Obama Administration federal contractor minimum wage. The Department estimated federal contractors would pay $1.7 billion every year in extra expenses. *Id.* at 67194. When the Department's rule took effect on January 30, 2022, President Biden described it as "a down payment" on his campaign "pledge" to raise the nationwide minimum wage. *Statement by President Biden on $15 Minimum Wage for Federal Workers and Contractors Going into Effect*, The White House (Jan. 28, 2022), https://tinyurl.com/e3wf8s2f.

D.   The Wage Mandate strained budgets for federal contractors.

The minimum wage jumped by 33 percent overnight, rising from $11.25

8

under Obama Administration rules to $15.00. *Cf.* Minimum Wage for Federal Contracts Covered by Executive Order 13658, Notice of Rate Change in Effect as of January 1, 2022, 86 Fed. Reg. 51683, 51684 (Sept. 16, 2021) (raising wage to $11.25). The Wage Mandate's effects were especially pronounced for federal contractors in Nebraska, Idaho, Indiana, and South Carolina. Nebraska, Idaho, and Indiana all had minimum wages between $7.25 and $9.00 per hour when the Wage Mandate took effect. ER-99. South Carolina had no state-specific minimum wage. ER-99.

The Wage Mandate affects States in multiple ways including in their capacities as federal contractors. For example, the Idaho Department of Fish and Game enters into cooperative agreements with the federal Department of Energy and Department of the Interior to improve salmon and steelhead fisheries. ER-30. Idaho State University contracts with the federal government to provide research on advanced energy, cyber security, and security of natural resources, among other things. ER-85. Both entities were required to raise the wage paid to multiple employees because of the Wage Mandate. ER-32, ER-85. Because of limits to state government budgets, the Wage Mandate forced the States to "offset this cost" with funds marked for operating expenses. *E.g.*, ER-35. States also suffered financial injuries because they received reduced tax revenue from federal contractors suffering under the Wage Mandate and

9

paid unemployment benefits to workers adversely affected by the policy. ER-10.

## II. Procedural History

Less than two weeks after the Wage Mandate took effect, the States of Nebraska, Arizona, Idaho, Indiana, and South Carolina filed a complaint challenging the Wage Mandate in the U.S. District Court for the District of Arizona. ER-122. Plaintiffs' six-count complaint alleged that the Wage Mandate violated the Procurement Act, the APA, the major questions doctrine, the non-delegation doctrine, and the Spending Clause. ER-113-21. It named as defendants the President, the Secretary of Labor, the Acting Administrator of the Department's Wage & Hour Division, the Department of Labor, and the Wage & Hour Division. ER-97.

In April 2022, Plaintiffs moved for a preliminary injunction seeking immediate relief from the Wage Mandate's enforcement. ER-148. Defendants opposed Plaintiffs' motion and moved to dismiss the complaint or in the alternative for summary judgment. ER-145. The district court heard argument on the parties' motions in July 2022. ER-04, ER-140-41.

On January 6, 2023, the district court entered an order denying Plaintiffs' motion and dismissing the case. ER-27. The district court held that Plaintiffs had standing both in their capacity as federal contractors and because of the Wage Mandate's effect on state tax revenue and unemployment benefits. ER-10. On the merits, the court held that the Wage

Mandate did not violate the Procurement Act. ER-10-19. The court concluded that the Wage Mandate's productivity and morale benefits provided a sufficient nexus to federal procurement economy and efficiency. ER-12-14. It did not apply the major questions doctrine because it concluded the Wage Mandate's economic impact was not large enough. ER-15-16. The district court also rejected the application of the constitutional avoidance canon and federalism canon. ER-17.

After dismissing Plaintiffs' Procurement Act claims, the district court held that the APA did not apply to Plaintiffs' challenge because the Wage Mandate Rule implemented an order of the President. ER-19-22. The district court dismissed Plaintiffs' non-delegation doctrine claim, concluding the Procurement Act's economy and efficiency standard supplied a constitutionally adequate "intelligible principle." ER-22-24. Finally, the district court dismissed Plaintiffs' Spending Clause claim by limiting the application of that doctrine to federal grants to States. ER-24-26.

Nebraska, Idaho, Indiana, and South Carolina timely appealed. ER-124-25. Arizona transitioned in attorneys general in January 2023 and did not appeal.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's dismissal of Plaintiffs' claims and order the court to enter a preliminary injunction. *First*, Defendants lack authority under the Procurement Act to issue the Wage

Mandate. This Court requires a nexus between Procurement Act policies and federal procurement economy and efficiency, but Defendants have not made that showing. *See Mayes*, 67 F.4th at 940. Raising contractors' costs makes them *less* economical and efficient. The Department of Labor even acknowledged the likelihood that government expenditures would rise—not fall—because of the policy. The Wage Mandate also goes beyond Procurement Act authority because it overrides specific federal contractor minimum wage statutes. In addition, the Wage Mandate's application to subcontractors, lessors, licensees, and permittees is unlawful. None of those entities have a procurement or supplier relationship with the Government.

*Second*, the Wage Mandate is invalid under the major questions doctrine. That doctrine applies to statutes like the Procurement Act that delegate power to the President. And it applies to the Wage Mandate because the policy addresses a subject of vast economic and political significance despite the absence of a statute clearly delegating decisionmaking authority on that question.

*Third*, the Wage Mandate Rule violates the APA. The district court erred in holding that the APA does not apply to final agency actions implementing executive orders. Indeed, this Court has previously reviewed agency actions implementing presidential directives. However, even if executive orders could insulate agency rules from APA review, this one did not. President Biden's order explicitly vested the Department of Labor

12

with discretion to create "exclusions" "as appropriate." Exec. Order No. 14026, § 4, 86 Fed. Reg. at 22836. At a minimum, the Department's exercise of that authority is subject to APA review. On the merits, the Rule violates the APA because it is arbitrary and capricious and contrary to law. The Department refused to consider alternatives, failed to provide a reasoned basis for its judgment, and did not consider the Rule's impact on States. Its conclusion that the Rule's benefits would offset its cost was incorrect and unsubstantiated. It also was pretext for the Administration's end-run around Congress's rejection of a $15.00 nationwide minimum wage.

*Fourth*, Plaintiffs are entitled to a preliminary injunction. In addition to showing a likelihood of success on the merits, Plaintiffs established irreparable harm and demonstrated that the balance of the equities and public interest favor an injunction. Plaintiffs' economic injury is ongoing and cannot be remedied through money damages. This Court should direct the district court to issue a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss for failure to state a claim, "tak[ing] all allegations of fact as true and constru[ing] them in the light most favorable to the nonmoving party." *Sinclair v. City of Seattle*, 61 F.4th 674, 678 (9th Cir. 2023). The denial of a motion for a preliminary injunction is reviewed for abuse of

discretion with underlying interpretations of law reviewed *de novo*. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 958-59 (9th Cir. 2014).

A preliminary injunction requires a showing that (1) the plaintiff is likely to prevail on the merits of its substantive claims, (2) the plaintiff is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Id*. at 958. "An abuse of discretion will be found if the district court based its decision 'on an erroneous legal standard or clearly erroneous finding of fact.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)).

## ARGUMENT

## I.   The Wage Mandate Is Likely *Ultra Vires*.

This Court has held that "[t]he Procurement Act empowers the President to 'prescribe policies and directives that the President considers necessary to carry out' the statute's objective of 'provid[ing] the Federal Government with an economical and efficient system' for '[p]rocuring . . . nonpersonal services, and performing related functions including contracting.'" *Mayes*, 67 F.4th at 940 (alterations and ellipses in original) (quoting 40 U.S.C. §§ 101, 121(a)). The Wage Mandate goes beyond this grant of authority in multiple ways. It lacks the required nexus to economy and efficiency. It overrides specific statutes requiring the application

14

of a different minimum wage to contractors covered by the Wage Mandate. And it exceeds the Procurement Act by controlling wages paid by entities that have no procurement or supplier relationship with the federal government. In addition, the Wage Mandate is invalid for reasons that this Court rejected in *Mayes*.

## A. The Wage Mandate does not promote economy and efficiency.

For the Wage Mandate "to have the force of law, 'it is necessary to establish a nexus between [it] and some delegation of the requisite legislative authority by Congress.'" *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979)). *Mayes* did not decide the exact nexus required, but it cited approvingly standards used in the Fourth and D.C. Circuits. *See id.* at 940. "The Fourth Circuit requires a finding that the executive branch policies are 'reasonably related to the Procurement Act's purpose.'" *Id.* (quoting *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981)). "The D.C. Circuit requires a 'sufficiently close nexus' between [the] order . . . and the statutory goals of economy and efficiency." *Id.* at 940 (quoting *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003)). To be sure, "'economy' and 'efficiency' are not narrow terms," but this Court still reads the terms to impose a "clear textual limiting principle." *Id.* at 940, 942. "'[E]conomy' and 'efficiency' . . . encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.*

at 940 (quoting *Am. Fed'n Lab. Cong. Indus. Orgs. v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979)). Actions that "restrain procurement costs" and generate "likely savings to the Government" satisfy this standard. *Kahn*, 618 F.2d at 793.

