# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF NEBRASKA, et al.,

Plaintiffs-Appellants, and

STATE OF ARIZONA, et al.,

Plaintiffs,

v.

JULIE A. SU, in her official capacity as Acting U.S. Secretary of Labor, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Arizona

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney General*

GARY M. RESTAINO
   *United States Attorney*

MARK B. STERN
DANIEL WINIK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue, NW*
   *Washington, DC 20530*
   *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION .......................................................................................................1

STATEMENT OF JURISDICTION...............................................................................2

STATEMENT OF ISSUES ...........................................................................................2

PERTINENT STATUTORY PROVISIONS.....................................................................3

STATEMENT OF THE CASE ......................................................................................3

    A.    Statutory And Administrative Background....................................................3

    B.    Prior Proceedings.......................................................................................7

SUMMARY OF ARGUMENT .................................................................................... 10

STANDARD OF REVIEW.......................................................................................... 13

ARGUMENT .......................................................................................................... 14

I.    The Challenged Executive Order Falls Within The President's FPASA Authority .......................................................................................................... 14

    A.    The President Reasonably Concluded That The Government Would Benefit If The Employees Working On Its Contracts Were Paid Enough ............................................................................................14

    B.    Plaintiffs Offer No Basis To Construe The FPASA Authority More Narrowly..........................................................................................28

II.    The Implementing Rule Is Valid .......................................................................... 38

III.    If This Court Reverses The District Court's Dismissal Of This Suit, It Should Remand For The District Court To Consider Any Request For Injunctive Relief .............................................................................................. 46

CONCLUSION ....................................................................................................... 49

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) ...............................................................8, 15, 33

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...........................................................................46

*Ancient Coin Collectors Guild v. CBP*,
  801 F. Supp. 2d 383 (D. Md. 2011) ...................................................................40

*Arc of California v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) .............................................................................47

*Arizona v. Walsh*,
  2023 WL 120966 (D. Ariz. Jan. 6, 2023)..........................7, 8, 9, 10, 22, 23, 24, 25, 27

*Biden v. Missouri*,
  142 S. Ct. 647 (2022) .........................................................................................38

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) .......................................................................................35

*Building & Construction Trades Department v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................35

*Chamber of Commerce v. Napolitano*,
  648 F. Supp. 2d 726 (D. Md. 2009) .......................................................16, 19, 36

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................41

*Chamber of Commerce v. Whiting*,
  563 U.S. 582 (2011) ...........................................................................................36

*Chrysler Corp v. Brown*,
  441 U.S. 281 (1979) ...........................................................................................32

*Clark v. Rameker*,
573 U.S. 122 (2014) ...................................................................26

*Dalton v. Specter*,
511 U.S. 462 (1994) ...................................................................39

*Department of Commerce v. New York*,
139 S. Ct. 2551 (2019) ...............................................................44

*Detroit International Bridge Co. v. Government of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ......................................... 40, 42

*DHS v. Regents of the University of California*,
140 S. Ct. 1891 (2020) ...............................................................40

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ................................................ 42, 43

*Epic Systems Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ...............................................................30

*Epona, LLC v. County of Ventura*,
876 F.3d 1214 (9th Cir. 2017) ....................................................46

*Evans v. Shoshone-Bannock Land Use Policy Commission*,
736 F.3d 1298 (9th Cir. 2013) ....................................................47

*Feds for Medical Freedom v. Biden*,
581 F. Supp. 3d 826 (S.D. Tex. 2022) .....................................39-40

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................. 39, 41

*Gartrell Construction Inc. v. Aubry*,
940 F.2d 437 (9th Cir. 1991) ......................................................33

*GEO Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ......................................................47

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ............................................. 30, 34

*Haaland v. Brackeen,*
143 S. Ct. 1609 (2023) ...................................................................................24

*Hawaii v. Trump,*
878 F.3d 662 (9th Cir. 2017) .....................................................................42, 43

*Hodel v. Virginia Surface Mining & Reclamation Association,*
452 U.S. 264 (1981) .......................................................................................34

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ......................................................................30, 31
57 F.4th 545 (6th Cir. 2023) ...........................................................................30

*Lathus v. City of Huntington Beach,*
56 F.4th 1238 (9th Cir. 2023) .........................................................................13

*League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen,*
615 F.3d 1122 (9th Cir. 2010) .........................................................................39

*Liberty Mutual Insurance Co. v. Friedman,*
639 F.2d 164 (4th Cir. 1981) ......................................................................25, 27

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) ......................................................28, 29, 32, 34-35

*Marathon Oil Co. v. United States,*
807 F.2d 759 (9th Cir. 1986) ..........................................................................45

*Mayes v. Biden,*
67 F.4th 921 (9th Cir. 2023) ...........................2, 11, 14, 15, 16, 17, 32, 33, 34, 35, 37

*NASA v. Nelson,*
562 U.S. 134 (2011) .............................................................................29, 35, 36

*NFIB v. OSHA,*
142 S. Ct. 661 (2022) .....................................................................................38

*Perkins v. Lukens Steel Co.,*
310 U.S. 113 (1940) .......................................................................................35

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) ..................................................................35

*Taylor v. Westly,*
488 F.3d 1197 (9th Cir. 2007) .......................................................46

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ..................................................................47

*Trump v. Hawaii,*
138 S. Ct. 2382 (2018) ..................................................................42

*Tulare County v. Bush,*
185 F. Supp. 2d 18 (D.D.C. 2001) ................................................40

*UAW-Labor Employment & Training Corp. v. Chao,*
325 F.3d 360 (D.C. Cir. 2003) ......................14, 15, 16, 19, 21

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952) .........................................................................45

*United States v. Mississippi Power & Light Co.,*
638 F.2d 899 (5th Cir. Unit A 1981) ............................................16

*United States v. Texas,*
143 S. Ct. 1964 (2023) ..................................................................23

*Utility Air Regulatory Group v. EPA,*
573 U.S. 302 (2014) ...............................................................11, 36

*WB Music Corp. v. Royce International Broadcasting Corp.,*
47 F.4th 944 (9th Cir. 2022) .........................................................31

*Wiener v. County of San Diego,*
23 F.3d 263 (9th Cir. 1994) ..........................................................46

*Winter v. Natural Resources Defense Council, Inc.,*
555 U.S. 7 (2008) ..........................................................................47

## Statutes:

Federal Property and Administrative Services Act of 1949,
 40 U.S.C. § 101 *et seq.* ....................................................................3
  40 U.S.C. § 101 ....................................................................17
  40 U.S.C. § 101(1) ..............................2, 3, 12, 14, 25, 26, 31, 32
  40 U.S.C. § 121(a) ..............2, 3, 14, 17, 20, 25, 31, 41

Pub. L. No. 107-217, 116 Stat. 1062 (2002) ....................................17

8 U.S.C. § 1158(b)(2)(C) ....................................................................43

8 U.S.C. § 1182(f) ....................................................................43

28 U.S.C. § 1291 ....................................................................2

28 U.S.C. § 1331 ....................................................................2

40 U.S.C. § 3142(a) ....................................................................29

40 U.S.C. § 3142(b) ....................................................................29

41 U.S.C. § 6502 ....................................................................29

41 U.S.C. § 6503 ....................................................................29

41 U.S.C. § 6702 ....................................................................29

## Regulatory Materials:

29 C.F.R. § 23.40 ....................................................................45

Exec. Order No. 11,246,
 30 Fed. Reg. 12,319 (Sept. 28, 1965) ....................................3, 25

Exec. Order No. 12,800,
 57 Fed. Reg. 12,985 (Apr. 14, 1992) ....................................3, 25

Exec. Order No. 13,201,
 66 Fed. Reg. 11,221 (Feb. 22, 2001) ....................................16, 19, 25

Exec. Order No. 13,465,
73 Fed. Reg. 33,285 (June 11, 2008) ...............................................................19

Exec. Order No. 13,658,
79 Fed. Reg. 9851 (Feb. 20, 2014) ...................................................................4

Exec. Order No. 13,706,
80 Fed. Reg. 54,697 (Sept. 10, 2015) ........................................................ 3, 25

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .................................................................................2

**Other Authorities:**

*Contract*, Black's Law Dictionary (11th ed. 2019)................................................26

Establishing a Minimum Wage for Contractors,
79 Fed. Reg. 60,634 (Oct. 7, 2014) ..................................................................4

43 Fed. Reg. 51,375 (Nov. 3, 1978) ......................................................................25

83 Fed. Reg. 25,341 (June 1, 2018) ............................................................... 4, 28

86 Fed. Reg. 22,835 (Apr. 30, 2021) ...................................... 5, 6, 7, 11, 17, 44-45

Increasing the Minimum Wage for Federal Contractors,
86 Fed. Reg. 67,126 (Nov. 24, 2021) .......6, 7, 11, 17, 18, 20, 21, 27, 29, 37, 42, 44, 45

Elena Kagan, *Presidential Administration*,
114 Harv. L. Rev. 2245 (2001)...........................................................................42

Minimum Wage for Contractors; Updating Regulations To Reflect Executive
Order 13838, 83 Fed. Reg. 48,537 (Sept. 26, 2018) ..........................................5

Minimum Wage for Federal Contracts Covered by Executive Order 14026,
Notice of Rate Change in Effect as of January 1, 2023,
87 Fed. Reg. 59,464 (Sept. 30, 2022) ................................................................7

Order, *Bradford v. U.S. Department of Labor*, No. 22-1023 (10th Cir. Feb. 17, 2022) ......48

*Table A-1: Employment Status of the Civilian Population by Sex and Age*, https://www.bls.gov/news.release/empsit.t01.htm (last visited July 29, 2023) ........38

U.S. Gov't Accountability Office, *A Snapshot of Government-Wide Contracting for FY 2021* (Aug. 25, 2022), https://perma.cc/R64Q-F7YN ........................................21

# INTRODUCTION

For nearly a decade, across three presidential administrations, executive orders have required a minimum-wage clause to be inserted in certain contracts with the federal government. President Obama issued the first such order; President Trump maintained it, with a limited carveout for contracts in connection with seasonal recreational services on federal lands; and President Biden rescinded the carveout and increased the amount of the wage to be required.

