No. 23-15179

STATE OF NEBRASKA, ET AL.,

*Plaintiffs-Appellants,*

v.

MARTIN WALSH, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Arizona
(Case No. 2:22-cv-213-JJT)

# BRIEF OF NATIONAL EMPLOYMENT LAW PROJECT, COMMUNICATIONS WORKERS OF AMERICA, SERVICE EMPLOYEES INTERNATIONAL UNION, NATIONAL WOMEN'S LAW CENTER, ECONOMIC POLICY INSTITUTE, AND GRAND CANYON INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Jeffrey Dubner
Brooke Menschel*
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
jdubner@democracyforward.org
bmenschel@democracyforward.org

*Counsel for* Amici Curiae

* 9th Circuit admission pending

1

# CORPORATE DISCLOSURE STATEMENT

The National Employment Law Project is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the NELP.

The Communications Workers of America is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the CWA.

The Service Employees International Union is a non-profit labor organization and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the SEIU.

The National Women's Law Center is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the NWLC.

The Economic Policy Institute is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the EPI.

The Grand Canyon Institute is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the GCI.

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ 4

Interest of *Amici Curiae* ............................................................................. 7

Summary of the Argument ......................................................................... 11

Argument ....................................................................................................... 13

    I.     E.O. 14,026 is within the President's Procurement Act authority ............ 13

        A. The President's Procurement Act authority extends to setting minimum wage requirements for those who choose to contract with the federal government ........................................................................................... 14

        B. The Department properly relied on evidence that increasing the federal contractor minimum wage increases employee morale and productivity and reduces turnover, absenteeism, and income inequality .................... 19

    II.    Appellants' failure to establish any of the requirements for preliminary injunctive relief, and the countervailing harms such relief would cause, weigh against a preliminary injunction .................................................... 26

Conclusion .................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) ................................................................................ 11, 14, 15-17

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) .................................................. 18

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ........................... 15

*City of Albuquerque v. DOI*, 379 F.3d 901 (10th Cir. 2004)........................................ 14

*Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159 (3d Cir. 1971) ................ 25

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112 (9th Cir. 2008) ................................................................................................. 27

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ............................................. 15

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) ............................................. 27

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) ................................................................................................. 26

*Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020)................................................... 26

*UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003).............. 14

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) .................................................. 12, 16-18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................................ 26

**Statutes**

Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 1, 1978) ..................................... 17

Exec. Order No. 13,658, 79 Fed. Reg. 9,851 (Feb. 12, 2014) .......................... 12, 17, 24

Exec. Order No. 13,838, 83 Fed. Reg. 25,341 (May 25, 2018).................................... 17

Exec. Order No. 14,026, 86 Fed. Reg. 22,835 (Apr. 27, 2021)............................. 11, 15

40 U.S.C. § 101 .......................................................................................... 14

40 U.S.C. § 121(a) ....................................................................................... 11

**Rules and Regulations**

Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 67126-01 (Nov. 24, 2021) ..........................................................................11, 15-17, 19, 20, 24-27

**Other Authorities**

Alexandre Mas & Enrico Moretti, *Peers at Work*, 99 Am. Econ. Rev. 112 (2009), (2009), https://www.princeton.edu/~amas/papers/text20.pdf................................ 20

Angela Bruns & Natasha Pilkauskas, *Multiple Job Holding and Mental Health Health Among Low-income Mothers*, 29(3) Womens Health Issues (May 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7141154/ ........................................... 27

Burgess Everett, *8 Democrats Defect on $15 Minimum Wage Hike*, Politico (Mar. 5, 2021), https://www.politico.com/news/2021/03/05/democrats-15-minimum-wage-hike-473875................................................................................................... 18

Candace Howes, *Living Wages and Retention of Homecare Workers in San Francisco*, 44 Indus. Rel. 139 (2005)........................................................................... 21

Courtney Jenkins Sievers, *Multiple Job Holders: The Impact of Employment Structure on Health, Access to Care, and the Effect of Policy Intervention,* University of Memphis Digital Commons 28-30 (2020)............................................................. 27

David Fairris et al., *Examining the Evidence: The Impact of the Los Angeles Living Wage Ordinance on Workers and Businesses* (2015), https://drive.google.com/file/d/1M3Mw4wybCGcG_5-5cbUBrpRKmEH_6-my/view....................................................................................................... 21

Heather Boushey & Sarah Jane Glynn, Ctr. for Am. Progress, *There are Significant Business Costs to Replacing Employees* 1 (2012), https://ampr.gs/3gMouL6 ....... 23