1.     Under either the "reasonably related" or "sufficiently close" standards, the Wage Mandate lacks a nexus to economy and efficiency. Federal contractors do not become more economical or efficient under the Wage Mandate. The Department of Labor estimates the policy will cost its contractors $1.7 billion annually. 86 Fed. Reg. at 67194, 67209. Over the next decade, contractors will spend more than $18 billion on the Wage Mandate. *Id.* at 67210. If anything, this total understates the Wage Mandate's cost. The Department admits its estimate excludes "spillover costs" in raised wages for workers already making more than $15.00 per hour. *Id.* at 67194. In addition, because the Wage Mandate requires annual inflation-based increases, its total cost will continue to swell over time. *Id.* at 67223. At the beginning of this year, the Department raised the wage eight percent to $16.20. Minimum Wage for Federal Contractors, 87 Fed. Reg. 59464 (Sept. 30, 2022).

On the other side of the ledger, the Department claimed benefits in the form of "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, increased equity, and reduced poverty and income inequality for Federal contract workers." 86 Fed. Reg. at 67212. Many of these benefits have nothing to do with

16

economy and efficiency. *See* p. 52-53, *infra*. Regardless, the asserted benefits do not make up for the Wage Mandate's substantial costs. The Executive has not made and cannot make that showing. Citing "uncertainty and data limitations," the Department admits its failure to "quantify benefits of this rulemaking." 86 Fed. Reg. 67212. The President's executive order also does not substantiate its *ipse dixit* that the mandate promotes economy and efficiency. *See generally* Exec. Order No. 14026, § 1, 86 Fed. Reg. at 22835. The conclusion that benefits will offset the Wage Mandate's $1.7 billion annual cost is both unsupported and unbelievable.

In addition to failing to improve economy and efficiency for contractors, the Wage Mandate does not make federal government procurement more economical or efficient. If the benefits flowing to the Government from the Wage Mandate (e.g., increases in contractor productivity) exceeded its cost to the Government, overall procurement costs would fall. But instead, the Wage Mandate *increases* government expenses. The Department admits that "Government expenditures may rise" if "contractors pass along part or all of the increased cost to the government in the form of higher contract prices." 86 Fed. Reg. at 67206; *id.* at 67208 (discussing "cost pass-throughs to the government"). Adding support for that concern, the Department notes that the "literature tends to find that minimum wages result in increased prices." *Id.* at 67206. The Wage Mandate lacks a nexus to economy and efficiency in federal procurement. If anything, it counters that objective.

2. The district court accepted Defendants' conclusion that the Wage Mandate's benefits offset its costs by comparing the mandate to other exercises of Procurement Act authority. ER-012, ER-014. However, none of the policies examined by the district court cost federal contractors $18 billion every ten years. Those orders required contractors to inform employees of rights, verify employees' eligibility to work in the United States, refrain from race-based discrimination, and use affirmative action. ER-012, ER-014. *Kahn*, also cited by the district court, involved the Wage Mandate's opposite. The *Kahn* order set a ceiling—not a floor—on "noninflationary price increases" and workers' "noninflationary wage increases." 618 F.2d at 786. While the court noted that some low bidders might not receive contracts as a result, *Kahn* concluded that "the direct and immediate effect" of price ceilings would "hold[] down the Government's procurement costs." *Id.* at 792. "[T]he Government will face lower costs in the future than it would have otherwise." *Id.* at 793. The Department cannot reach the same conclusion on the Wage Mandate.

The Biden Administration's federal contractor minimum wage has no analogue. The Wage Mandate more than *triples* federal contractors' annual costs relative to the contractor minimum wage set by the Obama Administration. *Compare* 86 Fed. Reg. at 67194 ($1.7 billion annual cost), *with* 79 Fed. Reg. at 60693 (estimating $100.2 million in annual transfer payments in 2015 and $501 million in annual transfer payments when fully implemented in 2019). The Trump Administration's curtailment of

18

the minimum wage also does not provide support. In revoking the minimum wage for certain recreational services providers, the Trump Administration recognized that removing the minimum wage "translates into . . . more affordable guided tours and recreational services." 83 Fed. Reg. at 48540. "Lowering the cost of business . . . could incentivize small outfitters to enter the market." *Id.* "Likewise, it could also incentivize existing outfitters to hire more guides and to increase the hours of current employees." *Id.* The Biden Administration's substantial increase to the minimum wage is at odds with this reasoning.

The district court also erred in blindly accepting the Executive's economy and efficiency analysis. If courts must accept the Executive's conclusion that the Wage Mandate will raise employee productivity and morale enough to offset billions of dollars in costs, the President could impose any number of expensive requirements on contractors. Mandatory paid leave, healthcare benefits, pension plans, and tuition reimbursement all might raise morale or otherwise indirectly benefit the Government. *Cf. Louisiana v. Biden*, 55 F.4th 1017, 1031-32 (5th Cir. 2022) (explaining that under the Government's interpretation, the President would be able to require contractors to "certify that their employees take daily vitamins, live in smoke-free homes, [and] exercise three times a week"). Could the Biden Administration make another 33-percent overnight increase to the minimum wage? Such questions are unanswerable under the district court's uncritical treatment of the Wage Mandate.

19

3. *Mayes*'s determination that a COVID-19 vaccine mandate promotes economy and efficiency also does not support the federal contractor minimum wage. *See* 67 F.4th at 940. Unlike the Wage Mandate, the vaccine mandate imposed *de minimis* pecuniary costs on federal contractors. The Biden Administration concluded: "Because vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status." Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63418, 63422 (Nov. 16, 2021). Accordingly, this Court could find that the vaccine mandate would "save labor costs on net" by comparing the benefit of "decrease[d] worker absence" to the mandate's virtually non-existent monetary costs to contractors. *Mayes*, 67 F.4th at 940. By contrast, the Wage Mandate imposes substantial financial costs—measured in the billions—that federal contractors will pay in perpetuity. The Wage Mandate does not promote economy and efficiency for federal contractors or the federal procurement system.

## B. The Procurement Act does not authorize the President to override state minimum wage laws.

Even if the Wage Mandate had the required nexus to economy and efficiency, the Executive cannot use the Procurement Act's highly

20

generalized authority to override specific statutes governing federal contractor minimum wages. "[R]elated statutes should be construed as if they were one law." *California v. Trump*, 963 F.3d 926, 947 n.15 (9th Cir. 2020) (quotation marks omitted); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012). "[I]t is a commonplace of statutory construction that the specific governs the general. That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (alteration in original) (citations and quotation marks omitted); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). In addition, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *National R.R. Pass. Corp. v. Nat'l Ass'n of R.R. Pass.*, 414 U.S. 453, 458 (1974) (quotation marks omitted).

Congress has specifically determined in three statutes what minimum wage the federal government should require its contractors to pay. The Davis-Bacon Act, Walsh-Healey Public Contracts Act, and McNamara-O'Hara Service Contract Act speak comprehensively[1] and

---

[1] When Congress passed the Service Contract Act it did so because "[t]he service contract is the only remaining category of Federal contracts to which no labor standards protection applies." S. Rep. No. 89-798 at 1 (1965).

directly to the same problem addressed by the Wage Mandate. All three statutes require payment of a local "prevailing" wage, not a fixed nation-wide rate. *See* 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1), 6703(1). Each has its own regulatory scheme, provides for exceptions, and is designed for a particular context. Defendants' reading of the Procurement Act wrongly presumes a congressional intention to authorize the Executive to nullify and override these three statutes.

The district court concluded the Wage Mandate did not "conflict" with these statutes because they "set floors for the wages of contractors' employees," not "'unambiguous commands' that wages cannot be higher than those wages prevailing locally." ER-017. *First*, the Wage Mandate and these statutes do conflict. Both speak to what minimum wage the Government will require its contractors to pay, and they require different standards. Locally prevailing wages control under the statutes. *See* 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1); 6703(1). Congress recognized that federal contractors in Omaha should not be required to pay New York's minimum wage. *Cf. S. Packaging & Storage Co. v. United States,* 618 F.2d 1088, 1092 (4th Cir. 1980) (holding that, when calculating the prevailing wage for purposes of the Service Contract Act, "the locality in which wage determinations should be made is where the work is to be performed"). But the Wage Mandate implicitly rejects Congress's judgment, substituting locally prevailing wages with a one-size-fits-all

nationwide floor that presently exceeds every state's minimum wage. *See* p. 1, *supra*.

*Second*, it is not enough that federal contractors can comply with both these statutes and the Wage Mandate. Of course, nothing prevents employers from paying wages above the statutory floor, and many do. Instead, these three statutes bear on the Procurement Act's meaning because they make it "implausible" that the Act authorizes the Executive "to create an alternative to the explicit and detailed . . . scheme" Congress provided. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017). "Had Congress intended to give such power to the [President], . . . it would have done so in a clear manner; instead, it undertook to balance those interests itself." *Id.* Congress's choice to answer the question of federal contractor minimum wages through specific statutes defeats Defendants' contention that Congress also intended to authorize the Executive to set a different floor for a federal contractor minimum wage.[2]

---

[2] This is especially true because Congress enacted the Service Contract Act in 1965, sixteen years after it passed the Procurement Act. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("[T]he implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." (citation and quotation marks omitted)).