These orders have a limited function. They do not set a nationwide minimum wage. They are directives to federal agencies, issued under the President's statutory authority to promote economy and efficiency in contracting by the Executive Branch, directing agencies to enter certain contracts only with companies that will agree to pay their workers at or above the prescribed level for work on or in connection with those contracts. The orders thus reflect a determination that the federal government benefits when its contractors' employees are sufficiently paid for the work that they do under federal contracts, because higher pay enhances their productivity and increases the quality of their work.

As the district court concluded, the 2021 order at issue here falls well within the President's authority under the Federal Property and Administrative Services Act (FPASA or the Act). The Act authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out" the Act's objective of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and

supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101(1), 121(a). As this Court recently explained in upholding another executive order issued under the same statutory authority, "[t]he broad language of the Act purposefully gives the President both necessary flexibility and broad-ranging authority in setting procurement policies." *Mayes v. Biden*, 67 F.4th 921, 941 (9th Cir. 2023) (quotation marks omitted), *reh'g pending*, No. 22-15518. This order, like that one, exercises the President's authority in a manner consistent with judicial and administrative precedents stretching back decades. The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on January 6, 2023. ER-28. Four plaintiffs timely filed this appeal on February 7, 2023. ER-125; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the challenged executive order, directing federal agencies to enter into covered contracts only with companies willing to pay their employees at or above a prescribed wage for work on or in connection with those contracts, is a lawful exercise of the President's authority under FPASA.

2.      Whether the Department of Labor's implementation of the executive order was arbitrary and capricious.

3.    Whether, if the Court reverses the dismissal of this suit, it should remand for the district court to address the propriety of injunctive relief.

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Administrative Background

1.    Congress enacted the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 101 *et seq.*, or FPASA, "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and non-personal services, and performing related functions including contracting." *Id.* § 101(1). The Act empowers the President to "prescribe policies and directives that the President considers necessary to carry out" that objective. *Id.* § 121(a).

Presidents have used this power to issue a wide range of directives. Many such orders have concerned contractors' hiring, payment, and management of their employees. For example, presidents have directed agencies to include in their contracts provisions forbidding contractors from discriminating on the basis of race, creed, color, or national origin with respect to their employees, Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 28, 1965); requiring contractors to inform their employees that they have a right not to pay union dues, Exec. Order No. 12,800, 57 Fed. Reg. 12,985 (Apr. 14, 1992); and requiring contractors to provide their employees with paid sick leave, Exec. Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 10, 2015).

2.a.    In 2014, President Obama exercised his authority under the Act by issuing

Executive Order 13,658, 79 Fed. Reg. 9851 (Feb. 20, 2014).  That order directed agencies

to include, in covered contracts entered on or after its effective date, clauses requiring

contractors to pay their employees at least $10.10 per hour (with subsequent increases

by formula) for work in the performance of the contracts.  *Id.* at 9851.  The order

reflected President Obama's determination that "[r]aising the pay of low-wage workers

increases their morale and the productivity and quality of their work, lowers turnover

and its accompanying costs, and reduces supervisory costs."  *Id.*  After public notice

and comment, the Department of Labor implemented the executive order through a

final rule.  Establishing a Minimum Wage for Contractors, 79 Fed. Reg. 60,634 (Oct. 7,

2014).

b.    In 2018, President Trump issued Executive Order 13,838, which excluded

from the requirements of the 2014 executive order any "contracts or contract-like in-

struments entered into with the Federal Government in connection with seasonal rec-

reational services," such as "river running, hunting, fishing, horseback riding, camping,

mountaineering activities, recreational ski services, and youth camps," "or seasonal rec-

reational equipment rental for the general public on Federal lands."  83 Fed. Reg. 25,341,

25,341 (June 1, 2018).  That order expressly maintained the minimum-wage requirement

for "lodging and food services associated with seasonal recreational services," *id.*, and

left the 2014 order intact in all other respects as well.  The Department of Labor issued

a rule implementing the order.  Minimum Wage for Contractors; Updating Regulations To Reflect Executive Order 13838, 83 Fed. Reg. 48,537 (Sept. 26, 2018).

c.  In April 2021, President Biden issued Executive Order 14,026.  86 Fed. Reg. 22,835 (Apr. 30, 2021).  The order directs agencies to include in certain federal contracts a clause requiring the payment of a $15 minimum hourly wage (with subsequent increases by formula) to employees for hours spent working on or in connection with the contract.  *Id.* at 22,835.  The requirement applies to several categories of new "contract[s]" or "contract-like instrument[s]," as well as "extension[s] or renewal[s]" of existing contracts or contract-like instruments.  *Id.* at 22,837.  The order reflected President Biden's determination that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."  *Id.* at 22,835.

Like the 2014 executive order, the 2021 order applies to a variety of contracts for which workers' wages "are governed by the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act."  86 Fed. Reg. at 22,837.  It includes, in particular, (1) "procurement contract[s] or contract-like instrument[s] for services or construction"; (2) "contract[s] or contract-like instrument[s] for services covered by the Service Contract Act"; (3) "contract[s] or contract-like instrument[s] for concessions"; and (4) "contract[s] or contract-like instrument[s] entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal

employees, their dependents, or the general public." *Id.* The order rescinded the 2018 exemption for seasonal recreational services and equipment rentals. *Id.* at 22,836.

After public notice and comment, the Department of Labor issued a final rule implementing the executive order. Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 67,126 (Nov. 24, 2021). In issuing the rule, the Department explained that it expected the minimum-wage requirement to benefit the government in numerous ways. For example, it noted that "higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services, thereby improving the experience of citizens who engage with these government contractors." *Id.* at 67,212. And it explained that a higher minimum wage for contractors' employees could make them more productive, reduce their rate of turnover, and reduce absenteeism, citing various studies for those propositions. *Id.* at 67,213-67,214.

The Department acknowledged that the government's "expenditures" in procuring goods or services could rise if the minimum-wage provision in contracts "increase[d] employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass[ed] along part or all of the increased cost to the government in the form of higher contract prices." *Id.* at 67,206. It explained, however, that "benefits" to the government "attributable to the Executive order are expected to accompany any such increase in expenditures, resulting in greater value to the Government" overall, and "that any potential increase in contract prices or decrease in profits" would likely "be negligible." *Id.*

Both the 2021 executive order and the implementing rule contain a severability provision stating that "[i]f any provision … , or the application of any provision … to any person or circumstance, is held to be invalid," the rest should remain in place. 86 Fed. Reg. at 22,837 (order); *see* 86 Fed. Reg. at 67,228 (rule).

The rule took effect on January 30, 2022. 86 Fed. Reg. at 67,126. For 2023, the inflation-indexed hourly wage required under contract provisions pursuant to the 2021 order has been $16.20. Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2023, 87 Fed. Reg. 59,464 (Sept. 30, 2022).

## B. Prior Proceedings

Shortly after the rule implementing the 2021 executive order took effect, the States of Arizona, Idaho, Indiana, Nebraska, and South Carolina (as well as the Attorney General of Arizona) brought this challenge to the rule and the executive order. Plaintiffs sought a preliminary injunction; the government moved to dismiss or, in the alternative, for summary judgment.