Hong Soon Kim & SooCheong Jang, *Minimum Wage Increase and Firm Productivity: Evidence from the Restaurant Industry*, 71 Tourism Mgmt. 378 (2019)................ 20

Jeff Thompson & Jeff Chapman, *The Economic Impact of Local Living Wages*, Econ. Pol'y Inst. Briefing Paper #170 (2006) https://files.epi.org/page/-/old/briefingpapers/170/bp170.pdf ........................................................................ 19

Jesse Wursten & Michael Reich, Inst. for Rsch. On Lab. and Emp., *Racial Inequality and Minimum Wages in Frictional Labor Markets* (2021), https://bit.ly/3w5bF5V .................................................................................... 24

Michael Reich et al., U.C. Berkley Inst. of Indus. Rel., *Living Wages and Economic Performance, the San Francisco Airport Model* (2003) https://laborcenter.berkeley.edu/wp-content/uploads/2021/06/Living-Wages-and-Economic-Performance-The-San-Francisco-Airport-Model.pdf ............................ 21

Natalia Emanuel & Emma Harrington, *The Payoffs of Higher Pay: Elasticities of Productivity and Labor Supply with Respect to Wages* (2020), https://bit.ly/34YuRIi .................................................................................... 20

Nat'l Women's Law Ctr., Nat'l Women's Law Ctr., *A Window Into The Wage Gap: What's Behind It and How to Close It* (Oct. 2020), https://nwlc.org/resource/wage-gap-explainer/ ......................................................................................... 24

Paul Sonn & Tsedeye Gebreselassie, Nat'l Emp. L. Project, *The Road to Responsible Contracting: Lessons from States and Cities for Ensuring the Federal Contracting Delivers Good Jobs and Quality Services* (2009) https://inthepublicinterest.org/the-road-to-responsible-contracting/ ............................................................. 21

Ray A. Smith, *More Workers Get Side Hustles to Keep Up with Rising Costs*, Wall Street Journal (Nov. 7, 2022), https://www.wsj.com/articles/more-professionals-need-to-get-second-jobs-because-of-inflation-11667774723 ................................. 27

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are non-profit organizations and unions that advocate for workers' rights, including for increased wages and benefits and for closing racial and gender wage gaps. *Amici* accordingly have a strong interest in improved employment standards for workers employed by businesses who benefit from contracts with the federal government.

The **National Employment Law Project ("NELP")** is a non-profit legal organization with over fifty years of experience advocating for the employment rights of workers in low-wage industries. NELP's areas of expertise include minimum wages, workplace health and safety, and worker mobility. NELP has collaborated closely with state and federal agencies, community-based worker centers, unions, and state policy groups, including in Ninth Circuit states, and has litigated and participated as *amicus curiae* in numerous cases addressing workers' wage and hour and health and safety rights under federal and state laws. NELP has submitted testimony to the U.S. Congress and state legislatures on numerous occasions on the importance of the economic security that accompanies living minimum wages, and on workplace health and safety.

---

[1] Counsel for all parties have consented to filing this brief. *Amici* certifies that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *amici*, their members, and their counsel contributed money intended to fund this brief.

The **Communications Workers of America, AFL-CIO ("CWA")** is a union of hundreds of thousands of public and private sector workers in communities across the United States, Canada, Puerto Rico, and other U.S. territories. Its members work in telecommunications and IT, the airline industry, manufacturing, news media, broadcast and cable television, education, health care, public service, and other fields. CWA organizes and represents thousands of federal contract employees covered by Executive Order 14,026. CWA and its industrial division, IUE-CWA, represent federal service contract workers who fix military fighter jets and other aircraft, support satellite operations, and provide ID badge services, among other occupations. Of particular relevance, CWA Local 7781, the United Professional Ski Patrols of America, represents Ski Patrollers at Crested Butte, Park City, Steamboat, Telluride, and Stevens Pass, and is committed to improving the working conditions of Ski Patrollers whether they work on or off federal lands. For years, CWA members have fought to improve workplaces by bargaining to improve pay and benefits, and for equal treatment, while advocating for labor standards that protect the safety and economic wellbeing of all workers.

The **Service Employees International Union ("SEIU")** is a labor union representing two million working people, including essential workers in property services, healthcare, and public service. Thousands of these workers provide services to the federal government on contracts to clean federal buildings, secure

important facilities, provide food services, and render essential assistance to our nation's veterans. SEIU is an anti-racist organization. Federal contract workers are disproportionately people of color, and SEIU views raising wages on federal contracts as not only a smart procurement policy, but also an economic and racial justice imperative.