## C.    The Procurement Act does not apply to subcontractors, lessors, licensees, and permittees.

The district court also erred in allowing the Executive to apply the Wage Mandate to entities that have no procurement or supplier relationship with the federal government. Under *Mayes*, the Procurement Act authorizes policies that "provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and . . . contracting." 67 F.4th at 926 (alterations in original) (quoting 40 U.S.C. § 101(1)). "The statute was designed to" improve "the public procurement process." *Kahn*, 618 F.2d at 787. It does not authorize the Government to go outside that context and regulate minimum wages paid by federal government subcontractors, lessors, licensees, and permittees.

1.    The Wage Mandate exceeds the Procurement Act's authority by covering subcontractors. *See* 29 C.F.R. § 23.20; *see also* 86 Fed. Reg. at 22835 (directing that the Wage Mandate "shall" be incorporated into covered "subcontracts"). The Act applies to "[p]rocuring and supplying" for "the Federal Government," 40 U.S.C. § 101(1), but subcontractors do not have a procurement or supplier relationship with the Government. The exercise of federal control over wages paid by contractors' agents is not "consistent with" the Act or "necessary to carry [it] out." 40 U.S.C. § 121(a). Moreover, the connection between wages paid by subcontractors and procurement economy and efficiency is too attenuated.

24

Affirming the district court would create a split with the Fourth Circuit, which rejected the Executive's attempted application of affirmative action requirements to subcontractors through the Procurement Act. *Liberty Mutual*, 639 F.2d at 171. The *Liberty Mutual* plaintiff, an insurer for a federal contractor, "[was] not itself a federal contractor and there [was], therefore, no direct connection to federal procurement." *Id.* The indirect "connection" argued also was "simply too attenuated . . . to find the requisite connection" to procurement. *Id.* Defendants appear to believe that raising wages for subcontractors' employees will set off a chain reaction ultimately making government procurement more economical and efficient. Under this theory, higher wages boost subcontractors' employees' productivity and morale, which improves the performance of subcontracts, which improves the performance of contracts, which benefits the Government in the end. Whatever diluted benefit reaches the Government is "simply too attenuated" to justify the cost that the Wage Mandate imposes on subcontractors. *Id.*[3]

---

[3] The Wage Mandate limits it application to a subcontractors' employees who spend at least 20 percent of their time working "in connection with" a covered contract. ER-018 (citing 29 C.F.R. §§ 23.40(f), 23.220(a)). However, that difference in degree from the insurance company subcontractor in *Liberty Mutual* does not establish a procurement or supplier relationship with the federal government. Nor does it explain whether the Government will receive a sufficient benefit in the end that offsets its substantial imposition on subcontractors.

The district court also worried that failing to apply the Wage Mandate to subcontractors could create a loophole for government contractors to evade the Wage Mandate. ER-018. That concern does not permit a court to rewrite the Procurement Act to cover entities lacking a procurement or supplier relationship with the federal government. But even if Procurement Act policies could govern subcontractors evading the Wage Mandate, the Wage Mandate does not tailor its subcontract definition to this concern. The Government's logic has no limiting principle and, if accepted, could bring wide swaths of the United States economy under the Executive's control. Nothing in the Government's reasoning requires it to stop with federal contractors' suppliers or explains why the entities with which subcontractors deal also could not be included in future Procurement Act policies.

2. The Wage Mandate also goes beyond the Procurement Act by covering the federal government's lessors, licensees, and permittees. The Wage Mandate applies to "any . . . type of agreement," including "lease agreements, cooperative agreements, provider agreements, intergovernmental service agreements, service agreements, licenses, permits," "contract[s] for concessions," and contracts "entered into with the Federal Government in connection with Federal property or lands and related to offering services." 29 C.F.R. §§ 23.20, 23.30(a)(1). The federal government's lessors, licensees, and permittees do not have a procurement or supplier relationship with the federal government. The only thing they

26

supply the Government with is a check, and that link is not enough to subject them to the Wage Mandate.

The district court disagreed because the Procurement Act's purpose includes "supplying property and nonpersonal services" and the Government's lessors, licensees, and permittees supply such things. ER-018 (quoting 40 U.S.C. §§ 101, 121(a)) (emphasis omitted). However, the Act's "purpose . . . is to provide the *Federal Government* with an economical and efficient system for . . . supplying property and nonpersonal services." 40 U.S.C. § 101(1) (emphasis added). These entities do not provide their goods and services to the federal government. They use their government leases, licenses, and permits to provide goods and services to their customers. Those transactions have no relevance to the Procurement Act. "An activity does not become a program or activity of a public entity merely because it is licensed by the public entity." *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 70 (2d Cir. 2012) (quotation marks omitted). At a minimum, this Court should hold that the Wage Mandate does not apply to subcontractors, lessors, licensees, and permittees.

**D.    The Wage Mandate is invalid for additional reasons rejected in *Mayes*.**

The Wage Mandate exceeds the Executive's Procurement Act authority in other ways that are inconsistent with *Mayes*.[4] The Procurement Act's purpose section does not expand the President's powers under the Act. Even if it did, the Act would limit his power to regulating the government's procurement system—not individual contractors' conduct. Finally, the avoidance canon and federalism canon apply to the Act and provide an additional reason that the Wage Mandate is *ultra vires*.

1.    The Procurement Act does not authorize the President to make policies that he concludes will generally promote economy and efficiency in federal procurement. The Act provides that "[t]he President may prescribe policies and directives that the President considers necessary to carry out this subtitle," i.e., the Procurement Act. 40 U.S.C. § 121(a). And the Act states its "purpose . . . is to provide the Federal Government with an economical and efficient system for" federal procurement. *Id.* § 101(1). But the district court erred in linking the two and presuming that the President "carr[ies] out [the Procurement Act]" by making a directive that he deems consistent with the statute's purpose. *Id.* § 121(a); ER-011 (declining to follow *Georgia*, 46 F.4th at 1293-1301).

―――――――――――――

[4] For the avoidance of doubt, Plaintiffs recognize that *Mayes* binds panels of this Court. *See United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2009). Plaintiffs reserve the right to argue that *Mayes* should be overruled for the reasons provided in this subpart and Part II.

Properly understood, the Procurement Act "empowers the President to issue directives necessary to effectuate the [Procurement] Act's substantive provisions, not its statement of purpose." *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023); *see also Kentucky*, 23 F.4th at 604; *Georgia*, 46 F.4th at 1298 (op. of Grant, J.). He can make policies instructing how the "lengthy" statutes setting out procurement-related authority for the General Services Administration, its administrator, and other agencies and officials are carried out. *Georgia*, 46 F.4th at 1293 (op. of Grant, J.). However, he does not have "free-wheeling authority to issue any order he wishes relating to the federal government's procurement system." *Id.*

Section 101 reflects *Congress's* overall purpose for the Act. "A statutory statement of purpose provides no legal authority." *Kentucky*, 57 F.4th at 551; *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008) ("[A] prefatory clause does not limit or expand the scope of the operative clause."). "A preamble no doubt contributes to the general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers . . . ." *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977). Accordingly, the Executive cannot claim authority for the Wage Mandate based on its asserted purpose of "bolster[ing] economy and efficiency in Federal procurement." 86 Fed. Reg. at 67126 (quoting Exec. Order No. 14026, § 1, 86 Fed. Reg. at 22835)).

29

2.     Even if the Act's purpose did expand the President's Procurement Act power, his authority would only apply to policies for the procurement "system." 40 U.S.C. § 101(1). The Act's "purpose . . . is to provide the Federal Government with an economical and efficient *system* for . . . [p]rocuring and supplying property and nonpersonal services." *Id.* (emphasis added). "'System,' in context, refers to '[a] formal scheme or method of governing organization, arrangement.'" *Kentucky*, 23 F.4th at 604 (alterations in original) (quoting *System*, Webster's New International Dictionary 2562 (2d ed. 1959)). "And 'procure' means '[t]o bring into possession; to acquire; gain; get; to obtain by any means, as by purchase or loan.'" *Id.* (alterations in original) (quoting *Procure*, Webster's New International Dictionary 1974 (2d ed. 1959)). The President may have authority to improve the "method of contracting," but nothing in the statute suggests he can try to improve the economy and efficiency of federal contractors or their employees. *Id. But see Mayes*, 67 F.4th at 941.

This interpretation better aligns the statute with Congress's intent. The Act was the product of a federal commission aiming to improve the procurement process after World War II left the Government with a sizable surplus of property. *See Georgia*, 46 F.4th at 1293 (op. of Grant, J.); *Kentucky*, 23 F.4th at 606. That surplus was believed to be the product of a "wartime procurement free-for-all" that permitted "many agencies [to] enter [into] duplicative contracts supplying the same items." *Kentucky*, 23 F.4th at 606 (quotation marks omitted). In passing the Act, it was

Congress's intent to "integrate[] and centraliz[e] procurement responsibility," *id.*, and to "coordinate purchasing . . . [in order to] avoid waste," *Georgia*, 46 F.4th at 1293 (op. of Grant, J.) (quotation marks omitted).