The district court granted the government's motion to dismiss and denied plaintiffs' motion as moot. *Arizona v. Walsh*, 2023 WL 120966 (D. Ariz. Jan. 6, 2023). The court explained that the President's authority under FPASA "is broad," though "not unqualified," and that "[c]ourts reviewing challenges to policies issued pursuant to the FPASA" have looked to whether the President's directives bear "'a sufficiently close nexus' to the statutory purposes of promoting 'economy' and 'efficiency' in federal

contracting." *Id.* at *5. "In conducting the nexus inquiry," the district court explained, "most courts have defined 'economy' and 'efficiency' broadly," *id.*, to include such factors as "price, quality, suitability, and availability of goods or services," *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc). That standard is satisfied here, the district court concluded, because "the President has rationally determined that increasing the minimum wages of contractors' employees will lead to improvements in their productivity and the quality of their work, and thereby benefit the government's contracting operations." 2023 WL 120966, at *6. The court found that rationale "at least as compelling as those upon which courts have relied in upholding other executive orders." *Id.* The court noted that "presidents of both parties have exercised their authority under the FPASA to issue orders pertaining to the compensation of contractors' employees," and that "[w]hile the President's view of his own statutory authority is not controlling, 'when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is entitled to great respect.'" *Id.* (quotation marks omitted) (quoting *Kahn*, 618 F.2d at 790). The court also noted the Department's conclusion that, even if the executive order could increase procurement costs to some degree, its "benefits" would "offset potential increased costs"—a rationale that the court observed was similar to one the D.C. Circuit accepted in *Kahn*. *Id.*

The district court further rejected plaintiffs' argument that the executive order exceeds the President's authority insofar as it applies to federal licensees and permittees, explaining that "[t]hat claim fails to give full effect to the text of the FPASA, which

authorizes the President to issue policies consistent with the statutory goals of economy and efficiency in both 'procuring'—i.e., acquiring—'*and supplying* property and nonpersonal services.'" *Id.* at *9. "[T]he word 'supplying,'" the court concluded, "'extends the President's authority with respect to contractors from whom the federal government is not directly "[p]rocuring" goods or services, such as licensees and permittees with whom the government enters agreements for the purpose of "[s]upplying property and nonpersonal services" to the public.'" *Id.*

The district court rejected plaintiffs' various arguments for a narrower interpretation of FPASA. The court explained that the major questions doctrine is inapplicable because "[t]his is not a case in which an agency has relied on an ancillary statutory provision to exercise novel regulatory powers," because the President "relied on a broad statutory delegation to exercise proprietary authority in an area … over which he also enjoys inherent powers," and because the expected effect of the President's directive is far less than in cases where the Supreme Court has applied the major questions doctrine. *Id.* at *7-8. The court disagreed with plaintiffs' reliance on federalism principles, explaining that the executive order and implementing rule "do not encroach upon states' traditional police powers" and do not "conflict with the other federal statutes related to wage regulation." *Id.* at *8. The court also rejected plaintiffs' invocation of the nondelegation doctrine, concluding that "FPASA sets out an 'intelligible principle' to guide the President's exercise of authority"—a conclusion the court found "bolstered by the fact that, while the President relied on his powers under the FPASA in issuing" the

challenged executive order, "the statute nonetheless implicates his inherent powers under Article II to exercise managerial control of the Executive Branch." *Id.* at *11.

Finally, the court rejected plaintiffs' argument that the executive order and the challenged components of the implementing rule should be held invalid under the arbitrary-and-capricious standard of the Administrative Procedure Act (APA). The court explained that the executive order itself "is not reviewable under the APA," because the Supreme Court has "held that the President's actions are not subject to review under" that statute, and that APA standards of review are equally inapplicable to the rule "to the extent it implements decisions made by the President pursuant to his delegated authority under" FPASA. *Id.* at *9-11.

Nebraska, Idaho, Indiana, and South Carolina appealed. ER-125. Arizona and its Attorney General did not.

## SUMMARY OF ARGUMENT

I. Executive Order 14,026 directs agencies to include in certain federal contracts a clause requiring the payment of a $15 minimum hourly wage (with subsequent increases by formula) for work performed on or in connection with the contract. Like the executive orders issued in 2014 and 2018, this order applies to a variety of contracts for which workers' wages are governed by the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act.

The executive order falls within the President's authority under FPASA, the "broad language" of which "purposefully gives the President both 'necessary flexibility

and broad ranging authority' in setting procurement policies." *Mayes v. Biden*, 67 F.4th 921, 941 (9th Cir. 2023) (quotation marks omitted), *reh'g pending*, No. 22-15518. The order plainly satisfies the "'lenient'" standard, *id.* at 940, for determining whether a FPASA directive bears the requisite nexus to the statutory goals of economy and efficiency. The order explained that, in the President's judgment, "[r]aising the minimum wage" for federal contractors would "bolster economy and efficiency in Federal procurement" because a higher minimum wage "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835. And the implementing rule issued by the Department of Labor provides extensive support for the reasonableness of that determination. 86 Fed. Reg. at 67,212-67,215.

Plaintiffs recognize that this Court in *Mayes* rejected many of the same arguments they advance here. The challenged executive order does not conflict with other statutes that regulate federal contractors. It does not raise any nondelegation or federalism concerns. And it does not implicate the major questions doctrine, both because it is an exercise of the President's proprietary authority over the Executive Branch, rather than an exercise of power by an agency over members of the public, and because it is not "vast" or "transformative" in its effects, *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Plaintiffs lack standing to challenge the executive order insofar as it governs contracts with entities from which the federal government does not directly procure goods—subcontractors, lessors, licensees, and permittees. Plaintiffs are not federal subcontractors, lessors, licensees, or permittees, and the Supreme Court has recently rejected theories of indirect injury like those they invoke. In any event, the executive order is valid as to those types of entities as well. Directives governing subcontractors, not just those limited to prime contractors, can foster "an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting," 40 U.S.C. § 101(1). And directives governing lessors, licensees, and permittees can foster "an economical and efficient system" for "supplying property and nonpersonal services," *id.*, to the public.

II.    Plaintiffs' challenge to the implementing rule largely invites the Court to perform a type of review that is unavailable under the APA—review of the President's own policy decisions. To the extent that an agency simply carries out policy determinations made by the President, under authority delegated to him, a court cannot apply APA standards of review to the agency's implementation of those policy determinations any more than it could apply them to the President's order itself. The Court accordingly cannot review, for example, whether the Department acted arbitrarily or capriciously by declining to consider alternatives to directing agencies to adopt contract clauses requiring a $15-per-hour minimum wage. Any such alternatives would have been inconsistent with the President's directive.

The Executive Order gives the Department authority to create exclusions from the rule. Plaintiffs urge that the Department acted arbitrarily in exercising its authority, in particular by not considering whether to exclude States from the scope of the order. But the Department's reasoning in implementing the rule is fully applicable to state contracts, and plaintiffs identify no comment on the proposed rule asking the Department to exempt state contracts specifically.

III.    If this Court reverses the dismissal of this suit, it should remand for the district court to consider any request for an injunction. Plaintiffs cite no case where this Court has itself directed the issuance of an injunction in an appeal from an order that dismisses a suit without resolving the merits of a preliminary-injunction motion, and even in cases that do arise from a preliminary-injunction ruling, this Court's ordinary practice is to remand for the district court to address the other preliminary-injunction factors if it disagrees with the district court's analysis of one of them. Plaintiffs identify no reason to depart from that practice here, where the analysis of the equitable factors would be fact-intensive and this Court would lack an appropriate foundation on which to conduct it in the first instance.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of an action for failure to state a claim. *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1240 (9th Cir. 2023).

# ARGUMENT

## I. The Challenged Executive Order Falls Within The President's FPASA Authority

### A. The President Reasonably Concluded That The Government Would Benefit If The Employees Working On Its Contracts Were Paid Enough

1. FPASA authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out" the statutory objective of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101(1), 121(a). As this Court recently explained in *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), *reh'g pending*, No. 22-15518, that "broad language … purposefully gives the President both 'necessary flexibility and broad ranging authority' in setting procurement policies." *Id.* at 941 (quoting *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (some quotation marks omitted)). In particular, "the Act leaves room for the President's discretion by directing the President to 'prescribe policies and directives that the President *considers* necessary' to carrying out the purposes of the Act," *id.*, whether or not a court (or Congress) would independently have considered the directives necessary.

Courts have therefore applied a "'lenient'" standard in determining whether FPASA directives bear the requisite nexus to the statutory goals of economy and effi-

ciency. *Mayes*, 67 F.4th at 940 (discussing the D.C. and Fourth Circuits' similar articulations of the standard). And they have recognized that "'[e]conomy and efficiency are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions.'" *Id.* (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc) (some quotation marks omitted)).

In *Kahn*, for example, the en banc D.C. Circuit upheld an executive order directing agencies "to require that all contractors certify … compliance with" recent "wage and price standards" created to reduce inflation. 618 F.2d at 785-786. The court noted that the order could cause contracts to be "diverted from low bidders who [were] not in compliance with the wage and price standards to higher bidders" who were in compliance, potentially causing "an unwarranted drain on the public fisc." *Id.* at 792; *see Chao*, 325 F.3d at 367 (observing that, "in the short run," the order at issue in *Kahn* would "plainly" have "increase[d] procurement costs"). But the D.C. Circuit deferred to the President's judgment that "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the government would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." 618 F.2d at 793.