The **National Women's Law Center ("NWLC")** fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls. NWLC uses the law in all its forms to change culture and drive solutions to the gender inequity that shapes our society and to break down the barriers that harm all of us—especially women of color, LGBTQ people, and low-income women and families. Since its founding in 1972, NLWC has worked to advance workplace justice, income security, educational opportunities, and health and reproductive rights for women and girls and has participated as counsel or *amicus curiae* in a range of cases. NWLC is committed to advocating for workers' rights and has a strong interest in supporting increased minimum wage requirements for workers whose employers benefit from contracting with the federal government.

The **Economic Policy Institute ("EPI")** is a non-profit organization with over thirty-five years of experience analyzing the effects of economic policy on the lives of working people in the United States. EPI has studied and produced extensive research examining how the minimum wage affects workers and the economy, who

benefits from the minimum wage, and how the declining value of the federal minimum wage over time has contributed to the growth in U.S. income inequality. This research includes the impact of increasing the minimum wage for federal contractors to $15 per hour. EPI has participated as *amicus curiae* in numerous cases impacting workers' rights under federal and state wage and hour laws. EPI strives to protect and improve the economic conditions of working people. EPI is concerned that all working people in the United States have good jobs with fair pay.

The **Grand Canyon Institute ("GCI")** is a centrist nonprofit think tank led by former state lawmakers, economists, community leaders, and academicians. The GCI is dedicated to informing and improving public policy in Arizona through evidence-based, independent, objective, nonpartisan research reflecting a pragmatic approach to addressing economic, fiscal, budgetary and taxation issues confronting Arizona. GCI has done prior analyses of the impact of increasing the state's minimum wage via initiative in 2016 that was touted by both proponents and opponents of the measure. GCI subsequently provided an analysis used during litigation after the initiative became law. GCI continues to analyze wage, employment, and unemployment issues in the State.

## SUMMARY OF THE ARGUMENT

For decades, courts have recognized that the Federal Property and Administrative Services Act of 1949 (widely known as the "Procurement Act") provides the President "particularly direct and broad-ranging authority" to set standards "the President considers necessary" to promote economy and efficiency for those who choose to contract with the federal government.[2]

Just like his predecessors, President Biden exercised his Procurement Act authority in issuing Executive Order 14,026 ("E.O. 14,026"), which "promotes economy and efficiency" by increasing the minimum wage for companies that choose to contract with the federal government to $15/hour, incrementally increasing tipped workers' minimum hourly wage, and revoking exemptions for certain outdoor recreational service employers.[3]

In promulgating a Rule to implement E.O. 14,026,[4] the Department of Labor ("Department") reasonably concluded that increasing the federal contractor minimum wage will increase employee productivity and decrease employee turnover and absenteeism. In doing so, it relied on studies across various industries and academic literature demonstrating that higher wages incentivize workers to stay

---

[2] *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979); 40 U.S.C. § 121(a).

[3] Administrative Record ("AR") 1 ¶ 1 at 22,835. All AR references are to the District Court Administrative Record filed at Dkt. 32-1.

[4] AR 2 ¶ 9.

in their jobs, reducing employee turnover, absenteeism, and the resulting costs, and increasing employee morale and productivity. This evidence, described further below, supports the Department's conclusion that increasing the minimum wage will increase economy and efficiency within the federal government.[5]

Both E.O. 14,026 and the Final Rule align with decades of executive and agency action pursuant to the Procurement Act and are consistent with federal law, yet Appellants —the States of Nebraska, Idaho, Indiana, and South Carolina—argue that these measures exceed the well-established Procurement Act authority because they do not bear a sufficient nexus to economy and efficiency. Appellants are mistaken. Moreover, Appellants concession that they have not challenged a similar executive order issued by President Obama or its implementing regulations,[6] despite those enactments being in effect for nearly a decade and being based on the same authority at issue here, demonstrates that this exercise of Procurement Act authority does not amount to the type of "transformative expansion in … regulatory authority" that would implicate the major questions doctrine.[7] This is particularly noteworthy to the extent Appellants have subjected themselves to the President's Procurement Act authority by entering into contracts covered by the earlier executive order.

---

[5] *Id*. at 67,212.

[6] Dkt. 24, Excerpts of the Record ("ER") at 110 ¶ 84 (acknowledging that Executive Order 13,658 and the Department's implementing regulations have "never been subject to court challenge or review").

[7] *West Virginia v. EPA*, 142 S. Ct. 2587, 2610, 2612-13 (2022).