"[N]o one seems to have envisioned the [Procurement] Act as a latent well of authority to order the . . . enhancement of contractor employees to make *them* more 'economical and efficient.'" *Kentucky*, 23 F.4th at 606. The Procurement Act ends with the procurement process. It does not license the President to insert the federal government into contractors' decisions about how they run their businesses. Thus, the Wage Mandate is *ultra vires* because it aims to up federal contractors' performance through improved morale and increased productivity. It does not regulate the federal government's "system" of procurement.

3. This Court also must read the Procurement Act narrowly under the avoidance and federalism canons of interpretation.

The avoidance canon favors an interpretation of the Act that averts non-delegation problems. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Under the non-delegation doctrine, a constitutional problem arises if Congress has "abdicate[d] or transferr[ed] to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry*

31

*Corp. v. United States*, 295 U.S. 497, 529 (1935). The Procurement Act would violate the Constitution if it authorized the President to regulate one fifth of the United States workforce on nothing more than a determination his policy promotes economy and efficiency. *See Kahn*, 618 F.2d at 811 (MacKinnon, J., dissenting). *Mayes* and the district court's expansive interpretation of Section 101's economy and efficiency standard read out of the statute the "clear intelligible principle" that the non-delegation doctrine requires. 67 F.4th at 943; ER-22-24.

The federalism canon applies because the Wage Mandate regulates minimum wages, traditionally a subject for state legislatures, and lacks a clear statement. "'[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). When Congress has acted on minimum wages, it has protected States' role by making local "prevailing" wages control. 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1); 6703(1); *see also* pp. 21-23, *supra*. Or it has acted unambiguously as in the Fair Labor Standards Act, which uses explicit terms to set a nationwide $7.25 minimum wage floor. 29 U.S.C. § 206(a)(1)(C).[5] But by forcing a minimum wage on contractors

---

[5] The Act also explicitly protects States' power to set minimum wages higher than this floor. 29 U.S.C. § 218(a). Most States do so. State

that exceeds every state's minimum wage, the Wage Mandate wipes out state authority in this context. The Procurement Act lacks the specificity required to overcome the presumption that Congress favors the protection of state power in setting minimum wages. This Court should apply the avoidance and federalism canons to the Procurement Act and hold that the Wage Mandate is *ultra vires*.

## II.  The Wage Mandate Likely Violates The Major Questions Doctrine.

The major questions doctrine precludes the Executive's assertion of authority to set a nationwide minimum wage for federal contractors. The doctrine "expect[s] Congress to speak clearly" in statutes authorizing the Executive to "exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 665 (2022) ("*NFIB*") (quoting *Ala. Ass'n of Realtors v. DHHS*, 141 S. Ct. 2485, 2489 (2021)). The analysis focuses on the "'nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *Brown & Williamson*, 529 U.S. at 159). Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* at 2609 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting)).

———————————

Minimum Wage Laws, U.S. Department of Labor (last accessed June 19, 2023), https://tinyurl.com/3cxjutrn.

The doctrine applies to statutes like the Procurement Act that delegate power to the President. Plaintiffs respectfully submit that *Mayes* erred in its contrary holding. The Wage Mandate implicates the major questions doctrine because the minimum wage paid by federal contractors is a question of "vast economic and political significance." *NFIB*, 142 S. Ct. at 665. *But see Mayes*, 67 F.4th at 935-36. The policy is invalid under the doctrine since the Procurement Act's vague delegation of power does not clearly state a congressional intention to allow the Executive to set a federal contractor minimum wage.

## A. The major questions doctrine applies to the Procurement Act.

*Mayes* wrongly held that the major questions doctrine does not apply to statutes like the Procurement Act that delegate power to the President. 67 F.4th at 932-34. In doing so, *Mayes* admittedly split from the Fifth, Sixth, and Eleventh Circuits, all of which have applied the doctrine to the Procurement Act. *See* 67 F.4th at 933-34 (discussing *Louisiana*, 55 F.4th at 1031 n.40; *Georgia*, 46 F.4th at 1295-97; *Kentucky*, 23 F.4th at 606-08). Because "Article II of the Constitution 'makes a single President responsible for the actions of the Executive Branch' delegations to the President and delegations to an agency should be treated the same under the major questions doctrine." *Louisiana*, 55 F.4th at 1031 n.40 (citations omitted) (quoting *Selia Law LLC v. Consumer Fin. Prot. Bureau*, 140 S.

34

Ct. 2183, 2203 (2020)). This Court should join its sister circuits in applying the doctrine to the Procurement Act.

*Mayes*'s distinction between delegations to the President and agencies misapprehends the major questions doctrine. *Mayes* distinguished the President based on separation-of-powers cases dealing with congressional *restrictions* on presidential power. *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010), held that congressional limits on the President's removal authority were unconstitutional. And *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), held that the APA's procedural restrictions did not apply to the President. But the major questions doctrine deals with statutory grants of power to the Executive Branch—not limitations on the exercise of such power. *West Virginia*, *Alabama Realtors*, and *NFIB* all reviewed statutes *empowering* the Executive Branch. The Court's precedents interpreting statutes *restricting* the Executive are inapplicable.

When the major questions doctrine asks whether the Executive's decision is "one[] that Congress would likely have intended for itself," it makes no difference which Executive Branch officer made the decision. *West Virginia*, 142 S. Ct. at 2613. This Court should join the Fifth, Sixth, and Eleventh Circuits in applying the major questions doctrine to the Procurement Act.

**B.    The Wage Mandate is a regulation of vast economic and political significance.**

The major questions doctrine applies to regulations of "vast economic and political significance." *NFIB*, 142 S. Ct. at 665. The Wage Mandate meets that standard. It requires federal contractors to pay at least $1.7 billion every year in perpetuity. *See* pp. 8, 16, *supra.* Over the next ten years, it will cost $18 billion. *Id.* And if anything, these figures underestimate the Wage Mandate's economic impact because it excludes spillover costs. *Id.* The district court agreed that the Wage Mandate "affect[s] a substantial number of workers and firms." ER-16. Indeed, Procurement Act policies apply to "one-fifth of the American workforce." *Mayes*, 67 F.4th at 935 n.25; *see also Louisiana*, 55 F.4th at 1028.

The Wage Mandate also has political salience. President Biden campaigned on a promise to raise the minimum wage to $15.00. *See* p. 6, *supra.* Congress debated that proposal, voted on it, and declined to make it the law. *Id.* Nonetheless, the subject remains a topic of discussion in Washington. In addition, state legislatures debate the minimum wage. *See, e.g.*, Nick Niedzwiadek, *The Minimum Wage Fight That Will Define the Decade*, POLITICO (Mar. 22, 2023), https://tinyurl.com/4kzchj6a. The minimum wage is clearly a question of both economic and political significance.

The district court disagreed by minimizing the Wage Mandate's $1.7 billion in annual costs with a comparison to the Clean Power Plan's

36

cost over two decades and the COVID-19 eviction moratorium's appropriation. ER-16-17. Unlike the eviction moratorium, the Wage Mandate continues in perpetuity and increases every year. The district court also wrongly asserted that this case does not involve "novel regulatory powers" and that "presidents of both parties have issued" similar orders. ER-12, ER-15. The Wage Mandate is novel. Washington regulated the minimum wage even before Congress enacted the Procurement Act 74 years ago. *See* Fair Labor Standards Act of 1938, Pub. L. No. 75-718, 52 Stat. 1060. But despite the federal government's longtime role in setting the minimum wage, no President used the Procurement Act for this purpose in the statute's first 65 years. *Cf. Mayes*, 67 F.4th at 926. Moreover, President Biden's use of this authority bears little resemblance to the minimum wage imposed by President Obama, which cost less than one third of the Biden minimum wage. *See* p. 18, *supra*.

It also is no answer that the Wage Mandate deals with "proprietary authority." *See* ER-16; *Mayes*, 67 F.4th at 935. "[T]he government has a much freer hand in dealing with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *NASA v. Nelson*, 562 U.S. 134, 148 (2011) (internal quotation marks omitted). But "[t]he vast scope of its mandate belies" a connection to the Procurement Act. *Louisiana*, 55 F.4th at 1032. "There is little internal about a mandate which encompasses even employees" of firms that have no procurement or supplier relationship with the Government. *Id.* The Executive's

inherent authority to act as a proprietor does not include a power to set a nationwide minimum wage. The Wage Mandate is an exercise of regulatory authority. *Cf. Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.,* 475 U.S. 282, 291 (1986).

The Wage Mandate "is no 'everyday exercise of federal power.'" *NFIB*, 142 S. Ct. at 665 (quoting *In re MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) (Sutton, J., dissenting)). Because it has vast economic and political significance, the major questions doctrine applies.

## C. The Procurement Act lacks a clear statement.

The power to decide major questions must be delegated through a clear statement. Congress does not make "[e]xtraordinary grants of regulatory authority" through "vague terms." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted). Against this standard, Defendants claim to find their authority in the combination of a purpose statute and a statute giving the President unspecified power. As explained, statements of purpose generally lack legal effect. *See* pp. 28-29, *supra*. But even if this one governed the President's power to "carry out" the Act, its "economical and efficient" standard does not clearly authorize presidential regulation of the minimum wage. 40 U.S.C. §§ 101(1); 121(a). Accordingly, the Wage Mandate violates the major questions doctrine.