In *Chao*, the D.C. Circuit similarly upheld an executive order requiring federal contractors to post notices of certain labor rights, on the basis of President Bush's judgment that "'[w]hen workers are better informed of their rights, … their productivity

is enhanced,'" and that "'[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.'" 325 F.3d at 366 (quoting Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221 (Feb. 22, 2001)). The court did so even as it recognized that "[t]he link" asserted by the President might "seem attenuated" and that one could "with a straight face advance an argument claiming opposite effects or no effects at all." *Id.* at 366-367. Again, the court respected the President's contrary judgment.

Presidents have also exercised their FPASA authority "to require federal contractors to commit to affirmative action programs when racial discrimination was threatening contractors' efficiency; … to ensure compliance with immigration laws; and to attain sick leave parity with non-contracting employers because federal contractors were lagging behind and losing talent." *Mayes*, 67 F.4th at 938. Courts have held such orders to be valid. *See, e.g.*, *United States v. Mississippi Power & Light Co.*, 638 F.2d 899, 905 (5th Cir. Unit A 1981) (affirmative-action executive order "was a proper exercise of congressionally delegated authority"); *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, 736-738 (D. Md. 2009) (upholding executive order concerning employers' compliance with immigration laws).

Both courts and the Executive Branch have thus interpreted FPASA as granting the President broad and flexible authority to determine what contracting practices promote the interests of the federal government. And Congress—which "'is presumed to be aware of a[] … judicial interpretation of a statute and to adopt that interpretation

when it re-enacts a statute without [substantive] change,'" *Mayes*, 67 F.4th at 938—did exactly that. In 2002, it recodified both FPASA's statement of purpose and the operative provision (authorizing the President to set contracting policies to achieve the statute's goals) without substantive change. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[.]"). It presumably knew when it did so that various courts "had interpreted the President's [FPASA] authority and the statutory terms 'economy' and 'efficiency' broadly," and its reenactment of the statute reflects its "affirmation of the broad understandings of those terms." *Mayes*, 67 F.4th at 938.

2. The executive order challenged here bears the requisite nexus to the statutory goals of economy and efficiency. The order directs federal agencies to enter covered contracts only with entities willing to pay their workers a prescribed wage for work on or in connection with those contracts, on the basis of the President's judgment that "[r]aising the minimum wage" for federal contractors would "bolster economy and efficiency in Federal procurement" because a higher minimum wage "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835.

The implementing rule provides extensive support for the reasonableness of that determination. 86 Fed. Reg. at 67,212-67,215. The rule notes, for example, that

"higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services, thereby improving the experience of citizens who engage with these government contractors"—a view supported by empirical research. *Id.* at 67,212. And it explains, again citing numerous studies, that a higher minimum wage for contractors' employees could make them more productive, reduce their rate of turnover, and reduce absenteeism. *Id.* at 67,213-67,214.

Those effects of a higher wage rate—particularly the expected increase in the quality of contractors' employees and of the services that they provide—inure to the benefit not just of government contractors but of the government itself. The rule acknowledges that if the minimum-wage provision in contracts "increase[d] employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass[ed] along part or all of the increased cost to the government in the form of higher contract prices," then the government's "expenditures" in procuring goods or services from those contractors could "rise." *Id.* at 67,206. But it explains that "benefits" to the government "attributable to the Executive order are expected to accompany any such increase in expenditures, resulting in greater value to the Government" overall, and "that any potential increase in contract prices or decrease in profits" would likely "be negligible." *Id.*

This rationale accords with those that courts have accepted as sufficient to sustain prior executive orders under the Act. As noted above, for example, the order sustained in *Chao*—President George W. Bush's order directing contractors to post notices

of labor rights—reflected the President's judgment that "'[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced.'" 325 F.3d at 366 (quoting 66 Fed. Reg. at 11,221). And an order requiring contractors to use the E-Verify system for verifying eligibility to work in the United States, likewise issued by President Bush, was sustained on the basis of the President's judgment that "[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources." *Chamber of Commerce*, 648 F. Supp. 2d at 738 (quoting Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 11, 2008)).

Plaintiffs contend that this executive order lacks the requisite nexus to economy and efficiency because the Department of Labor estimated that it would cause the transfer of approximately $1.7 billion per year from contractors to their employees.[1] But as the Department noted, that does not mean contractors' costs would actually increase by $1.7 billion per year, because the payment of a higher minimum wage would be expected to lead to "productivity gains" and "cost[] savings" (for example, from

---

[1] Plaintiffs suggest (Br. 16) that, given "annual inflation-based increases" in the required minimum wage, the cost of the requirement "will continue to swell over time." That argument misunderstands the nature of an inflation adjustment, which simply ensures that the real economic value of the minimum wage (and thus the real total cost of the requirement) remains constant even as nominal values increase.

decreased employee turnover).  86 Fed. Reg. at 67,206.  In any event, the relevant question is not whether the minimum-wage requirement will increase contractors' costs but whether the President reasonably believed that the requirement would promote the *government's* interests in economy and efficiency.  And because the $1.7 billion figure represents a very small proportion of what the federal government pays contractors, the Department concluded that, to the extent the minimum-wage requirement caused contractors' overall costs to rise, and to the extent contractors passed those costs on "to the government in the form of higher contract prices," any such increase would likely "be negligible." *Id.*  The Department also believed that such an increase would be outweighed by the "benefits" to the government "attributable to the Executive order … , resulting in greater value to the Government" overall.  *Id.*  Those conclusions support the reasonableness of the President's determination.

Plaintiffs denigrate the Department's conclusions as "unsupported and unbelievable" (Br. 17), faulting the Department for not attempting to quantify the monetary value of such benefits as improvements in the quality of services provided by contractors through their employees.  But courts reviewing the validity of executive orders under FPASA have never insisted on a precise quantification of the expected benefits of a directive.  For good reason:  Congress vested the President with broad authority to promulgate directives that he "*considers* necessary to carry out" FPASA's objectives of economy and efficiency, 40 U.S.C. § 121(a) (emphasis added), rather than more narrowly limiting the President's authority to directives that a court might later determine actually

*are* necessary for that purpose. That is why, for example, the D.C. Circuit sustained the validity of the executive order in *Chao*—requiring contractors to post notices of certain labor rights—even though it found the asserted economy-and-efficiency justification to be "attenuated" and believed that one could "with a straight face advance an argument claiming opposite effects or no effects at all." 325 F.3d at 366-367.

In any event, plaintiffs are incorrect to characterize the Department's conclusion—that a higher minimum wage for workers on government contracts would produce "greater value to the Government" even if it slightly increased costs, 86 Fed. Reg. at 67,206—as "unbelievable" (Br. 17). The federal government spends well more than $600 billion on contracts each year. *See, e.g.*, U.S. Gov't Accountability Office, *A Snapshot of Government-Wide Contracting for FY 2021* (Aug. 25, 2022) ($637 billion in Fiscal Year 2021), https://perma.cc/R64Q-F7YN. Adding $1.7 billion to that amount would be an increase of roughly a quarter of one percent. Many people paying $10,000 for a contractor to perform home repairs would gladly pay $25 more for the work to be done by well-compensated employees, who would be more likely to produce high-quality work, more likely to work with high morale, and less likely to be inexperienced as a result of turnover. That is the equivalent of the President's conclusion that it is worth having higher-paid employees perform government contracts, even if it means paying slightly more for those contracts.

3.     Plaintiffs lack standing to challenge the executive order insofar as it governs contracts with entities from which the federal government does not directly procure goods—namely subcontractors, lessors, licensees, and permittees.  In any event, the executive order is valid in that respect as in others.

a.     Plaintiffs principally assert standing to challenge the executive order on the ground that some of their "arms, agencies, and subdivisions" contract with the federal government, such that they will be bound by the obligation to pay higher wages under the contractual provisions required by the executive order.  ER-98–99 ¶¶ 21-24.  But plaintiffs do not assert that any of their arms, agencies, or subdivisions is a federal subcontractor, lessor, licensee, or permittee.

Before the district court, plaintiffs asserted standing to challenge this element of the executive order on three theories: (1) that the order will cause them to "lose tax revenue or have to pay increased unemployment benefits," (2) that "their economies will be harmed" by the order, and (3) that the order will cause them to "suffer a 'sovereign injury,' because their regulatory choices" to require lower minimum wages "will be overridden."  2023 WL 120966, at *3.  Of those theories, the district court accepted only the first, finding it "more than merely speculative" that in-state companies paying higher minimum wages to their employees as a result of the challenged executive order may take greater "deductions from" their "state taxable incomes" and cause plaintiffs to "incur unemployment insurance expenses."  *Id.* at *4.