Appellants may disagree with E.O. 14,026's efforts to improve federal government and contractor efficiency by setting a higher minimum wage, but the district court rightly rejected the legally and factually unsupported allegations that the President lacked authority to issue E.O. 14,026, and that the Rule exceeds the Department's authority under the Procurement Act.

Appellants not only failed to show a likelihood of success on the merits, but significant harm would also befall workers in Appellants' States if E.O. 14,026 or the Final Rule were enjoined. Hundreds of thousands of federal contract workers who have already received and relied upon increased wages would suddenly face significant pay cuts and be forced to make difficult financial decisions, harming the affected individuals as well as the broader economy. The Court should therefore affirm the decision of the district court denying Appellants' request for a preliminary injunction and granting Appellees' motion to dismiss.

## ARGUMENT

### I.  E.O. 14,026 is within the President's Procurement Act authority.

The district court properly concluded that Appellants are not likely to succeed on the merits of their claims that the Rule exceeds the President's Procurement Act authority. That conclusion flows directly from both existing precedent and the stated purpose of advancing economy and efficiency, and was amply supported by the Department's record before the district court.

### A. The President's Procurement Act authority extends to setting minimum wage requirements for those who choose to contract with the federal government.

Appellants contend that E.O. 14,026 does not support economy and efficiency. Appellants' Br. 15-20. They further contend that the Procurement Act does not give the President authority to regulate the minimum compensation of employees of contractors and subcontractors. Appellants' Br. 20-27. They are wrong on both counts. The text of the Procurement Act and decades of precedent interpreting the President's statutory authority prove otherwise.

The Procurement Act vests in the President "broad-ranging authority" with "necessary flexibility."[8] The Act's stated purpose is to provide the government "with an economical and efficient system" for activities including "[p]rocuring and supplying property and nonpersonal services."[9] The Act grants the President wide discretion to "prescribe policies and directives that *the President* considers necessary to carry out" the Act's goals.[10] Courts sustain presidential action pursuant to the Act so long as it has a "sufficiently close nexus" to "the values of 'economy' and 'efficiency.'"[11] The terms "efficiency" and "economy" encompass "factors like price, quality, suitability, and availability of goods or services that are involved in all

---

[8] *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003); *see also City of Albuquerque v. DOI*, 379 F.3d 901, 914 (10th Cir. 2004).

[9] 40 U.S.C. § 101.

[10] *Id*. § 121(a) (emphasis added).

[11] *See, e.g., Kahn*, 618 F.2d at 792.

acquisition decisions."[12] Courts recognize that these concepts "reach[] beyond any narrow" construction and include "secondary policy views that deal with government contractors' employment practices—policy views that are directed beyond the immediate quality and price of goods and services purchased."[13]

Under these established principles, Appellants' claims fail. E.O. 14,026 addresses wage standards for federal contractors, which multiple circuits have expressly recognized are within the President's Procurement Act authority.[14] President Biden concluded that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."[15] He reasoned that "ensuring that Federal contractors pay their workers an hourly wage of at least $15.00 will bolster economy and efficiency in Federal procurement."[16] Those are precisely the bases on which Congress authorized the President to invoke Procurement Act authority.

---

[12] *Id*. at 789.

[13] *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333-37 (D.C. Cir. 1996). Courts have upheld the use of Procurement Act authority for various secondary purposes, the "most prominent" involving "a series of anti-discrimination requirements for Government contractors." *Kahn*, 618 F.2d at 790.

[14] *Kahn*, 618 F.2d at 792-93; *Kentucky v. Biden*, 23 F.4th 585, 607 (6th Cir. 2022) (noting that using Procurement Act authority to require federal contractors "to abide by wage and price controls" "has a 'close nexus' to the ordinary hiring, firing, and management of labor.")

[15] AR 1 ¶ 1; *see also* AR 2 ¶ 9 (same).

[16] *Id*.

Meanwhile, the Department determined that, in the event that "Government expenditures may rise," the benefits "expected to accompany any such increase" will result in "greater value to the Government."[17] The Department concluded, "[e]ven without accounting for increased productivity and cost-savings"—which it concluded would likely result from the Rule—"direct costs to employers and transfers are relatively small compared to Federal covered contract expenditures (about 0.4 percent of contracting revenue . . .), and thus… any potential increase in contract prices or decrease in profits will be negligible."[18] For companies unable to pass costs to the government, the Department determined that increased payroll costs would likely be small and able to be mitigated through the Rule's benefits, passing along costs to the public, and "negotiating a lower percentage of sales paid as rent or royalty to the Federal government in new contracts."[19]

Appellants' suggestion that the major questions doctrine divests the President and the Department of their well-established Procurement Act authority is neither compelling nor accurate.[20] Despite Appellants' claims, this is simply not the type of "extraordinary case[]" where the major questions doctrine applies.[21] Neither E.O. 14,026 nor the Rule represent an "unheralded" assertion of power or a

---

[17] AR 2 ¶ 9 at 67,206
[18] *Id.*
[19] *Id.* at 67,206-07.
[20] *See* Appellants' Br. at 33-38.
[21] *See West Virginia*, 142 S. Ct. at 2608 (2022).