## III. The Wage Mandate Rule Violates The Administrative Procedure Act.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court erred in holding that the APA did not apply to Defendants' implementation of the Executive Order. A presidential order does not insulate an agency's rulemaking from review. The Department violated the APA because it failed to consider alternatives, relied on improper considerations, and made the erroneous, unsubstantiated, and pretextual judgment that the Wage Mandate Rule promotes economy and efficiency in federal procurement.

### A. The APA applies to the Wage Mandate Rule.

The district court wrongly held that the President's executive order protected the Wage Mandate Rule from Plaintiffs' challenge. ER-19-22. The Administrative Procedure Act applies to "final agency action." 5 U.S.C. § 704. Because the President is not an "agency," the APA does not apply to the President's "final . . . action[s]." *Franklin*, 505 U.S. at 797. But nothing in the APA prevents review of a "final agency action" that incorporates or implements presidential action. 5 U.S.C. § 704. The fact an agency's "regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even

39

if the validity of the Order were thereby drawn into question." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

1. Plaintiffs' claim fits comfortably under the APA because it challenges a final rulemaking promulgated by the Department of Labor. ER-19-22. The Wage Mandate Rule was issued because the President directed the agency "to implement the requirements of [an executive order]." Exec. Order No. 14026, § 4(a), 86 Fed. Reg. at 22836. However, that direction does not change the APA's requirements. *Hawaii v. Trump* applied the APA to two agencies' "implementation" of a presidential proclamation barring the admission of certain foreign nationals. 878 F.3d 662, 681 (9th Cir. 2017), *vacated in part on other grounds by* 138 S. Ct. 2392, 2407 (2018) (assuming the reviewability of claims). While noting that "the President's actions fall outside the scope of" APA review, this Court allowed an APA claim to proceed "against the entities charged with carrying out [the President's] instructions." *Id.* at 680. "[B]ecause these agencies [had] 'consummat[ed]' their implementation of the Proclamation, from which 'legal consequences will flow,' their actions . . . [were] reviewable under the APA." *Id.* at 681 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-79 (1997)).

*East Bay Sanctuary Covenant v. Trump* subjected agency rulemaking "incorporat[ing]" a presidential proclamation to the APA. 932 F.3d 742, 770 (9th Cir. 2018). In that case, the Executive Branch issued a presidential proclamation and agency rule on the same day that joined

together to deny asylum to certain aliens crossing the southern border. *Id.* at 754-55. While noting that the presidential proclamation was not subject to APA review, this Court held that the APA permitted it to "review the substantive validity of the Rule together with the Proclamation." *Id.* at 770. "[I]nsofar as DOJ and DHS have incorporated the Proclamation by reference into the Rule, we may consider the validity of the agency's proposed action, including its 'rule.'" *Id.* (quoting 5 U.S.C. § 551(13)). The D.C. Circuit likewise treats agency actions implementing presidential orders as reviewable. That court has rejected the argument that "a challenge to [such a] regulation should be regarded as nothing more than a challenge to the legality of the President's Executive Order." *Reich*, 74 F.3d at 1326. Here too, the entirety of the Wage Mandate Rule is subject to APA review.

2.     The district court reached a contrary result by relying on case law holding that presidential actions are not themselves subject to APA review. ER-20. *Franklin v. Massachusetts* held that the APA applies to only "final agency action" and "the President is not an agency." 505 U.S. at 796. Under that rule, the President's post-census reapportionment of House seats was not subject to APA review. *Id.* at 800-01. Following *Franklin*, *Dalton v. Specter* similarly concluded that the President's decision to close military bases was not "agency action" because the President was not an agency. 511 U.S. 462, 468-71 (1994).

41

Neither case bears on Plaintiffs' claim, which challenges agency action *following* presidential action. *See* 86 Fed. Reg. at 67126. The "crucial" "fact" in applying *Franklin* is "that '[t]he President, not the [agency], takes the final action that affects'" the parties. *Dalton*, 511 U.S. at 470. "*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). The Wage Mandate Executive Order is not the final step that gives the Wage Mandate legal effect. The executive order directs the Department of Labor to make rules, limits its scope to those rules, and does not make the Wage Mandate applicable until those rules take effect. *See* Exec. Order No. 14026, §§ 1, 2(a), 4, 8(c), 9, 86 Fed. Reg. at 22835-38. The Wage Mandate is subject to the APA in full.

3.     The district court also expressed concern that subjecting the Rule to APA review would place the Department "in the 'untenable position' of having both to follow the mandatory orders of the President and to engage in APA-required deliberation about whether to do just the opposite." ER-20. The district court's concern wrongly presumes a congressional intent to place the President's Procurement Act judgments beyond question. Congress required the opposite when it decided to subject every "procurement policy, regulation, procedure, or form" to public comment for sixty days. 41 U.S.C. § 1707(a)(1). If Congress wished to insulate

agency action implementing presidential orders from the APA, it could have created an exception. It has done so in other contexts. *See* 5 U.S.C. § 701(a). Instead, Congress "establishe[d] a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

If accepted, the district court's rule would significantly undermine the APA. It would allow the President to insulate virtually any agency action from APA review with the stroke of a pen. The district court emphasized the Procurement Act's placement of authority in the President and not an agency head, but the Constitution gives the President the power to direct agencies' discharge of their statutory duties. "Under the Constitution, the executive Power—all of it—is vested in a President." *Seila Law*, 140 S. Ct. at 2191. "[I]ndividual executive officials['] . . . authority remains subject to the ongoing supervision and control of the elected President." *Id.* at 2203. Thus, under the district court's decision, the President could exempt a rule from the APA by using his constitutional power to direct specific agency action. Nothing in *Franklin* or *Dalton* engrafts that loophole onto the APA.

4. Agency actions that implement presidential directions are subject to the APA, but even if they were not, the district court overlooked the Department's significant discretion here. The Wage Mandate Executive Order put the Department in charge of deciding which contractors

would be subject to the Wage Mandate. No contract is definitively subject to the Executive Order. The Order states it applies to "contracts and contract-like instruments" "as defined in regulations issued" by the Department. Exec. Order No. 14026, § 2(a), 86 Fed. Reg. at 22835. Elsewhere, it identifies certain "contract[s]" and "contract-like instrument[s]" to which the order "shall apply," *id.* § 8(a), but states that the Order "shall not apply to . . . any contracts or contract-like instruments expressly excluded by the regulations issued" by the Department, *id.* § 8(c). The Order directs the Secretary to make "definitions of relevant terms" while expressing a preference for definitions in certain federal statutes and in President Obama's previous federal contractor minimum wage executive order. *Id.* § 4(a), (c). Most importantly, the order empowers the Department to create "exclusions from the requirements of [the] order" "as appropriate." *Id.* § 4(a).

By its plain language, the Wage Mandate Executive Order gave the Department the discretion to exclude any category of contracts from the Wage Mandate. "'As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text,' which 'must be construed consistently with the Order's 'object and policy.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (quoting *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005)). Nothing about the Order's object or policy limit the breadth of the Department's discretion. The Order's qualification directing exclusions "as appropriate" "clearly confers

discretion." *Donahue v. United States*, 870 F. Supp. 2d 97, 110 (D.D.C. 2012). "On its face, the Executive Order" authorized the Department to exclude any contractor from the Wage Mandate. *San Francisco*, 897 F.3d at 1239. "It would be incongruous . . . to say it does not mean what it says." *Id.*

Defendants cannot rely on the President's unwritten expectations to narrow the Department's authority. This "logic impermissibly seeks to displace the plain meaning of the [executive order] in favor of something lying beyond it." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1750 (2020). "Judges are not free to overlook plain . . . commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Bostock*, 140 S. Ct. at 1754. A substantial exercise of this discretion might have disappointed the White House. But the President gave the Department that power, and the Department would not have acted *ultra vires* had it used it differently. At a minimum, the APA applies to the Department's use and non-use of its power to create exclusions from the Wage Mandate and to define terms.

### B.    The Wage Mandate Rule violates the APA.

Under the APA, courts must "hold unlawful and set aside action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Wage Mandate Rule violates this provision in several respects. The Department wrongly refused to consider alternatives and failed to provide a reasoned basis for its

judgment. It did not consider the Rule's impact on States. And its judgment that the Rule would promote economy and efficiency is both wrong and pretextual. In addition, given the Department's general copy and paste of the Wage Mandate Executive Order's terms, the legal defects identified in Part I also constitute APA violations.

1. The Department failed to consider any alternatives or meaningful exceptions to the 33-percent overnight minimum wage increase it imposed on contractors. "As the APA requires that agencies engage in reasoned decisionmaking, the agency had an obligation to consider its other obligations and any alternatives, even if it could properly end up rejecting them." *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020) (cleaned up). This obligation "is well settled" and includes "a duty . . . to give a reasoned explanation for its rejection of such alternatives." *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (internal quotation marks omitted). The Department admits it did not consider "modify[ing] the amount of the . . . minimum wage rate, chang[ing] the effective date for the wage rate, or phas[ing] in the wage rate over a number of years" despite receiving numerous comments urging this consideration. 86 Fed. Reg. at 67130. The Department also received multiple comments encouraging it to limit the extent to which the Rule overrides statutes regulating the minimum wage paid to federal contractors' employees. The Department explicitly refused to consider those alternatives too, even though it had explicit authority to create

46

exclusions. 86 Fed. Reg. at 67129-30. This "'artificial narrowing of options' is antithetical to reasoned decisionmaking and cannot be upheld." *Int'l Ladies Garment Workers Union v. Donovan*, 722 F.2d 795, 814 (D.C. Cir. 1983) (quoting *Pillai v. Civ. Aeronautics Bd.*, 485 F.2d 1018, 1027 (D.C. Cir. 1973)).