That reasoning does not survive the Supreme Court's subsequent decision in *United States v. Texas*, 143 S. Ct. 1964 (2023). In that case, two States asserted standing to challenge federal immigration-enforcement guidelines on the theory that the guidelines "impose[d] costs on the States," such as by requiring them to "continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. The district court accepted that theory, *id.*, but the Supreme Court reversed. It explained that the States' challenge to the enforcement guidelines was "not the kind redressable by a federal court," *id.* at 1971, and emphasized more generally that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," *id.* at 1972 n.3. In particular, the Court described as "attenuated" theories of state standing resting on claims that a federal policy "has produced only" "indirect effects on state revenues or state spending." *Id.* That is exactly the sort of theory the district court accepted—a theory that, even though plaintiffs are not themselves federal subcontractors, lessors, licensees, or permittees, they have standing to challenge the executive order as applied to those entities within their borders because it might have certain downstream consequences for their tax revenues or insurance obligations. Federal courts lack jurisdiction to address such attenuated injuries—injuries not clearly traceable to the challenged policy or redressable by relief against it.

Plaintiffs' other theories of jurisdiction are equally flawed. The theory that "their economies will be harmed" by the challenged executive order, 2023 WL 120966, at *3,

amounts to a repackaged version of the theory the district court accepted—the idea that plaintiffs will ultimately bear certain costs as an indirect downstream consequence of in-state companies' paying higher wages. To the extent the States purport to assert their *citizens'* interests in a strong economy, the theory would be barred because—as the Supreme Court reiterated in another recent case—"'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023). And the "'sovereign injury'" theory, 2023 WL 120966, at *3, is also unfounded. The challenged requirement does not "'override[]'" plaintiffs' minimum-wage laws, *id.*; it simply directs federal agencies to require the payment of a prescribed wage to employees working on or in connection with their contracts, while leaving contractors otherwise free to pay whatever wages they want (consistent with other minimum-wage laws, including the States'). There is no authority for the proposition that States have standing to challenge any federal policy that differs from the State's own policy on a related subject.

b.     In any event, the challenged executive order is as valid as to federal subcontractors, lessors, licensees, and permittees as it is in other respects. Plaintiffs offer two principal arguments, neither of which is persuasive, that the order cannot apply to these entities (Br. 24-27).

*First*, plaintiffs contend that subcontractors, lessors, licensees, and permittees "do not have a procurement or supplier relationship with the federal government" (Br. 26; *see* Br. 24), by which plaintiffs appear to mean that those entities do not directly supply

goods to the federal government and that the federal government does not procure goods directly from them. But FPASA extends the President's authority more broadly than that: The authority to "prescribe policies and directives that [he] considers necessary to carry out" the objective of "provid[ing] … an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting," 40 U.S.C. §§ 101(1), 121(a), is not limited to policies concerning a particular type of contract or contractor.

Directives governing subcontractors, not just those limited to prime contractors, plainly can advance the statutory objective. Indeed, it would often be difficult for directives under FPASA to advance that objective if they did not include subcontractors, since as the district court here recognized, contractors could easily circumvent the required clauses by "simply subcontracting out the bargained-for services." 2023 WL 120966, at *8. That is presumably why most of the FPASA directives discussed above included provisions concerning subcontractors. 80 Fed. Reg. at 54,697; 66 Fed. Reg. at 11,222-11,223; 57 Fed. Reg. at 12,986-12,987; 43 Fed. Reg. 51,375, 51, 375 (Nov. 3, 1978); 30 Fed. Reg. at 12,320-12,324. Plaintiffs mistakenly urge (Br. 25) that the Fourth Circuit rejected the application of FPASA directives to subcontractors in *Liberty Mutual Insurance Co. v. Friedman*, 639 F.2d 164 (4th Cir. 1981). The Fourth Circuit in that case simply regarded the ostensible benefits of applying a particular directive to a particular subcontractor as "too attenuated" from the statutory objectives. *Id.* at 171. It did not

hold that the President's authority under FPASA is categorically limited to prime contractors.

Directives governing lessors, licensees, and permittees are likewise within the President's authority because they can foster "an economical and efficient system" for "*supplying* property and nonpersonal services," 40 U.S.C. § 101(1) (emphasis added). Plaintiffs appear to read FPASA's reference to "supplying" property and services to mean supplying them *to* the government. But that would give "supplying" no meaning distinct from that of "procuring": When a contractor provides goods or services directly to the government, the government is "procuring" those goods or services. *See, e.g.*, *Contract*, Black's Law Dictionary (11th ed. 2019) (defining a "procurement contract" as "[a] contract in which a government receives goods or services"). Plaintiffs' argument thus "flouts the rule that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quotation marks omitted). Rather than duplicating the word "procuring," the word "supplying" serves to extend the President's authority to entities with which the government enters agreements for the purpose of "supplying property and nonpersonal services" to the public—for example, licenses and permits that allow the entity to provide recreational equipment or services on federal land.

*Second*, plaintiffs contend that even if the President has authority to apply a FPASA directive to subcontractors, lessors, licensees, and permittees, the application of this directive to such entities does not adequately advance the statutory objectives of

economy and efficiency.  That argument is equally incorrect.  As noted above, if sub-contractors were not subject to the contractual provisions required by the challenged executive order, then prime contractors could easily evade those provisions by "sub-contracting out the bargained-for services."  2023 WL 120966, at *8.  Plaintiffs' reliance on the Fourth Circuit's decision in *Liberty Mutual* is again misplaced.  That decision held that a nondiscrimination requirement lacked an adequate nexus to economy and effi-ciency as applied to a company that provided worker's compensation insurance to a federal contractor under "a single policy" for "employees working on both federal and nonfederal contracts."  639 F.2d at 171.  That reasoning is inapposite here, where the contractual minimum-wage obligation *is* limited to the particular hours that employees spend working on or in connection with federal contracts.

It was likewise reasonable for the President to conclude that the government would benefit from the payment of a higher-minimum wage to the employees of con-tractors—like lessors, licensees, and permittees—from whom the government does not directly procure items or services.  The implementing rule explains as much, noting that a higher minimum wage can (among other benefits) "increase the quality of services provided to the Federal Government and the general public" and thus "attract more customers and result in increased sales."  86 Fed. Reg. at 67,153.  Notably, although President Trump reached a different conclusion as to wilderness guides and outfitters, he maintained the preexisting requirement for "lodging and food services associated

with seasonal recreational services," as well as for other types of lessors, licensees, and permittees.  83 Fed. Reg. at 25,341.

**B.  Plaintiffs Offer No Basis To Construe The FPASA Authority More Narrowly**

1.  Plaintiffs suggest (Br. 19) that, if the executive order at issue here is within the President's authority, the President could equally require contractors to offer their employees "[m]andatory paid leave, healthcare benefits, pension plans, and tuition reimbursement."  Plaintiffs also invoke the Fifth Circuit's similar suggestion that, if the executive order at issue in *Mayes* were lawful (as this Court held), the President could equally require contractors to "'certify that their employees take daily vitamins, live in smoke-free homes, [and] exercise three times a week.'"  *Id.* (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1031-1032 (5th Cir. 2022)).

Whether or not any such directives would be lawful, they differ fundamentally from the executive order challenged here.  This order does not require federal contractors to pay all of their employees a prescribed wage regardless of whether they work on federal contracts.  *Cf. Louisiana*, 55 F.4th at 1032-1033 (noting that the COVID-19 vaccination requirement at issue extended to "'employees of covered contractors who are not themselves working on or in connection with a covered contract'").  Rather, unlike the hypothetical directives that plaintiffs discuss, this order pertains only to the hours that employees spend working on or in connection with covered federal contracts.  It simply sets the federal government's desired parameters for work done under

its own contracts. Courts have recognized that "'the Government has a much freer hand in dealing with citizen employees [and government contractors] than it does when it brings its sovereign power to bear on citizens at large,'" *Louisiana*, 55 F.4th at 1032 (alteration in original) (quoting *NASA v. Nelson*, 562 U.S. 134, 148 (2011) (some quotation marks omitted)), and the narrow scope of this order places it at the zenith of the government's authority "as the manager of its internal affairs," *NASA*, 562 U.S. at 153.

2.    Plaintiffs next argue (Br. 20-23) that the President's authority should be construed narrowly in light of other statutes that regulate federal contractors. Plaintiffs identify three statutes with which they claim the 2021 executive order conflicts: the Davis-Bacon Act, which requires the payment of prevailing wages to "mechanics or laborers" working on the construction of public buildings and public works, 40 U.S.C. § 3142(a), (b); the Walsh-Healey Public Contracts Act, which requires the payment of prevailing wages to employees of contractors engaged "by an agency of the United States for the manufacture or furnishing" of certain goods, 41 U.S.C. § 6502; and the McNamara-O'Hara Service Contract Act, which requires the payment of prevailing wages to service employees on federal government contracts that are principally for services, *id.* §§ 6702, 6703.