"transformative expansion in … regulatory authority," nor do they regulate a sector of the economy that Congress did not intend the President to regulate. [22]

Rather, the decades-long history of at least four presidents exercising this precise authority demonstrates that President Biden's exercise of Procurement Act authority was neither unprecedented nor transformative. Dating back to at least 1978, presidents have exercised their Procurement Act authority to issue executive orders concerning wages for federal contractor employees,[23] and courts have recognized that authority.[24] Far from a novel, unheralded assertion of authority, the President's and the Department's action here is consistent with the scope of prior executive orders on federal contractor minimum wage.

Likewise, neither the economic nor political impact of E.O. 14,026 and the Rule trigger the major questions doctrine. The Department estimates the economic impact of the rule to be $1.7 billion per year.[25] That is a far cry from the hundreds of

---

[22] *Id.* at 2610, 2612-13 (2022) (internal alterations and citations omitted).

[23] *See, e.g.*, Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 1, 1978) (President Carter's E.O. conditioning federal contracts on compliance with wage-and-price controls); Exec. Order No. 13,658, AR 3 ¶ 10(b)(iii) (President Obama's E.O. establishing a minimum wage for federal contractors, including tipped workers); Exec. Order No. 13,838, AR 3 ¶ 10(b)(ii) (President Trump's E.O. maintaining minimum wage rules for federal contractors but providing limited exceptions for certain classes of workers).

[24] *See, e.g.*, *Kahn*, 618 F.2d at 787-93; 43 Fed. Reg. 51,375 (finding that President Carter's Executive Order 12,092 was a valid exercise of Procurement Act authority as the E.O. had a "sufficiently close nexus" to economy and efficiency).

[25] AR 2 ¶ 9, at 67,194.

billions that constitute a "staggering" economic impact sufficient to trigger analysis under the major questions doctrine.[26] Nor do the E.O. or the Rule satisfy any "political significance" requirement. Appellants point to Congressional inaction and state legislative debates on minimum wage as evidence that the E.O. and Rule are of sufficient political significance to trigger the major questions doctrine. But the Congressional action they cited is far broader in scope than the E.O. or the Rule,[27] and the state legislative debates raise complex questions not at issue here. The mere existence of political disagreement with President Biden and the Department does not sweep the E.O. and the Rule into the major questions doctrine.

The President and the Department took the exact type of action Congress empowered them to take, just as decades of administrations have done before. This is plainly not the exceptional case that calls for the application of a special mode of statutory analysis.

---

[26] *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (finding an economic impact of $469 billion to $519 billion sufficiently staggering to trigger the major questions doctrine); *West Virginia*, 142 S. Ct. at 2604 (finding that a $1 trillion projected economic impact triggered the major questions doctrine).

[27] *See, e.g.*, Burgess Everett, *8 Democrats Defect on $15 Minimum Wage Hike*, Politico (Mar. 5, 2021), https://www.politico.com/news/2021/03/05/democrats-15-minimum-wage-hike-473875 (describing an unsuccessful effort to "tack" a $15 minimum wage hike onto a $1.9 trillion COVID aid bill).

**B. The Department properly relied on evidence that increasing the federal contractor minimum wage increases employee morale and productivity and reduces turnover, absenteeism, and income inequality.**

The record before the Department amply supports its conclusion that increasing contractor minimum wage supports "efficiency and economy … in government procurement."[28] The cited studies and literature demonstrate the link between increased wages and efficiencies, including improvements in morale and productivity and decreases in employee turnover and absenteeism. They also show the larger social benefits of reducing poverty and racial and gender wage disparities by increasing wages. And contrary to Appellants' suggestion, the record is replete with evidence to support the Department's position that, "by increasing the quality and efficiency of services" provided to the government, E.O. 14,026 will improve the value of the government's investments.[29]

To support its conclusion regarding increased worker morale and productivity, the Department reviewed studies on efficiency wage theory, an established economic principle[30] that provides that employers paying a premium in wages give "the worker[s] an incentive to try to keep their job, to lower recruiting and turnover