In addition to failing to consider alternatives, the Department failed to provide a reasoned basis for its decision. "When an agency changes its position, it must (1) display awareness that it is changing positions, (2) show the new policy is permissible under the statute, (3) believe the new policy is better, and (4) provide good reasons for the new policy." *Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (cleaned up). The Rule raises the wage to $15.00 from the $11.25 wage required under then-existing regulations' inflation adjustment provisions. *See* pp. 8-9, *supra*. The Department gave no reasoning for this increase other than the fact the President issued the Wage Mandate Executive Order. This too violated the APA.

The Department's treatment of the Wage Mandate Rule as partially exempt from the APA was wrong. The Department claimed it lacked "authority to modify the amount or timing of the minimum wage requirement." 86 Fed. Reg. at 67130. It said it "[did] not have the discretion to implement alternatives" or "to deviate from the explicit terms of the Executive Order." 86 Fed. Reg. at 67180, 67216. *First*, executive orders do not create exceptions to the APA. *See* pp. 40-43, *supra*. President Biden

ordered an agency to engage in rulemaking, and nothing in the APA permits an agency to ignore its APA obligations just because the agency acts under an executive order. An agency is a "'creature of statute,' having 'no constitutional or common law existence or authority.'" *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)). Congress has decided their rulemaking must obey certain procedural requirements and made no exception for directions conveyed via executive order. The Third Circuit has held that an executive order directing the EPA to "suspend or postpone the effective dates" of certain rules did not allow that agency to ignore the APA's requirements by stating its "action was 'taken pursuant to Executive Order.'" *Natural Resources Defense Council, Inc. v. U.S. E.P.A.*, 683 F.2d 752, 755-56, 765-67 (3d Cir. 1982). This Court should hold that the Wage Mandate Rule violated the APA by relying on the Executive Order to refuse to consider alternatives or explain its decision.

*Second*, even if executive orders could override the APA, this one did not. It gave the agency explicit authority to decide its scope. As explained, the Executive Order allowed the agency to create "exclusions from the requirements of this order" "as appropriate." Executive Order 14026, § 4(a), 86 Fed. Reg. at 22835; *see* pp. 12, 44-45, *supra*. It also made the Department responsible for defining the "contracts" and "contract-like instruments" subject to the mandate. *Id.* The agency's exercise of this

discretion is subject to the APA.[6] And the Department's misapprehension of its duties and authority constitutes an additional reason to vacate the Rule. *See Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) ("'An order may not stand if the agency has misconceived the law.'") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

2.     Next, the Department violated the APA by failing to consider the Wage Mandate's impact on one of the largest and most unique categories of federal government contractors: States. The Rule's effect on States is an "important aspect of the problem" that the Department was required to address. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because States are sovereign entities and generally do not sell products or services, new costs must be offset by tax increases or cuts to government programs. Despite these and other distinctions between States and the Government's private-sector contractors, the Rule lumped States together with private-sector contractors. Elsewhere, the Rule ignored States. The Rule excluded States from its cost estimate. The Rule estimated it would impose $1.7 billion in costs every year on federal contractors by first estimating the number of

---

[6] Moreover, the Executive Order required the Department to "issue regulations" "consistent with applicable law," i.e., the APA. Exec. Order No. 14026, § 3(b), 86 Fed. Reg. at 22836. "[T]he President gave no explicit indication that he intended to ask the agencies not to comply with the APA. Indeed, he specifically stated that agencies should comply with all applicable law." *Natural Resources Def. Council*, 683 F.2d at 765 n.24.

employees affected. 86 Fed. Reg. at 67208-09. But in making that calculation "[t]he Department limited its analysis to employed individuals in the private sector." 86 Fed. Reg. at 67201.

The Department also failed to consider States' "extensive reliance interest[s]." *Nat'l Urban League*, 977 F.3d at 778; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). Plaintiffs submitted declarations in the district court showing that Idaho faces legislative appropriation limitations and must absorb new expenses because of the minimum wage increase. ER-29-36. For the Idaho Department of Fish and Game, the 33-percent increase in the minimum wage raises wages for employees paid both more and less than $15.00 per hour. ER-32. The federal government's failure "to offset this cost" means "a shift of funds that were previously budgeted for operating (non-personnel) expenses." ER-35. Nothing in the record reflects the Department's consideration of States' reliance interests. The Department violated the APA by failing to consider the ripple effects of its policy's shock to States.

3. The Department's economy and efficiency analysis also violated the APA because it misapplied the Procurement Act and was pretextual. Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at

50

43. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

*First*, the Department failed to support its conclusion that the Rule's economy and efficiency benefits outweighed its costs. The Procurement Act's "policy directive to pursue economy and efficiency implicates numbers, measurement, and accountability and supplies a meaningful standard against which to evaluate an agency's exercise of discretion." *Diebold v. United States*, 947 F.2d 787, 796 (6th Cir. 1991). *But see* p. 31, *supra*. The Department estimated average annual transfer payments of $1.7 billion. 86 Fed. Reg. at 67194. At the same time, it recognized this amount could "underestimate" payments because it left out "spillover costs" in raised wages for workers already making more than $15.00 per hour. *Id.* The Department did not attempt to calculate those effects even though elsewhere it discusses Congressional Budget Office statistics estimating a national $15.00 minimum wage's spillover effects. *Id.* at 67208.

The Department also did not attempt a measurement of the Rule's benefits. Citing "uncertainty and data limitations," the Department admitted its failure to "quantify benefits of this rulemaking." *Id.* 67212. It instead relied on "general findings from the literature" to conclude the Rule's benefits "will offset" its $1.7 billion annual price tag. *Id.* at 67204,

51

67212. Even those conclusory statements are contradicted by the Department's suggestion, elsewhere in its findings, that the benefits of the Rule would only "substantially"—not entirely—"offset" its "adverse economic effects." *Id*. at 67149, 67153. The Department's conclusion that the Rule's amorphous and unquantified benefits would make up for the more than tripling of transfer payments from the Obama Administration minimum wage is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

*Second*, the Department relied on the wrong criteria in determining that the Rule promotes economy and efficiency. The Rule must "provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and . . . contracting." 40 U.S.C. § 101(1). But in determining that the Rule's benefits exceeded its costs, the Department relied on numerous benefits that have nothing to do with procurement. While the Obama Rule limited its benefits to "reduced absenteeism and turnover in the workplace, improved employee morale and productivity, reduced supervisory costs, and increased quality of government services," 79 Fed. Reg. at 60699, the Biden Administration supplemented this list. The Department concluded that in addition to the Obama Administration benefits, "increased equity[] and reduced poverty and income inequality for Federal contract workers" factored into the benefit analysis. 86 Fed. Reg. at 67212. Equity, poverty reduction, and income equality are social policy objectives. They

52

do not bear on the economy and efficiency of government procurement and should not have been considered. Even if the Department was justified in failing to quantify the Rule's benefits, it must subtract these social benefits and reconsider whether the Rule's actual economy and efficiency benefits offset its costs.

*Third*, the Department's economy and efficiency conclusions are pretextual. The APA requires agencies to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). *Department of Commerce* vacated the Secretary of Commerce's decision to add a citizenship question to the decennial census questionnaire because the Secretary's justification was pretextual. *Id.* The Secretary cited a desire to help the Department of Justice improve enforcement of the Voting Rights Act, but "the evidence t[old] a story that d[id] not match [that] explanation." *Id.* at 2575. The Department of Commerce had elicited the Department of Justice's request for help and made up its mind before receiving the request. *Id.* Those facts led the Court to conclude the agency's justification "seems to have been contrived." *Id.*; *see also Kentucky*, 23 F.4th at 609 n.15 (concluding vaccine mandate was pretextual); *Woods Petroleum Corp. v. U.S. Dept. of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) ("obvious that the sole reason behind" agency action "was to provide a pretext for [an] ulterior motive").

Like *Department of Commerce*, the justification offered for the Wage Mandate is subterfuge. President Biden promised a national $15.00 minimum wage as a candidate and failed to win Congress's support for that change. *See* pp. 6-7, *supra*. He issued the Wage Mandate Executive Order shortly after this failure as a partial end-run around Congress's judgment. President Biden even confirmed the Administration's true reasons for the policy when he described the Wage Mandate as "a down payment" on his campaign "pledge." Statement by President Biden (Jan. 28, 2022), https://tinyurl.com/e3wf8s2f. This Court should not "ignore the disconnect between the decision made and the explanation given." *Department of Commerce*, 139 S. Ct. at 2576. The Department justified its rule with impermissible "contrived reason[s]" in violation of the APA. *Id*.