But as the Department explained in the implementing rule, those statutes "establish 'minimum' wage rates," not maximum wage rates, so it is "not inconsistent" with the statutes "to establish a higher minimum wage rate." 86 Fed. Reg. at 67,129. Indeed,

States routinely enact minimum-wage requirements exceeding those of the federal statutes on which plaintiffs rely; plaintiffs presumably do not believe those state requirements are preempted by federal law.  "When confronted with two Acts of Congress allegedly touching on the same topic," courts are "not at 'liberty to pick and choose among congressional enactments'"; they must "strive 'to give effect to both.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018).  Here, "harmoniz[ing]" the statutes, *id.*, is straightforward:  A contractor can comply both with the provisions required by the challenged executive order and with the statutes on which plaintiffs rely.  And in the absence of any conflict, there is no basis to read the minimum-wage laws as creating an unwritten exception to the broad statutory authority at issue here.

3.     Plaintiffs also argue that the President's FPASA authority should be construed narrowly on various grounds that this Court rejected in *Mayes*.  Those arguments would be unpersuasive even if they were not foreclosed.

a.     Plaintiffs first contend that the President's authority is limited to "'directives necessary to effectuate [FPASA's] substantive provisions,'" as opposed to "'its statement of purpose,'" and "to policies for the procurement 'system,'" as opposed to those that seek "to improve the economy and efficiency of federal contractors or their employees."  Br. 28-31 (quoting *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023), and citing *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022), and *Georgia v. President of the United States*, 46 F.4th 1283, 1298 (11th Cir. 2022) (opinion of Grant, J.)).

But plaintiffs made only part of that argument before the district court. There, plaintiffs argued that FPASA does not "provide authority to regulate contractors and their employees 'to make *them* more economical and efficient.'" SER-29 (quoting *Kentucky*, 23 F.4th at 605) (some quotation marks omitted). But plaintiffs did not contend, as they now do (Br. 29), that FPASA "'empowers the President to issue'" only those "'directives necessary to effectuate the'" statute's "'substantive provisions,'" as opposed to its "'statement of purpose.'" To the contrary, they characterized FPASA as allowing the President to take "actions he 'considers necessary' for 'economical and efficient' '[p]rocuring and supplying property.'" SER-76 (quoting 40 U.S.C. §§ 101(1), 121(a)); *see also* SER-36 (explaining that FPASA "allows certain policies prescribed by the President only to the extent that he 'considers [them] necessary to carry out' th[e] objectives" set forth in § 101). This Court "ordinarily 'will not consider an issue raised for the first time on appeal,'" *WB Music Corp. v. Royce Int'l Broad. Corp.*, 47 F.4th 944, 951 (9th Cir. 2022), and should not do so here.

To the extent plaintiffs' argument is preserved, moreover, plaintiffs recognize that this Court rejected it in *Mayes*, which upheld the same executive order at issue in *Kentucky* and *Georgia*. As this Court explained in *Mayes*, FPASA's text "allows for prescribing requirements that address contractors' operations," because "prescribing" the "steps contractors must take in order to work on government contracts" is a way of "promot[ing] an economical and efficient 'system' for both procuring services and per-

forming contracts." 67 F.4th at 941. That conclusion is bolstered by "Presidents' historical practices" of issuing FPASA directives, "many of which undeniably affected contractors' own operations rather than merely the government's entry into contracts." *Id.* at 941-942. And as the Court recognized, *id.* at 942, executive orders under FPASA do not rely on the statement of statutory objectives, 40 U.S.C. § 101(1), as the source of the President's authority. It is § 121(a) that supplies the operative authority; the statement of objectives in § 101(1) simply supplies "a clear textual limiting principle" for the authority codified in § 121(a), ensuring that "the President can *only* prescribe policies and directives that he 'considers necessary' to ensure 'an economical and efficient system' for procurement and contracting." 67 F.4th at 942.[2]

    b.    Plaintiffs next invoke "the avoidance and federalism canons of interpretation," arguing that the Court should read FPASA "narrowly" in order to "avert[] non-

---

[2] Plaintiffs' amici (Br. 9) also invoke a footnote in *Chrysler Corp v. Brown*, 441 U.S. 281, 304 n.34 (1979), but that footnote sheds no meaningful light on the interpretive issue here. The question in *Chrysler* was whether a disclosure of information provided pursuant to an executive order issued under FPASA would violate a criminal statute, the Trade Secrets Act, and the answer turned on whether the regulation requiring the disclosure was "law," such that the disclosure was "authorized by law." *Id.* at 285, 295. In the course of addressing that issue, the Supreme Court concluded that it was "not necessary to decide whether" the executive order was authorized by FPASA or by other statutes. *Id.* at 304. It then observed in the footnote that "[l]ower courts ha[d] suggested that" FPASA "was the authority for predecessors of" the executive order in question, but it noted that "these suggestions were dicta." *Id.* at 304 n.34. The footnote is, in short, dicta about dicta—and it is noncommittal about whether the prior dicta was correct. *See Louisiana*, 55 F.4th at 1025-1026 & n.24 (5th Cir. 2022) (explaining that *Chrysler*'s discussion of FPASA is "dicta" and "not particularly direct" in any event).

delegation problems" and reserve to States the regulation of minimum wages. Br. 31-33. But plaintiffs recognize that *Mayes* rejected those arguments, too.

*First*, the Court recognized in *Mayes* that FPASA does not raise any serious non-delegation questions because it contains "a clear intelligible principle" that "'can be applied generally to the President's actions to determine whether those actions are within the legislative delegation.'" 67 F.4th at 943 (quoting *Kahn*, 618 F.2d at 793 n.51). Plaintiffs contend (Br. 32) that that "'intelligible principle'" would be "read out of the statute" if it were interpreted to allow "the President to regulate one fifth of the United States workforce," but the fact that an action exercising delegated authority has significant effects does not mean that the delegation lacked appropriate bounds. In any event, as discussed below (at 37-38), plaintiffs significantly overstate the effects of the challenged executive order.

*Second*, the Court held in *Mayes* that the executive order at issue in that case—requiring the inclusion in federal contracts of a clause requiring contractors' employees to be vaccinated against COVID-19—did not raise federalism or state sovereignty concerns because it was "aimed at federal contracting, even if also motivated by health and safety concerns" that might be regarded as state prerogatives. 67 F.4th at 943-944; *see also, e.g.*, *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438-441 (9th Cir. 1991) (state licensing requirements were preempted as to federal contractors). Moreover, the Court observed, "the federal government does not 'invade[]' areas of state sovereignty 'simply because it exercises its authority … in a manner that displaces the States' exercise of

their police powers.'" 67 F.4th at 944 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). Plaintiffs appear to recognize that those holdings foreclose their argument that the challenged executive order "wipes out state authority" by directing federal agencies to require, by contract, the payment of a wage higher than the state minimum. As in *Mayes*, the challenged requirement is "aimed at federal contracting," *id.* at 943-944, and it does not undermine the States' powers any more than Congress would be deemed to violate state sovereignty (contra *Hodel*) if it set a federal minimum wage exceeding those set by the States.

c. Finally, plaintiffs invoke the major questions doctrine. Br. 33-38. But that argument, too, is both foreclosed by *Mayes* and incorrect even aside from *Mayes*.

The major questions doctrine, as articulated by the Supreme Court, "requires Congress to speak clearly if it wishes to assign to *an agency* decisions of vast economic and political significance." *Mayes*, 67 F.4th at 932-933 (quotation marks omitted). The doctrine "is motivated by skepticism of agency interpretations that 'would bring about an enormous and transformative expansion in … regulatory authority without clear congressional authorization.'" *Id.* at 933. But FPASA delegates authority "to *the President*," not to an agency, and it accordingly does not implicate the concerns underlying the major questions doctrine, "as the President 'does not suffer from the same lack of political accountability that agencies may, particularly when *the President* acts on a question of economic and political significance.'" *Id.* (quoting *Georgia*, 46 F.4th at 1313 (Anderson, J., concurring in part and dissenting in part), and citing *Louisiana*, 55 F.4th

at 1038 (Graves, J., dissenting)). To the contrary, "'[t]he Framers made the President the most democratic and politically accountable official in Government.'" *Id.* (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020)). Plaintiffs appear to argue (Br. 35) that presidential accountability should matter less in determining the scope of "statutory grants of power" than in analyzing "congressional *restrictions* on presidential power," but they fail to explain why that would be so. And any concern about Executive Branch agencies exceeding their statutory authority is further diminished here in light of the President's inherent Article II power to exercise "'general administrative control' … throughout the Executive Branch of government, of which he is the head," *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002), including by managing the performance of employees and contractors alike, *see NASA*, 562 U.S. at 150.

The major questions doctrine is also inapplicable because a FPASA directive is an exercise of "proprietary authority," *Mayes*, 67 F.4th at 935, as opposed to "an exercise of regulatory authority," *id.*, or of some other power of "'the administrative state,'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). It is a directive by the Chief Executive to Executive Branch agencies about how to exercise the Executive's contracting authority—not a directive governing members of the public. "Like private individuals and businesses, the Government enjoys the unrestricted power … to determine those with whom it will deal[.]" *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). The challenged executive order, like other FPASA directives, reflects the President's management decision that the federal government will do business with companies only on terms that

he regards as promoting economy and efficiency. When the government acts "in its capacity 'as proprietor' and manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'" *NASA*, 562 U.S. at 148. Plaintiffs contend (Br. 37-38) that "[t]he Executive's inherent authority to act as a proprietor does not include a power to set a nationwide minimum wage," but again, that is not what the challenged executive order does. The order simply directs agencies to enter covered contracts only with companies willing to pay their workers what the President regards as an adequate wage for work on or in connection with the contract— not to pay that wage to all their workers for all their working hours.