---

[28] AR 2 ¶ 9 at 67,212.
[29] *See* Appellants' Br. at 16-17; AR 2 ¶ 9 at 67,131.
[30] AR 16 ¶ 10(i)(xlii), *also available at* Jeff Thompson & Jeff Chapman, *The Economic Impact of Local Living Wages*, Econ. Pol'y Inst. Briefing Paper #170 (2006) https://files.epi.org/page/-/old/briefingpapers/170/bp170.pdf.

costs[,] or to increase morale and effort."[31] One study looked at the effects of "higher pay on productivity for warehouse workers and customer service representatives, using objective productivity metrics" and estimated that "the increase in productivity caused by raising wages fully pays for itself."[32] Another study concluded that "increasing the federal minimum wage immediately enhances restaurant productivity for up to two years."[33]

Likewise, the Department considered indirect productivity increases that could result from the Rule. For instance, a study of grocery store cashiers recognized that although the industry was "particularly prone to" reduced employee productivity, the addition of a "high productivity worker," such as a person whose wages had increased, raised the "total output directly because the worker has high productivity," but also indirectly as the worker boosts the productivity of others.[34]

---

[31] AR 14 ¶ 10(i)(xvii) at 3, note 3, *also available at* Natalia Emanuel & Emma Harrington, *The Payoffs of Higher Pay: Elasticities of Productivity and Labor Supply with Respect to Wages* (2020), https://bit.ly/34YuRIi.

[32] *Id.* at 3, 16 (finding that increasing warehouse workers pay by $1 increased productivity representing "hourly savings of $1.10"); *id.* at 16 ("[E]ach $1/hr increase in relative pay [for customer service representatives] is associated with a 7.5% increase in call volume, 1.9 additional calls per day off of a based of 26.")

[33] AR 15 ¶ 10(i)(xxvii) at 378, *also available at* Hong Soon Kim & SooCheong Jang, *Minimum Wage Increase and Firm Productivity: Evidence from the Restaurant Industry*, 71 Tourism Mgmt. 378, 380 (2019).

[34] AR 15 ¶ 10(i)(xxxiii) at 143, *also available at* Alexandre Mas & Enrico Moretti, *Peers at Work*, 99 Am. Econ. Rev. 112, 143 (2009), https://www.princeton.edu/~amas/papers/text20.pdf.

Evidence also supports the Department's conclusion that increased wages reduce turnover and absenteeism. Reduced turnover represents "both potential productivity gains and cost savings for the employer" because "more experienced employees … need less supervision and are more skilled at their jobs," resulting in "decreased spending on recruitment, hiring, and supervisor time spent training new employees."[35]

To support its conclusion, the Department cited studies assessing local living wage ordinances.[36] These laws "set wage and benefit standards for companies that do business with the government" in order "to improve the quality of contracted jobs and increase the standard of living for low-income workers."[37] More than 140 cities and the State of Maryland have adopted such laws.[38] Such ordinances often cover

---

[35] AR 14 ¶ 10(i)(xx) at 107, *also available at* David Fairris et al., *Examining the Evidence: The Impact of the Los Angeles Living Wage Ordinance on Workers and Businesses* 107 (2015), https://drive.google.com/file/d/1M3Mw4wybCGcG_5-5cbUBrpRKmEH_6-my/view.

[36] *See id.;* AR 16 ¶ 10(i)(xxxix), *also available at* Michael Reich et al., U.C. Berkley Inst. of Indus. Rel., *Living Wages and Economic Performance, the San Francisco Airport Model* (2003) https://laborcenter.berkeley.edu/wp-content/uploads/2021/06/Living-Wages-and-Economic-Performance-The-San-Francisco-Airport-Model.pdf; AR 16 ¶ 10(i)(xlii); AR 16 ¶ 10(i)(xli), *also available at* Paul Sonn & Tsedeye Gebreselassie, Nat'l Emp. L. Project, *The Road to Responsible Contracting: Lessons from States and Cities for Ensuring the Federal Contracting Delivers Good Jobs and Quality Services* (2009) https://inthepublicinterest.org/the-road-to-responsible-contracting/; AR 14 ¶ 10(i)(xxv), *also available at* Candace Howes, *Living Wages and Retention of Homecare Workers in San Francisco,* 44 Indus. Rel. 139 (2005).

[37] AR 14 ¶ 10(i)(xx) at 1.