## IV. Plaintiffs Are Entitled To A Preliminary Injunction.

In addition to showing a likelihood of success on the merits, Plaintiffs have satisfied the other elements for a preliminary injunction. A preliminary injunction requires a showing that (1) the plaintiff is likely to prevail on the merits of its substantive claims, (2) the plaintiff is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court "evaluate[s] these factors via a sliding scale approach, such that serious questions going to the merits and a balance of hardships that tips

sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (internal quotation marks omitted).

The district court did not consider Plaintiffs' entitlement to a preliminary injunction after concluding that Plaintiffs claims should be dismissed. Nevertheless, all four elements are met, and this Court should instruct the district court to enter a preliminary injunction on remand. *See, e.g.*, *Taylor v. Westly*, 488 F.3d 1197, 1201 (9th Cir. 2007); *Cottrell*, 632 F.3d at 1131, 1135-39. Applying the same test, a motions panel of the Tenth Circuit entered an injunction pending appeal for different plaintiffs challenging the Wage Mandate. *Bradford v. U.S. Dep't of Labor*, No. 22-1023, Doc. 010110646538 (10th Cir. Feb. 17, 2022).

A.    Plaintiffs will suffer irreparable harm absent an injunction.

Economic harm is irreparable when a plaintiff cannot seek compensatory damages. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (A "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm."). "[A] regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v.*

*Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) (emphasis in original).

Plaintiffs cannot seek damages for the economic harm that they suffer because of the Wage Mandate. The Wage Mandate places States in a "Hobson's choice" between giving up contracts with the government or "incur[ring] large costs" by paying their employees higher wages. *Am. Trucking Associations*, 559 F.3d at 1057, 1058. The district court recognized Plaintiffs' dilemma in its standing analysis. ER-10. Plaintiffs showed that Idaho's state fisheries were offsetting the more than $800,000 financial impact of the Wage Mandate by reducing operating expenses. ER-35. Such expenses are not recoverable in this litigation and therefore irreparable.

Nor can Plaintiffs recover the damages they suffer in the form of lower tax revenues and higher enrollment in their unemployment insurance programs. The district court recognized both injuries, ER-10, and the Wage Mandate Rule acknowledged research showing that a $15.00 minimum wage will result in job losses. *See* 86 Fed. Reg. 67212 (discussing Congressional Budget Office estimate). Finally, Plaintiffs suffer irreparable injuries to their sovereignty because the Wage Mandate overtakes the minimum wages required by their laws. *See* ER-87; *see also* ER-33, 10; ER-85. A state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305,

2324 n.17 (2018); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

B.    The balance of the equities and public interest also favor an injunction. These factors merge where the government is a party. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted). This Court has recognized public interests in both vindicating Congress's statutory intent and adhering to the Constitution. *See Am. Trucking Ass'ns*, 559 F.3d at 1059-60; *see also Azar*, 911 F.3d at 581 ("The public interest is served by compliance with the APA.").

As explained, the Wage Mandate exceeds the Procurement Act's authority and violates the Constitution and the APA. An injunction will ensure the public can contract with the federal government free from illegal restraints. And it will likely reduce contracting costs for both Plaintiffs and Defendants. *See* 86 Fed. Reg. at 67152, 67206, 67212. An injunction will encourage lower unemployment, more contractor output, and less state government spending on personnel costs. *See* 86 Fed. Reg. at 67212; ER-87-89. Because the public interest and balance of the equities support immediate relief, this Court should direct the district court to enter a preliminary injunction.

## CONCLUSION

The Court should vacate the district court's order dismissing Plaintiffs' claims and order the district court to enter a preliminary injunction against Defendants' enforcement of the Wage Mandate.

Respectfully submitted.

RAÚL R. LABRADOR
Attorney General of Idaho

JOSHUA N. TURNER
Deputy Solicitor General

DOUGLAS A. WERTH
Lead Deputy Attorney General

Office of the Attorney General of Idaho
P.O. Box 83720
Boise, Idaho 83720

TODD ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

Office of the Attorney General of Indiana
Indiana Government Ctr. South
302 W. Washington Street
Indianapolis, Indiana 46204

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Eric J. Hamilton
ERIC J. HAMILTON
Solicitor General
eric.hamilton@nebraska.gov

LINCOLN J. KORELL
Assistant Attorney General

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297

ALAN WILSON
Attorney General of South Carolina

THOMAS T. HYDRICK
Assistant Deputy Solicitor General

Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211

58

Counsel for Plaintiffs-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** <u>No. 23-15179</u>

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** <u>s/ Eric Hamilton</u>     **Date** <u>June 20, 2023</u>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>No. 23-15179</u>

I am the attorney or self-represented party.

**This brief contains 13,394 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

61

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  <u>s/ Eric Hamilton</u>        **Date** <u>June 20, 2023</u>

ADDENDUM

# INDEX TO ADDENDUM

40 U.S.C. § 101 ........................................................................... A-1

40 U.S.C. § 121 .......................................................................... A-2

Exec. Order No. 14026,
86 Fed. Reg. 22835 (2021)........................................................ A-6

## 40 U.S.C. § 101

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

### 40 U.S.C. § 121

(a) POLICIES PRESCRIBED BY THE PRESIDENT.— The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

(b) ACCOUNTING PRINCIPLES AND STANDARDS.—

(1) PRESCRIPTION.— The Comptroller General, after considering the needs and requirements of executive agencies, shall prescribe principles and standards of accounting for property.

(2) PROPERTY ACCOUNTING SYSTEMS.— The Comptroller General shall cooperate with the Administrator of General Services and with executive agencies in the development of property accounting systems and approve the systems when they are adequate and in conformity with prescribed principles and standards.

(3) COMPLIANCE REVIEW.— From time to time the Comptroller General shall examine the property accounting systems established by executive agencies to determine the extent of compliance with prescribed principles and standards and approved systems. The Comptroller General shall report to Congress any failure to comply with the principles and standards or to adequately account for property.

(c) REGULATIONS BY ADMINISTRATOR.—

(1) GENERAL AUTHORITY.— The Administrator may prescribe regulations to carry out this subtitle.

(2) REQUIRED REGULATIONS AND ORDERS.— The Administrator shall prescribe regulations that the Administrator considers necessary to carry out the Administrator's functions under this subtitle and the head of each executive agency shall issue orders and directives that the agency head considers necessary to carry out the regulations.

(d) DELEGATION OF AUTHORITY BY ADMINISTRATOR.—

(1) IN GENERAL.— Except as provided in paragraph (2), the Administrator may delegate authority conferred on the Administrator by this subtitle to an official in the General Services Administration or to the head of another federal agency. The Administrator may authorize successive redelegation of authority conferred by this subtitle.

(2) EXCEPTIONS.— The Administrator may not delegate—

(A) the authority to prescribe regulations on matters of policy applying to executive agencies;

(B) the authority to transfer functions and related allocated amounts from one component of the Administration to another under paragraphs (1)(C) and (2)(A) of subsection (e); or

(C) other authority for which delegation is prohibited by this subtitle.

(3) RETENTION AND USE OF RENTAL PAYMENTS.— A department or agency to which the Administrator has delegated authority to operate, maintain or repair a building or facility under this subsection shall retain the portion of the rental payment that the Administrator determines is available to operate, maintain or repair the building or facility. The department or agency shall directly expend the retained amounts to operate, maintain, or repair the building or facility. Any amounts retained under this paragraph shall remain available until expended for these purposes.

(e) ASSIGNMENT OF FUNCTIONS BY ADMINISTRATOR.—

(1) IN GENERAL.— The Administrator may provide for the performance of a function assigned under this subtitle by any of the following methods:

(A) The Administrator may direct the Administration to perform the function.

(B) The Administrator may designate or establish a component of the Administration and direct the component to perform the function.

(C) The Administrator may transfer the function from one component of the Administration to another.

(D) The Administrator may direct an executive agency to perform the function for itself, with the consent of the agency or by direction of the President.

(E) The Administrator may direct one executive agency to perform the function for another executive agency, with the consent of the agencies concerned or by direction of the President.

(F) The Administrator may provide for performance of a function by a combination of the methods described in this paragraph.

(2) TRANSFER OF RESOURCES.—

(A) Within administration.— If the Administrator transfers a function from one component of the Administration to another, the Administrator may also provide for the transfer of appropriate allocated amounts from the component that previously carried out the function to the component being directed to carry out the function. A transfer under this subparagraph must be reported to the Director of the Office of Management and Budget.

(B) Between agencies.— If the Administrator transfers a function from one executive agency to another (including a transfer to or from the Administration), the Administrator may also provide for the transfer of appropriate personnel, records, property, and allocated amounts from the executive agency that previously carried out the function to the executive agency being directed to carry out the function. A transfer under this subparagraph is subject to approval by the Director.

(f) ADVISORY COMMITTEES.— The Administrator may establish advisory committees to provide advice on any function of the Administrator under this subtitle. Members of the advisory committees shall serve without compensation but are entitled to transportation and not more than $25 a day instead of expenses under section 5703 of title 5.

(g) CONSULTATION WITH FEDERAL AGENCIES.— The Administrator shall advise and consult with interested federal agencies and seek their advice and assistance to accomplish the purposes of this subtitle.