The challenged executive order is hardly unique in adopting a policy concerning the exercise of the Executive Branch's proprietary authority that the Executive lacks the regulatory power to impose outside of the contracting context. For example, President Bush's order requiring agencies to contract only with employers that use E-Verify, upheld in *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, followed Congress's decision to forbid the Executive Branch from imposing such a requirement on private businesses, *see Chamber of Commerce v. Whiting*, 563 U.S. 582, 590-591 (2011).

The challenged executive order is also not "vast" or "transformative" in its consequences, *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). As this Court explained in *Mayes*, "Presidents have used [FPASA] to require federal contractors to commit to affirmative action programs when racial discrimination was threatening contractors' efficiency; to adhere to wage and price guidelines to help combat inflation in

the economy; to ensure compliance with immigration laws; and to attain sick leave parity with non-contracting employers because federal contractors were lagging behind and losing talent." 67 F.4th at 938. The Court held there that it was "not a 'transformative expansion' of that same authority to require federal contractors … to take vaccination-related steps … that promote economy and efficiency," *id.*, and the same is true of the minimum-wage requirement at issue here. Indeed, the challenged executive order simply builds on the foundation of a minimum-wage requirement adopted in 2014 and unchallenged since.

Plaintiffs suggest (Br. 36) that the challenged executive governs "'one-fifth of the American workforce.'" But even if an effect of that size would cause the order to implicate the major questions doctrine—which it would not, for the reasons discussed above—plaintiffs' figure considerably overstates the number of workers affected by this order. It refers to the total proportion of workers employed by a company that con-tracts with the federal government. But the requirement at issue here will affect only a fraction of them—those who work on or in connection with covered federal con-tracts—and only for the hours that they spend doing so. In the implementing rule, the Department of Labor determined that roughly 1.8 million workers were "potentially affected" by the requirement (because they work on covered contracts), and that of those, only "327,300 [would] be affected and see an increase in wages" during the first year of the requirement's existence, including because many of the workers in question already earned more than the specified wage. 86 Fed. Reg. at 67,200. That figure

(327,300) is roughly one-fifth of one percent of the U.S. workforce[3] and roughly one-thirtieth of the number of employees affected by the COVID-19 vaccination requirement for healthcare workers, which the Supreme Court upheld without discussion of the major questions doctrine, *see Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam); *id.* at 655 (Thomas, J., dissenting) (noting the requirement's application to "10 million healthcare workers"). By contrast, the worker safety standard to which the Supreme Court applied the major questions doctrine in *NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), "applie[d] to roughly 84 million workers." *Id.* at 662.

In short, *Mayes* forecloses plaintiffs' arguments for a narrowing construction of the President's FPASA authority, but those arguments would fail even aside from *Mayes*.

## II. The Implementing Rule Is Valid

Plaintiffs contend that, even if the challenged executive order fell within the President's authority, the Department of Labor's rule implementing the order should be held unlawful and set aside for three reasons: first, that the Department did not consider alternatives to requiring contractors to pay a $15 minimum wage; second, that the Department did not consider the effect of the requirement on States as contractors; and third, that the Department's economy-and-efficiency analysis was arbitrary and capricious as well as pretextual.

---

[3] As of June 2023, the Bureau of Labor Statistics estimated that 167.91 million Americans were part of the civilian labor force. *Table A-1: Employment Status of the Civilian Population by Sex and Age*, https://www.bls.gov/news.release/empsit.t01.htm (last visited July 29, 2023).

Those arguments largely invite the Court to perform a type of review that is unavailable under the APA—review of the President's own policy decisions. It is settled that "[t]he actions of the President … are not reviewable under the APA," because "the President is not an 'agency'" within the meaning of that statute. *Dalton v. Specter*, 511 U.S. 462, 470 (1994) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992)). It follows that, to the extent that an agency simply carries out policy determinations made by the President, under authority delegated to him, a court cannot apply APA standards of review to the agency's implementation of those policy judgments any more than it could apply them to the President's order itself. Doing so would incorrectly imply that the agency had discretion to make the relevant determinations, when in reality it is bound by the President's determinations. *See, e.g.*, *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010) (executive order is "'binding on …agencies'").

For example, in recent litigation over the validity of the President's executive order requiring federal employees to be vaccinated against COVID-19, a district court explained that the President's determination of the requirement was "not reviewable under the APA" and that applying APA standards to the determination as implemented by the agency "would contravene the thrust of the Supreme Court's holding in *Franklin* by subjecting almost every executive order to APA review." *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir. 2023) (en banc),

*petition for cert. filed*, No. 23-60 (July 21, 2023); *see also, e.g.*, *Detroit Int'l Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 102 (D.D.C. 2016) (action taken by State Department was "unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law"), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018); *Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402-403 (D. Md. 2011) (similar), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012); *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (similar, as to action by the Forest Service "carrying out directives of the President"), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002).

In a similar vein, the Supreme Court declined to consider claims that the Secretary of Homeland Security acted arbitrarily or capriciously in determining that the Deferred Action for Childhood Arrivals program was unlawful, where the determination of legality was statutorily vested in the Attorney General. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020). The Court explained that the plaintiffs raising that claim failed to address why the Secretary of Homeland Security would be "required to explain a legal conclusion that was not hers to make." *Id.* That reasoning applies with equal force where plaintiffs seek arbitrary-and-capricious review of a determination made not by an agency but by the President, in the exercise of authority statutorily vested in him.

Plaintiffs' contrary arguments are red herrings. *First*, plaintiffs suggest (Br. 42-43) that the President's exercise of his FPASA authority would be "place[d] … beyond

question" if it could not be reviewed through APA scrutiny of the implementing rule. But no one doubts that executive orders invoking statutory authority, including directives issued under FPASA, can be reviewed for their consistency with the authorizing statute. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331-1332 (D.C. Cir. 1996). That is why it is proper for this Court to decide whether the challenged executive order is within the President's authority under FPASA. The question is whether, in addition to that review for statutory authority, the federal courts can also review the President's directives (as implemented by an agency) under the usual APA standards that apply to agency actions. A negative answer to that question hardly "place[s] … beyond question" (Br. 42) the President's exercise of FPASA authority; it simply limits the *type* of question courts may ask. And to the extent it limits review of presidential directives, it follows from Congress's choice not to specify that the APA applies to the President. *See Franklin*, 505 U.S. at 800-801.

*Second*, plaintiffs suggest (Br. 43) that denying APA review of the President's own judgments "would allow the President to insulate virtually any agency action from APA review with the stroke of a pen," "by using his constitutional power to direct" actions by the agencies under his Article II authority. But no one is suggesting that an agency's exercise of its own authority under a legislative delegation of power is immune from APA review simply because the President tells the agency how to exercise that authority. The relevant power here is not delegated to an agency; Congress vested it directly in the President. 40 U.S.C. § 121(a). That is why the President's exercise of the authority, even

as implemented by an agency, cannot properly be reviewed under the APA. *See, e.g.,* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001) (cited in *Detroit Int'l Bridge*, 189 F. Supp. 3d at 104-105) (distinguishing a challenge "to an action delegated to an agency head but directed by the President," as to which "the review provisions usually applicable to that agency's action should govern," from "a challenge to an action that Congress has committed to the sole discretion of the President").

*Third*, plaintiffs observe (Br. 43-45) that not everything the Department did in implementing the challenged executive order was determined by the President. The Department exercised significant discretion of its own—for example, in determining what constitutes a "contract or contract-like instrument," 86 Fed. Reg. at 67,133-67,135; or whether to apply the rule in overseas territories of the United States, *id.* at 67,138-67,139; or whether to exclude employees who spent less than twenty percent of their time working on or in connection with a federal contract, *id.* at 67,217. But no one doubts that those determinations, by the Department itself, can properly be reviewed under the ordinary APA standards. Such review does not implicate the bar against reviewing the President's own determinations under the APA.

The two decisions of this Court on which plaintiffs rely (Br. 40-41)—*Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017) (per curiam), and *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)—are consistent with these principles. In *Hawaii*, which the Supreme Court later reversed on other grounds, *Trump v. Hawaii*, 138 S. Ct. 2382 (2018), this Court recognized the availability of an APA cause of action to review

the legality of President Trump's ban on the entry of certain foreign nationals, pursuant to authority delegated to the President under 8 U.S.C. § 1182(f), on the ground that the executive action had been implemented through actions by two agencies. 878 F.3d at 680-681. But the Court did not apply arbitrary-and-capricious review to the President's judgment; it reviewed that judgment only for statutory and constitutional authority. *See id.* at 683-698. As noted above, no one disputes that the Court may similarly review whether the executive order challenged here is a lawful exercise of FPASA authority.