[38] AR 16 ¶ 10(i)(xli) at 13.

both employers that contract to supply services to governments, as well as concessions that "contract with the city to operate a business on city property, and typically agree to pay the city a percentage of the revenue generated by that business."[39] Two policies implemented at the San Francisco Airport ("SFO"), one "establishing compensation, recruitment and training standards" for airport safety and security employees and another setting living wage requirements for airport leases and service contracts, are illustrative.[40] According to an implementation study, after wages increased, employee turnover fell by an average of 34% for all contractors, and 60% for contractors that "experienced average wage increases of 10 percent or more."[41] For airport screeners, the turnover rate fell from 94.7% to 18.7% in fifteen months—a nearly 80% decrease.[42]

Other cited studies show similar results. One study assessing the impacts of an ordinance nearly doubling wages for in-home health care workers found a 31% reduction in turnover for all workers and a 57% reduction for new workers.[43] Another study concluded that employers subject to Los Angeles's living wage ordinance had less turnover than those that were not.[44]

---

[39] AR 14 ¶ 10(i)(xx) at 15.
[40] AR 16 ¶ 10(i)(xxxix) at 7.
[41] *Id*. at 10.
[42] *Id*.
[43] AR 14 ¶ 10(i)(xxv) at 161.
[44] AR 14 ¶ 10(i)(xx) at 105-06.

The Department also considered other cost savings associated with reduced employee turnover. For instance, the SFO study showed that the cost of replacing an employee averaged $4,275, and the new wage requirements saved $6.6 million per year from reduced turnover.[45] These findings are not outliers—a review of 30 studies estimated that employee turnover costs employers "about one-fifth of a worker's salary to replace that worker."[46]

Studies on absenteeism and productivity showed similar effects. One study found a statistically significant decrease in employee absenteeism for contractor employers required to pay higher wages under Los Angeles's living wage ordinance, when compared to those that were not.[47] And the SFO study found that one-third of employers reported higher job performance among covered employees, reporting fewer employee grievances (reported by 45% of these employers), decreases in disciplinary issues (44%), and a decrease in absenteeism (29%).[48] The Department reasonably concluded that the "evidence is strong enough to suggest a relationship between increased wages and reduced absenteeism," and that connection, combined

---

[45] AR 16 ¶ 10(i)(xxxix) at 10.
[46] AR 13 ¶ 10(i)(x) at 1, *also available at* Heather Boushey & Sarah Jane Glynn, Ctr. for Am. Progress, *There are Significant Business Costs to Replacing Employees* 1 (2012), https://ampr.gs/3gMouL6.
[47] AR 14 ¶ 10(i)(xx) at 109, 116.
[48] AR 16 ¶ 10(i)(xxxix) at 10.

with "the connection between absenteeism and productivity are well enough established that this is a feasible benefit of the final rule."[49]

The Department further found that increasing the minimum wage could lead to decreases in poverty and race and gender inequality among federal contractor workers. The Department noted that for a full-time worker making $10.95/hour—the minimum wage rate under the unchallenged Rule implementing President Obama's E.O. 13,658[50]—the worker's "annual salary would be $22,776, which is below the 2020 Census Poverty Threshold for a family of four."[51] Increasing the minimum wage to $15/hour increases full-time annual earnings above the poverty threshold. Likewise, the Department rightly recognized that increasing the minimum wage reduces income inequality and racial and gender wage gaps, given that the workers on federal contracts who are paid the lowest wages are disproportionately women and people of color.[52] The Department also cited to analysis and data

---

[49] AR 2 ¶ 9 at 67,214.
[50] AR 4 ¶ 10(c)(iii) at 53,850-01.
[51] AR 2 ¶ 9 at 67,214.
[52] *Id.* at 67,215; *see also, e.g.*, Jesse Wursten & Michael Reich, Inst. for Rsch. On Lab. and Emp., *Racial Inequality and Minimum Wages in Frictional Labor Markets* 30, 3 (2021), https://bit.ly/3w5bF5V (finding minimum wage increases between 1990 and 2019 reduced the Black–white "wage gap by 12 percent overall and by 60 percent among workers with a high school degree or less" and while "minimum wages increase earnings for all race/age/gender groups," they "increase more for black workers and women in general."); Nat'l Women's Law Ctr., *A Window Into The Wage Gap: What's Behind It and How to Close It* (Oct. 2020), https://nwlc.org/resource/wage-gap-explainer/ (demonstrating that women, particularly women of color, experience wage gaps at all education levels in nearly

provided by commenters, including from *Amici* Economic Policy Institute and National Employment Law Project, as well as U.S. Bureau of Labor Statistics data, showing that many of the industries affected by the Rule are disproportionately comprised of people of color and/or women—and that "[b]ecause they are otherwise paid disproportionately low wages, Black and Hispanic workers would also receive the largest pay increases."[53] As courts have long recognized, workplace racial inequities undermine efficiency in government contracting, and acting to combat those inequalities is authorized by the Procurement Act.[54]

Appellants are entitled to disagree with the Department's conclusion that the Rule supports economy and efficiency, but that amounts to a policy disagreement, not an ultra vires claim. The evidence cited in the Rule is itself sufficient to show that the Department was well within its authority to find that the Rule supports economy and efficiency, and moreover that its actions were neither arbitrary nor capricious.