(h) ADMINISTERING OATHS.— In carrying out investigative duties, an officer or employee of the Administration, if authorized by the Administrator, may administer an oath to an individual.

**Exec. Order No. 14026, 86 Fed. Reg. 22835 (2021)**

**Increasing the Minimum Wage for Federal Contractors**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 et seq., and in order to promote economy and efficiency in procurement by contracting with sources that adequately compensate their workers, it is hereby ordered as follows:

**Section 1.** *Policy*. This order promotes economy and efficiency in Federal procurement by increasing the hourly minimum wage paid by the parties that contract with the Federal Government to $15.00 for those workers working on or in connection with a Federal Government contract as described in section 8 of this order. Raising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs. Accordingly, ensuring that Federal contractors pay their workers an hourly wage of at least $15.00 will bolster economy and efficiency in Federal procurement.

**Sec. 2**. *Increasing the Minimum Wage for Federal Contractors and Subcontractors*. (a) Executive departments and agencies, including independent establishments subject to the Federal Property and Administrative Services Act, 40 U.S.C. 102(4)(A), (5) (agencies), shall, to the extent permitted by law, ensure that contracts and contract-like instruments (as defined in regulations issued pursuant to section 4(a) of this order and as described in section 8(a) of this order) include a clause that the contractor and any covered subcontractors (as defined in regulations issued pursuant to section 4(a) of this order) shall incorporate into lower-tier subcontracts. This clause shall specify that, as a condition of payment, the minimum wage to be paid to workers employed in the performance of the contract or any covered subcontract thereunder, including workers whose wages are calculated pursuant to special certificates issued under section 14(c) of the Fair Labor Standards Act of 1938 (29 U.S.C. 214(c)), shall be at least:

A-6

(i) $15.00 per hour, beginning January 30, 2022; and

(ii) beginning January 1, 2023, and annually thereafter, an amount determined by the Secretary of Labor (Secretary). The amount shall be published by the Secretary at least 90 days before such new minimum wage is to take effect and shall be:

(A) not less than the amount in effect on the date of such determination;

(B) increased from such amount by the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States city average, all items, not seasonally adjusted), or its successor publication, as determined by the Bureau of Labor Statistics; and

(C) rounded to the nearest multiple of $0.05.

(b) In calculating the annual percentage increase in the Consumer Price Index for purposes of subsection (a)(ii)(B) of this section, the Secretary shall compare such Consumer Price Index for the most recent month, quarter, or year available (as selected by the Secretary prior to the first year for which a minimum wage is in effect pursuant to subsection (a)(ii)(B) of this section) with the Consumer Price Index for the same month in the preceding year, the same quarter in the preceding year, or the preceding year, respectively.

(c) Nothing in this order shall excuse noncompliance with any applicable Federal or State prevailing wage law, or any applicable law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this order.

**Sec. 3.** *Application to Tipped Workers.* (a) For workers covered under section 2 of this order who are tipped employees pursuant to section 3(t) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(t)), the cash wage that must be paid by an employer to such workers shall be at least:

(i) $10.50 per hour, beginning January 30, 2022;

(ii) beginning January 1, 2023, 85 percent of the wage in effect under section 2 of this order, rounded to the nearest multiple of $0.05; and

(iii) beginning January 1, 2024, and for each subsequent year, 100 percent of the wage in effect under section 2 of this order.

(b) Where workers do not receive a sufficient additional amount on account of tips, when combined with the hourly cash wage paid by the employer, such that their wages are equal to the minimum wage under section 2 of this order, the cash wage paid by the employer, as set forth in this section for those workers, shall be increased such that their wages equal the minimum wage under section 2 of this order. Consistent with applicable law, if the wage required to be paid under the Service Contract Act, 41 U.S.C. 6701 et seq., or any other applicable law or regulation is higher than the wage required under section 2 of this order, the employer shall pay additional cash wages sufficient to meet the highest wage required to be paid.

**Sec. 4.** *Regulations and Implementation.* (a) The Secretary shall, consistent with applicable law, issue regulations by November 24, 2021, to implement the requirements of this order. Such regulations shall include both definitions of relevant terms and, as appropriate, exclusions from the requirements of this order. Within 60 days of the Secretary issuing such regulations, the Federal Acquisition Regulatory Council, to the extent permitted by law, shall amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations, contracts, and contract-like instruments subject to this order the clause described in section 2(a) of this order.

(b) Within 60 days of the Secretary issuing regulations pursuant to subsection (a) of this section, agencies shall take steps, to the extent permitted by law, to exercise any applicable authority to ensure that contracts and contract-like instruments as described in sections 8(a)(i)(C) and (D) of this order, entered into on or after January 30,

2022, consistent with the effective date of such agency action, comply with the requirements set forth in sections 2 and 3 of this order.

(c) Any regulations issued pursuant to this section should, to the extent practicable, incorporate existing definitions, principles, procedures, remedies, and enforcement processes under the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et seq.; the Service Contract Act, 41 U.S.C. 6701 et seq.; the Davis-Bacon Act, 40 U.S.C. 3141 et seq.; Executive Order 13658 of February 12, 2014 (Establishing a Minimum Wage for Contractors); and regulations issued to implement that order.

**Sec. 5.** *Enforcement.* (a) The Secretary shall have the authority for investigating potential violations of and obtaining compliance with this order.

(b) This order creates no rights under the Contract Disputes Act, 41 U.S.C. 7101 et seq., and disputes regarding whether a contractor has paid the wages prescribed by this order, as appropriate and consistent with applicable law, shall be disposed of only as provided by the Secretary in regulations issued pursuant to this order.

**Sec. 6.** *Revocation of Certain Presidential Actions.* Executive Order 13838 of May 25, 2018 (Exemption From Executive Order 13658 for Recreational Services on Federal Lands), is revoked as of January 30, 2022. Executive Order 13658 of February 12, 2014 (Establishing a Minimum Wage for Contractors), is superseded, as of January 30, 2022, to the extent it is inconsistent with this order.

**Sec. 7.** *Severability.* If any provision of this order, or the application of any provision of this order to any person or circumstance, is held to be invalid, the remainder of this order and its application to any other person or circumstance shall not be affected thereby.

**Sec. 8.** *Applicability.* (a) This order shall apply to any new contract; new contract-like instrument; new solicitation; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument, if (i):

(A) it is a procurement contract or contract-like instrument for services or construction;

(B) it is a contract or contract-like instrument for services covered by the Service Contract Act;

(C) it is a contract or contract-like instrument for concessions, including any concessions contract excluded by Department of Labor regulations at 29 CFR 4.133(b); or

(D) it is a contract or contract-like instrument entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public; and

(ii) the wages of workers under such contract or contract-like instrument are governed by the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act.

(b) For contracts or contract-like instruments covered by the Service Contract Act or the Davis-Bacon Act, this order shall apply only to contracts or contract-like instruments at the thresholds specified in those statutes. Where workers' wages are governed by the Fair Labor Standards Act of 1938, this order shall apply only to procurement contracts or contract- like instruments that exceed the micro-purchase threshold, as defined in 41 U.S.C. 1902(a), unless expressly made subject to this order pursuant to regulations or actions taken under section 4 of this order.

(c) This order shall not apply to grants; contracts, contract-like instruments, or agreements with Indian Tribes under the Indian Self-Determination and Education Assistance Act (Public Law 93–638), as amended; or any contracts or contract-like instruments expressly excluded by the regulations issued pursuant to section 4(a) of this order.

**Sec. 9.** *Effective Date.* (a) This order is effective immediately and shall apply to new contracts; new contract-like instruments; new solicitations; extensions or renewals of existing contracts or contract-like

instruments; and exercises of options on existing contracts or contract-like instruments, as described in section 8(a) in this order, where the relevant contract or contract-like instrument will be entered into, the relevant contract or contract- like instrument will be extended or renewed, or the relevant option will be exercised, on or after:

(i) January 30, 2022, consistent with the effective date for the action taken by the Federal Acquisition Regulatory Council pursuant to section 4(a) of this order; or

(ii) for contracts where an agency action is taken pursuant to section 4(b) of this order, January 30, 2022, consistent with the effective date for such action.

(b) As an exception to subsection (a) of this section, where agencies have issued a solicitation before the effective date for the relevant action taken pursuant to section 4 of this order and entered into a new contract or contract-like instrument resulting from such solicitation within 60 days of such effective date, such agencies are strongly encouraged but not required to ensure that the minimum wages specified in sections 2 and 3 of this order are paid in the new contract or contract-like instrument. But if that contract or contract-like instrument is subsequently extended or renewed, or an option is subsequently exercised under that contract or contract- like instrument, the minimum wages specified in sections 2 and 3 of this order shall apply to that extension, renewal, or option.

(c) For all existing contracts and contract-like instruments, solicitations issued between the date of this order and the effective dates set forth in this section, and contracts and contract-like instruments entered into between the date of this order and the effective dates set forth in this section, agencies are strongly encouraged, to the extent permitted by law, to ensure that the hourly wages paid under such contracts or contract- like instruments are consistent with the minimum wages specified in sections 2 and 3 of this order.

**Sec. 10**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.