By contrast, *East Bay Sanctuary Covenant* involved a challenge to an exercise of authority delegated not to the President but to an agency, under 8 U.S.C. § 1158(b)(2)(C). The agency established a rule that a noncitizen "entering 'along the southern border with Mexico'" could "not be granted asylum" if he or she was "'subject to a presidential proclamation … suspending or limiting'" entry at that border. 932 F.3d at 754. The President then issued such a proclamation, invoking 8 U.S.C. § 1182(f), the statute at issue in *Hawaii. Id.* at 761. The Court subjected the agency's rule (including insofar as it relied on the proclamation to create a "rule of decision for asylum eligibility") to arbitrary-and-capricious review. *Id.* at 770-775. But it did *not* review the President's exercise of his § 1182(f) authority under that standard. To the contrary, the Court took pains to note that the "rule of decision" that the plaintiffs were challenging was "not an exercise of the President's authority under § 1182(f)." *Id.* at 773. *East Bay Sanctuary Covenant* is thus fully consistent with the principle that courts will not apply ordinary APA standards to a President's exercise of his own authority.

That principle is fatal to most of plaintiffs' arbitrary-and-capricious arguments (Br. 45-54). In particular, the Court cannot review whether the Department acted arbitrary or capriciously by declining to consider alternatives to directing agencies to adopt contract clauses requiring a $15-per-hour minimum wage—alternatives like "'modify[ing] the amount of the … minimum wage rate, chang[ing] the effective date for the wage rate, or phas[ing] in the wage rate over a number of years'" (Br. 46)— because, as the Department explained, those choices would have been inconsistent with the President's direction. 86 Fed. Reg. at 67,130. Nor can the Court review whether the Department acted arbitrarily or capriciously in explaining why the requirement for agencies to adopt $15-per-hour minimum wage clauses would advance economy and efficiency in federal contracting. Congress vested the President, not the Department, with authority to make that determination under FPASA. The Department's analysis simply explains why the President's judgment was reasonable. Plaintiffs' argument (Br. 53) that the Department's analysis was "pretextual" misses the point: Unlike in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), where the relevant judgment (whether to include a citizenship question on the Census) was vested in an agency, here there was no doubt that the President had already made the judgment plaintiffs are attacking. The Department was hardly engaged in "subterfuge" (Br. 54).

That leaves plaintiffs' arguments (Br. 48-50) that the Department acted arbitrarily in exercising its authority to create "exclusions from the requirements" at issue—an authority granted by Section 4(a) of the challenged executive order, 86 Fed. Reg. at

22,836.  In particular, plaintiffs contend (Br. 49-50) that the Department should have granted such an exclusion for States.  Those arguments are reviewable under the APA, since they challenge the Department's exercise of discretion, as opposed to the President's exercise of his own powers.

But the arguments fail on the merits:  The agency did not fail "'to consider its other obligations and any alternatives'" to the rule it adopted (Br. 46).  The Department was well aware of its authority to exclude certain types of contracts or contractors from the minimum-wage requirement, as evidenced by its decision (noted above) to create "an exclusion from coverage for" workers covered by the Fair Labor Standards Act "who spend less than 20 percent of their work hours in a workweek performing 'in connection with' covered contracts," 86 Fed. Reg. at 67,217; *see also id.* at 67,227 (codified at 29 C.F.R. § 23.40) (full set of exclusions).  And although plaintiffs fault the Department for not explicitly considering such an exclusion for States, they fail to point to any comment asking the Department to do so.  This Court generally "will not consider issues not presented before an administrative proceeding at the appropriate time," *Marathon Oil Co. v. United States*, 807 F.2d 759, 767 (9th Cir. 1986)—a policy reflecting, as a matter of "[s]imple fairness," the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice," *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

**III.** **If This Court Reverses The District Court's Dismissal Of This Suit, It Should Remand For The District Court To Consider Any Request For Injunctive Relief**

Finally, plaintiffs ask (Br. 54-57) that this Court "instruct the district court to enter a preliminary injunction" if it reverses the district court's dismissal of this suit. But they cite no case where this Court has taken that extraordinary step in an appeal from an order that dismisses a suit and thus denies a preliminary-injunction motion as moot, as opposed to an appeal from an order resolving a preliminary-injunction motion on the merits. *See* Br. 55 (citing *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007) (per curiam) (appeal from preliminary-injunction ruling); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) (same)). This Court has held that it "must allow the district court to address the merits of" a "preliminary injunction motion in the first instance," on remand from the reversal of a ruling "dismiss[ing] the entire action," if the district court's decision not to "address the merits of the preliminary injunction motion" leaves this Court with an inadequate "evidentiary record to decide the appropriateness of a preliminary injunction." *Wiener v. County of San Diego*, 23 F.3d 263, 268-269 (9th Cir. 1994); *see also Epona, LLC v. County of Ventura*, 876 F.3d 1214, 1227 (9th Cir. 2017) (similarly remanding for consideration of preliminary injunction after reversing dismissal).

Indeed, even where a district court has ruled on a preliminary-injunction motion, this Court regularly remands for the district court to address the other preliminary-injunction factors if it disagrees with the district court's analysis of one of them. *See,*

*e.g.*, *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 763 (9th Cir. 2022) (en banc); *Arc of California v. Douglas*, 757 F.3d 975, 992 (9th Cir. 2014); *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013). It has emphasized in doing so that "'[a] preliminary injunction is an extraordinary remedy never awarded as of right,'" *Evans*, 736 F.3d at 1307; that "'[t]he grant of a preliminary injunction is a matter committed to the discretion of the trial judge,'" *Geo Grp.*, 50 F.4th at 763; and that the equitable factors of the preliminary-injunction standard "present … intensely factual questions" of the sort that "'should be decided in the first instance by the district court,'" *Arc of California*, 757 F.3d at 992.

That concern is amply present here. Plaintiffs present the irreparable-harm analysis cursorily (Br. 55-57), as if the district court's standing analysis would necessarily also establish that they face irreparable harm in the absence of an injunction. But standing to seek injunctive relief requires only "material risk of future harm … , at least so long as the risk of harm is sufficiently imminent and substantial," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021); by contrast, the irreparable-harm element of the preliminary-injunction standard requires a *likelihood* of future injury, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In order to determine whether plaintiffs can carry their burden as to irreparable harm, the district court would therefore need to determine from evidence whether the challenged requirement is actually *likely* to harm plaintiffs, notwithstanding the significant benefits (to employees' morale, productivity, and so forth) anticipated by the President and the Department. This Court lacks a

sufficient foundation to render that finding on its own. The same is true as to the balance-of-equities and public-interest factors (which merge here, as plaintiffs note (Br. 57)). Plaintiffs argue, for example, that the challenged requirement is likely to have various ill effects on the public—but as noted above, the President and the Department marshaled evidence for the opposite conclusion. The district court would need to resolve that dispute.

There is, moreover, no need to short-circuit the orderly litigation process in this case. Plaintiffs' amici (Br. 19-26) describe the supposedly "dire" consequences of the challenged requirement, but one would not know from their discussion that the requirement has been in effect since January 30, 2022, except to the limited extent it was enjoined pending appeal by the Tenth Circuit. Order, *Bradford v. U.S. Department of Labor*, No. 22-1023 (10th Cir. Feb. 17, 2022).[4] To the extent any "dire" results have occurred in reality, rather than as a matter of academic theory, neither plaintiffs nor amici make any attempt to identify them. Plaintiffs waited more than two months after filing this suit (and nearly three months after the challenged requirement took effect) even to seek a preliminary injunction, ER-150–154, and made no effort to expedite this appeal or seek an injunction pending appeal. Absent any apparent urgency even from plaintiffs'

---

[4] That injunction bars enforcement of the minimum-wage requirement solely "in the context of contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands." *Id.* at 2.

perspective, this Court need not reach out to make a decision ordinarily, and in this case imperatively, reserved for the district court.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

GARY M. RESTAINO
*United States Attorney*

MARK B. STERN

/s/ Daniel Winik
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

## STATEMENT OF RELATED CASES

I am unaware of any related case pending in this Court.

*/s/ Daniel Winik*
Daniel Winik

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** <u>No. 23-15179</u>

     I am the attorney or self-represented party.

     **This brief contains** <u>12,469</u> **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>*/s/ Daniel Winik*</u>      **Date** <u>August 21, 2023</u>

# ADDENDUM

# TABLE OF CONTENTS

40 U.S.C. § 101 ................................................................................A1

40 U.S.C. § 121 ................................................................................A1

**40 U.S.C. § 101**

## § 101. Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

**40 U.S.C. § 121**

## § 121. Administrative

(a) Policies prescribed by the President.—The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

…