_____

every occupation, are overrepresented in low-paid jobs, and are "typically paid only 84 cents for every dollar paid to their male counterparts").

[53] AR 2 ¶ 9 at 67,215 (internal quotations omitted).

[54] *See, e.g., Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971) (recognizing that orders barring race discrimination in federal contracting were seemingly "authorized by the broad grant of procurement authority" because "it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority work[ers].").

## II. Appellants' failure to establish any of the requirements for preliminary injunctive relief, and the countervailing harms such relief would cause, weigh against a preliminary injunction.

The district court correctly recognized that the Appellants' claims are meritless and should be dismissed. Appellants are equally unsuccessful in establishing any of the other preliminary injunction factors.[55] They fail to meet the high bar required to warrant an injunction "that alter[s] the status quo[, which] '[is] not granted unless extreme or very serious damage will result and [is] not issued in doubtful cases.'"[56] Appellants "routinely contract" with the federal government, and their argument is premised on their desire to pay federal contract employees lower wages than those mandated by the Rule.[57] If Appellants secure an injunction and drop federal contract employees' wages back to the pre-Rule rates, the results will be catastrophic. More than 327,000 workers across the nation were expected to receive higher wages in the first year of implementation of the Rule.[58] Many of these workers would lose wage gains and drop back below the poverty line, potentially causing serious, and often irrevocable, harm—particularly for those who made housing, insurance, schooling, or other commitments in reliance on increased wages.

---

[55] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party to a case, "the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

[56] *Id.* (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotations omitted)).

[57] ER-98 ¶ 21; ER-98-100 ¶¶ 27, 29.

[58] AR 2 ¶ 9 at 67,194.

In turn, many of these workers may be forced to work additional hours at other jobs,[59] which itself is often harmful to workers' health and wellbeing.[60] Appellants ignore these real and substantial impacts on the lives and livelihood of countless federal contractor workers, including those in Appellant States, who are disproportionately people of color and women. Allowing Appellants, and other federal contractors, to flout the minimum-wage requirements during the pendency of this litigation would drive into debt those federal contract workers who reasonably relied upon their current wages—without the Court issuing any finding that the Rule is unlawful. As the Ninth Circuit has recognized, when "[f]aced with ... a conflict between financial concerns and preventable human suffering," including economic hardship, "we have little difficulty concluding that the balance of hardships tips decidedly in favor of the latter."[61]

---

[59] Ray A. Smith, *More Workers Get Side Hustles to Keep Up with Rising Costs*, Wall Street Journal (Nov. 7, 2022), https://www.wsj.com/articles/more-professionals-need-to-get-second-jobs-because-of-inflation-11667774723 (reporting that approximately 75% of workers need additional work to earn adequate income).

[60] *See, e.g.*, Courtney Jenkins Sievers, *Multiple Job Holders: The Impact of Employment Structure on Health, Access to Care, and the Effect of Policy Intervention,* Univ. of Memphis Digital Commons, 28-30 (2020), https://digitalcommons.memphis.edu/etd/2780 (finding that multiple job holders are more likely to suffer negative health consequences than single job holders); Angela Bruns & Natasha Pilkauskas, *Multiple Job Holding and Mental Health Health Among Low-income Mothers*, 29(3) Womens Health Issues, 205-212 (May 2019) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7141154/ (same for mental health).

[61] *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (citing *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)

# CONCLUSION

For the reasons above and in Defendants-Appellees' filings, *Amici* respectfully urge this Court to affirm the district court's dismissal of Appellants' claims and denial of their motion for a preliminary injunction.

Respectfully submitted,

*/s/ Jeffrey Dubner*

Jeffrey Dubner
Brooke Menschel*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 517-6600
jdubner@democracyforward.org
bmenschel@democracyforward.org

*Counsel for* Amici Curiae

* 9th Circuit admission pending

_____

(quotation marks omitted)).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-15179

I am the attorney or self-represented party.

**This brief contains** | 6,499 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jeffrey Dubner | **Date** | 8/28/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*