# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF NEBRASKA, et al.,

Plaintiffs-Appellants, and

STATE OF ARIZONA, et al.,

Plaintiffs,

v.

JULIE A. SU, in her official capacity as Acting U.S. Secretary of Labor, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Arizona

## PETITION FOR REHEARING EN BANC

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

GARY M. RESTAINO
*United States Attorney*

MARK B. STERN
DANIEL WINIK
*Attorneys, Appellate Staff
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION AND RULE 40(b)(2) STATEMENT .................................... 1

STATEMENT ......................................................................................................... 3

ARGUMENT .......................................................................................................... 8

I.    The Panel Majority Misconstrued The Procurement Act, In Conflict With Its Text And Longstanding Precedent ............................. 8

II.   The Majority's APA Holding Also Warrants En Banc Review ........... 18

CONCLUSION ..................................................................................................... 21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*AFL-CIO v. Kahn*,
    618 F.2d 784 (D.C. Cir. 1979) .............................................................................10

*Arizona v. Walsh*,
    2023 WL 120966 (D. Ariz. Jan. 6, 2023) .............................................................5

*Bradford v. U.S. Department of Labor*,
    101 F.4th 707 (10th Cir. 2024) .............................................................................2

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ................................................................................. 16, 17

*Contractors Association of Eastern Pennsylvania v. Secretary of Labor*,
    442 F.2d 159 (3d Cir. 1971) ..................................................................................9

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................................19

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018)..................................................................... 20, 21

*Farkas v. Texas Instrument, Inc.*,
    375 F.2d 629 (5th Cir. 1967)................................................................................9

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) .................................................................... 6, 14

*Hawaii v. Trump*,
    878 F.3d 662 (9th Cir. 2017)..............................................................................20

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ..............................................................................14

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ........................................................ 6, 14

*Lorillard v. Pons*,
   434 U.S. 575 (1978) .....................................................................11

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) .............................................. 10, 16, 17

*Mayes v. Biden*,
   67 F.4th 921 (9th Cir. 2023), *vacated as moot by*
   89 F.4th 1186 (9th Cir. 2023) .................................... 1, 2, 9, 11, 13, 16

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...............................................................9

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ............................... 6, 7, 8, 13, 14, 15, 16, 17, 18, 19

*Texas v. EPA*,
   983 F.3d 826 (5th Cir. 2020) ................................................................9

*UAW-Labor Employment & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) ...................................................... 9, 10

**Statutes:**

Federal Property and Administrative Services Act of 1949,
   Pub. L. No. 81-152, 63 Stat. 377 ...........................................................3

Pub. L. No. 107-217, 116 Stat. 1062 (2002)........................................................11

40 U.S.C. § 101 *et seq.*...................................................................................3

40 U.S.C. § 101 .................................................................................. 11, 15

40 U.S.C. § 101(1) ...............................................................................3, 8

40 U.S.C. § 111..................................................................................3

40 U.S.C. § 121(a) ......................................................... 1, 3, 8, 9, 11, 19

**Executive Branch Materials:**

Exec. Order No. 13,658,
    79 Fed. Reg. 9851 (Feb. 12, 2014).......................................................3

Exec. Order No. 13,838,
    83 Fed. Reg. 25,341 (June 1, 2018) ....................................................4

Exec. Order No. 14,026,
    86 Fed. Reg. 22,835 (Apr. 30, 2021) ............................................. 4, 12

*Increasing the Minimum Wage for Federal Contractors*,
    86 Fed. Reg. 67,126 (Nov. 24, 2021) ....................................... 4, 12, 13

**Other Authorities:**

*Consistent*, Oxford English Dictionary,
    https://doi.org/10.1093/OED/2753437657
    (last visited Dec. 17, 2024)..................................................................9

*Economical*, Oxford English Dictionary,
    https://doi.org/10.1093/OED/6400492054
    (last visited Dec. 17, 2024)........................................................ 13-14

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ......20

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

For more than a decade, executive orders have required a minimum-wage clause in certain contracts with the federal government. President Obama issued the first such order; President Trump maintained it, except for contracts in connection with seasonal recreational services on federal lands; and President Biden rescinded that exception and increased the amount of the required wage. These orders do not set a nationwide minimum wage for all employees. They simply direct agencies to enter certain contracts only with companies that will pay at or above the prescribed level for work on or in connection with those contracts. In doing so, they implement the President's determination that the federal government benefits when its contracts are performed by sufficiently well-paid employees.

The orders invoke the President's authority to "prescribe policies and directives that [he] considers necessary to carry out" the set of contracting and property-management functions specified in the relevant "subtitle" of the U.S. Code. 40 U.S.C. § 121(a). As a panel of this Court held in *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023)—a decision later vacated as moot when the executive order at issue was rescinded, 89 F.4th 1186 (9th Cir. 2023)—"[t]he broad language of" that provision "purposefully gives the President both

necessary flexibility and broad-ranging authority in setting procurement policies." 67 F.4th at 941 (quotation marks omitted). That interpretation aligned with decades of executive and judicial precedents, impliedly ratified by Congress. And the Tenth Circuit, applying the same longstanding interpretation of the statute, recently sustained the minimum-wage requirement. *Bradford v. U.S. Department of Labor*, 101 F.4th 707 (10th Cir. 2024), *pet. for cert. pending* (No. 24-232).

But over Judge Sanchez's dissent, the panel here invalidated the requirement. In doing so, it adopted a narrow construction of the Act that sharply curtails the President's statutory power to specify the terms on which federal agencies enter into contracts. The majority also held that the Department of Labor is required to consider alternatives to the President's minimum-wage directive.

That decision squarely conflicts with *Bradford* and departs from the reasoning of this Court's vacated decision in *Mayes* and decisions of other courts of appeals. The decision is mistaken for the reasons articulated in the dissent and in those prior decisions, and it has the exceptionally significant consequence of limiting the President's statutory authority to superintend the operations of the Executive Branch. Rehearing en banc is warranted.

**STATEMENT**

1.    Congress enacted the Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 (codified as amended at 40 U.S.C. § 101 *et seq.*), known as the Procurement Act, "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1). The Act empowers the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle" as long as the directives are "consistent with this subtitle." *Id.* § 121(a). "[T]his subtitle," defined by 40 U.S.C. § 111, includes basic authorities for procurement and property management.

2.    Presidents have used this power to issue a wide range of directives. As noted above, this case concerns a series of directives for agencies to contract with companies that agree to pay specified minimum wages for work on or in connection with a covered contract. President Obama issued the first such directive in 2014, specifying a minimum wage of $10.10 per hour.[1] Exec. Order No. 13,658, 79 Fed. Reg. 9851 (Feb. 12, 2014).

---

[1] The order included "contract-like instruments[] and solicitations," 79 Fed. Reg. at 9851; we refer to them collectively as "contracts."

In 2018, President Trump excluded from the 2014 order any contracts "in connection with seasonal recreational services" or "seasonal recreational equipment rental for the general public on Federal lands." Exec. Order No. 13,838, 83 Fed. Reg. 25,341, 25,341 (June 1, 2018). He maintained the minimum-wage requirement in all other respects, including for "lodging and food services associated with seasonal recreational services." *Id.*

In 2021, President Biden increased the amount of the required wage and rescinded the exemption for seasonal recreational services and equipment rentals. Exec. Order No. 14,026, 86 Fed. Reg. 22,835 (Apr. 30, 2021). His order directs agencies to include in covered contracts a clause requiring contractors to pay at least $15 per hour (indexed for inflation) for time spent working on or in connection with the contract. *Id.* at 22,835. It reflects President Biden's determination that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.* at 22,835.

The Department of Labor issued a rule implementing the 2021 executive order. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021).

3.      Several States brought this challenge to the 2021 rule and executive order and moved for a preliminary injunction.  The district court dismissed the action and denied plaintiffs' motion as moot.  *Arizona v. Walsh*, 2023 WL 120966 (D. Ariz. Jan. 6, 2023).  The court explained that the Procurement Act authority "is broad" and that courts have approved directives that bear "'a sufficiently close nexus' to the statutory purposes of promoting 'economy' and 'efficiency' in federal contracting."  *Id.* at *5.  That standard is satisfied here, the court concluded, because "the President has rationally determined that increasing the minimum wages of contractors' employees will lead to improvements in their productivity and the quality of their work, and thereby benefit the government's contracting operations."  *Id.* at *6.

The court rejected plaintiffs' claim that the challenged components of the implementing rule were arbitrary or capricious under the Administrative Procedure Act (APA).  The court explained that the executive order "is not reviewable under the APA" and that APA standards of decisionmaking are equally inapplicable to the rule "to the extent it implements decisions made by the President pursuant to his delegated authority."  *Id.* at *9-11.

4.     A divided panel reversed the dismissal, vacated the denial of a preliminary injunction, and remanded. *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024).

The majority concluded that "the President can only rely on § 121 to issue a policy that otherwise carries out an operative provision of the" Procurement Act. *Id.* at 7. It reasoned that the longstanding construction of the Act, adopted by this Court in *Mayes*, inappropriately treated the statutory statement of purpose as an "operative" source of authority. *Id.* at 8. The majority deemed *Mayes* "not … persuasive" and also rejected opinions of the D.C. and Fourth Circuits, as well as the Tenth Circuit's decision upholding this executive order. *Id.* at 8-10. Instead, the majority agreed with the Sixth Circuit's decision in *Kentucky v. Biden*, 57 F.4th 545 (6th Cir. 2023), which invalidated the executive order that *Mayes* upheld, and the opinion of a single Eleventh Circuit judge addressing the same order, *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292-1301 (11th Cir. 2022) (Grant, J.).

The majority further held that, "[e]ven under" what it regarded as the "faulty interpretation" of the *Mayes* panel, the challenged requirement would be invalid because it would not "serve[] the interests of economy and efficiency." 121 F.4th at 10.

Finally, the majority concluded that the Department of Labor "acted arbitrarily or capriciously when it failed to consider alternatives" to the policy determined by the President. *Id.* at 15.

Without addressing the equitable factors of the preliminary-injunction standard, the majority "conclude[d] that the district court abused its discretion in denying … a preliminary injunction" and remanded "for further proceedings." *Id.* at 17.

Judge Ryan Nelson, who wrote the majority opinion, filed a concurrence addressing the major-questions doctrine (which the majority held to be inapplicable). *Id.* at 17-22; *see id.* at 14 (majority opinion).

5. Judge Sanchez dissented, explaining that "the plain text of the Procurement Act, longstanding judicial precedent, and executive practice since its enactment all confirm that President Biden has the authority to direct federal agencies in this manner." *Id.* at 23. The dissent concluded that "[t]he President—not unelected judges—has the democratic accountability, institutional competence, and statutory authority to determine whether it is sound economic policy to require minimum-wage floors for work on government contracts" and that the President "rationally determined that raising the minimum wage for work on federal projects [would] lead to

improvements in productivity and the quality of work and thereby benefit the government's contracting operations." *Id.* at 27-29. Finally, the dissent explained that "an agency does not act 'arbitrarily and capriciously' by implementing a binding presidential directive." *Id.* at 31.

## ARGUMENT

### I. The Panel Majority Misconstrued The Procurement Act, In Conflict With Its Text And Longstanding Precedent

1. The operative provision of the Procurement Act authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle," so long as the policies are "consistent with this subtitle." 40 U.S.C. § 121(a). "This subtitle" includes basic authorities for procurement and property management. Among its provisions is 40 U.S.C. § 101(1), which states that the subtitle's "purpose … is to provide the Federal Government with an economical and efficient system for," among other things, "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting."

By its plain terms, then, § 121(a) gives the President discretion to direct agencies' performance of their contracting functions. The word "necessary" has a range of meanings, but "it frequently imports no more than that one

thing is convenient, or useful, or essential to another." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819). That interpretation is appropriate here given Congress's authorization for the President to act as he "*considers necessary*," 40 U.S.C. § 121(a) (emphasis added). *See, e.g.*, *Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020). And "consistent" means "congruous" or "compatible." *Consistent*, Oxford English Dictionary, https://doi.org/10.1093/OED/2753437657 (last visited Dec. 17, 2024). Section 121(a) thus authorizes directives that the President considers useful for agencies to carry out the functions covered by "this subtitle," as long as the directives are "consistent with" the provisions of "this subtitle." And directives are "consistent with" those provisions if they do not contradict the provisions, including the objectives articulated in § 101.

2. Numerous courts, including this Court in *Mayes*, have recognized that this "broad language … purposefully gives the President both 'necessary flexibility and "broad-ranging authority"' in setting procurement policies." *Mayes*, 67 F.4th at 941 (quoting *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003)); *see also, e.g.*, *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971) ("broad grant of procurement authority"); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632

n.1 (5th Cir. 1967) ("broad authority").  Courts have thus "generally landed on a 'lenient' standard" for reviewing directives under the Act.  *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quoting *Chao*, 325 F.3d at 367).  They have sustained such directives if they bear a "'close nexus'" to the objectives "'of economy and efficiency.'"  *Id.* (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979) (en banc)) (some quotation marks omitted).  And they have understood "'[e]conomy' and 'efficiency'" to "encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions."  *Kahn*, 618 F.2d at 789.

Historical practice confirms the breadth of the statutory language.  For decades, Presidents have adopted a broad range of directives to manage federal procurement and contracting, including by specifying the terms on which the government will do business, and courts have upheld those directives.  This Court canvassed that history in *Mayes*, describing among other things "'a series of anti-discrimination'" and affirmative-action "'requirements for Government contractors,'" upheld by the Third and Fifth Circuits; an executive order "by President Carter that required federal contractors to adhere to price and wage guidelines," upheld in *Kahn*; and an executive order by President George W. Bush requiring the posting of labor-rights

notices, upheld in *Chao*. *Mayes*, 67 F.4th at 936-938. And in *Mayes* itself, this Court upheld the President's authority "to require federal contractors … to take vaccination-related steps … that promote[d] economy and efficiency by reducing absenteeism, project delays, and cost overruns." *Id.* at 938.

The *Mayes* panel also noted that Congress had impliedly ratified the consensus view of the Executive and Judicial Branches. 67 F.4th at 938. Congress "is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), and Congress did that when, in 2002, it recodified the Procurement Act's statement of purpose and the operative provision without substantive change. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[.]").

3.     As explained by Judge Sanchez's dissent and by the Tenth Circuit in *Bradford*, the requirement at issue is authorized by the statutory text and the longstanding understanding of the authority it confers. The executive order directs agencies to enter covered contracts with entities willing to pay a prescribed wage for work on or in connection with those contracts, on

the basis of the President's judgment that "[r]aising the minimum wage" for work on federal contracts would "bolster economy and efficiency in Federal procurement." 86 Fed. Reg. at 22,835. The President reached that judgment on the view that a higher minimum wage "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.*

The implementing rule provides extensive support for that determination. 86 Fed. Reg. at 67,212-67,215. It notes, for example, that "higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services"—a view supported by empirical research. *Id.* at 67,212. And although the rule recognizes that government expenses could rise if the minimum-wage provision "increases employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass along part or all of the increased cost to the government in the form of higher contract prices," it explains that the Department expects "benefits" to the government "attributable to the Executive order … to accompany any such increase in expenditures, resulting in greater value to the Government"

overall, and expects "any potential increase in contract prices" to "be negligible." *Id.* at 67,206.

The panel majority misunderstood the Department's reasoning. Most significantly, the Department did not conclude that the benefits of a higher wage would "not … outweigh" higher contracting costs, 121 F.4th at 10-11. To the contrary, the Department concluded that the requirement would "result[] in greater value to the Government" even if it led to "any … increase in contract prices." 86 Fed. Reg. at 67,206. The majority's belief that the Department "confesse[d] that expenditures [would] likely rise," 121 F.4th at 11 (citing 86 Fed. Reg. at 67,207), appears to have been based on the Department's analysis of potential price increases by "[n]on-procurement contract[ors]"—*i.e.*, those who sell goods or services to members of the public, not the government. *See* 86 Fed. Reg. at 67,207. And even if this requirement increased governmental expenditures, that would not mean it disserves economy and efficiency. Those terms encompass not only price but also value; it can often be economical and efficient to pay more for a higher-quality item or service. *See, e.g.*, *Mayes*, 67 F.4th at 940 ("'[e]conomy and efficiency … encompass … factors like price [and] quality'"); *Economical*, Oxford English Dictionary, https://doi.org/10.1093/OED/6400492054 (last visited

Dec. 17, 2024) (to say that a purchase is "economical" can mean it "represent[s] good value for money," is "cost-efficient").

4.     The majority's principal rationale was that the unanimous panel in *Mayes*—along with the D.C. Circuit in *Kahn* and *Chao*, the Tenth Circuit in *Bradford*, and numerous Presidents of both parties—erred in construing the Procurement Act in the manner discussed above.  Only one court of appeals, the Sixth Circuit, had previously adopted the majority's narrow construction of the Procurement Act.  *Kentucky*, 57 F.4th at 552; *see Kentucky v. Biden*, 23 F.4th 585, 606 (6th Cir. 2022).   A single judge of the Eleventh Circuit had endorsed a similar reading, *Georgia*, 46 F.4th at 1298-1300 (Grant, J.), but her opinion was not joined in relevant part by the other panel members, *see id.* at 1308 (Edmondson, J., concurring in the result); *id.* (Anderson, J., concurring in part and dissenting in part).

Like the Sixth Circuit and Judge Grant, the majority overlooked § 121(a)'s text in construing it to authorize only directives "that carr[y] out an operative provision" elsewhere in the statute, 121 F.4th at 8.  For a directive to fall within § 121(a), the President must "consider[]" it "necessary to carry out this subtitle," *and* it "must be consistent with this subtitle."   If directives were "necessary to carry out this subtitle" only if they carried out

a provision elsewhere in the subtitle, the "consistent with" language would be surplusage: A directive that implements the subtitle's specific provisions is necessarily consistent with the subtitle. The majority offered no response to that problem.[2]

The only sound reading of § 121(a)'s text is that it authorizes directives the President determines will help agencies conduct economically and efficiently the overall set of contracting and property-management functions covered by "this subtitle." Such directives "carry out this subtitle" without necessarily effectuating a particular provision. The challenged order is illustrative: Whether or not it effectuates any specific provision, the order guides agencies in the exercise of their contracting functions.

Like the Sixth Circuit and Judge Grant, the majority emphasized that the statutory purpose provision, 40 U.S.C. § 101, is not an operative grant of authority for the President. But as we have made clear throughout this litigation, we agree with that understanding; our argument recognizes that

---

[2] The majority did suggest that our interpretation would itself render superfluous a set of provisions vesting the Administrator of General Services with oversight of various contracting and property-management functions. 121 F.4th at 9. But that was incorrect: The President's broad authority under our understanding of § 121(a) hardly divests the Administrator of the more specific authorities specified by those provisions.

§ 101 does not confer authority. It is § 121(a), not § 101, that authorizes the President to issue directives superintending the contracting and property-management functions covered by "this subtitle." Section 101 constrains the authority conferred by § 121(a) because it is among the provisions with which § 121(a) directives must be "consistent." The *Mayes* panel recognized as much, 67 F.4th at 942, as did the Fifth Circuit in *Louisiana v. Biden*, a case the majority misread in citing it favorably on this point. *See Louisiana*, 55 F.4th at 1023 n.17 (§ 101 "acts as a set of guidelines within which" directives under § 121(a) "must reside").

The majority equally erred in characterizing a footnote in *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979), as having "endorsed" its "interpretive approach," 121 F.4th at 9. The issue in *Chrysler* was whether regulations requiring the disclosure of certain information had "the 'force and effect of law,'" which turned on whether there was "a nexus between the regulations and some delegation of the requisite legislative authority by Congress." 441 U.S. at 304. The regulations were putatively authorized by an executive order requiring that government contractors "provide equal employment opportunity regardless of race or sex." *Id.* at 286; *see id.* at 303. The Supreme Court concluded that it was "not necessary to decide whether" the

executive order was authorized by the Procurement Act, or by other statutes, because the Court found it sufficiently clear that the *regulations* were not contemplated by any of the statutes.  *Id.* at 304-306.  In a footnote, the Court observed that "[l]ower courts ha[d] suggested" the Procurement Act "was the authority for predecessors of" the executive order, but it noted that "these suggestions were dicta" and that the Act contains no "specific reference to employment discrimination."  *Id.* at 304 n.34.  As the Fifth Circuit recognized in *Louisiana*, the footnote's "'specific reference'" language, which was itself "dicta," cannot be read as "a narrowing instruction for interpretation of" the Procurement Act.  55 F.4th at 1025-1026, 1026 n.24.

Finally, the majority erred in concluding that the longstanding interpretation of the Procurement Act "would allow the President to require that 'all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism relating to childbirth and care.'"  121 F.4th at 10 (quoting *Louisiana*, 55 F.4th at 1032).  The Fifth Circuit made that statement in describing what it would mean to uphold the directive at issue in *Louisiana*—one that would have required contractors to ensure their employees were vaccinated against COVID-19.  But the more

limited directive here bears no resemblance to that parade of horribles. Unlike those hypothetical directives, the requirement here pertains only to the particular hours that employees spend working on or in connection with covered federal contracts; it does not extend to their other working hours, much less to their private lives.

5. The panel decision warrants rehearing. The majority's conflict with the views of three judges in *Mayes* and the dissent in this case itself suggests that review by the full Court is appropriate. The panel's decision also conflicts with decisions of several circuits and aligns with the law of only the Sixth Circuit. If this Court corrects the panel's decision, the Sixth Circuit could eliminate the conflict among the circuits through en banc review in a future case. Finally, the panel's decision has the exceptionally significant consequence of curtailing the President's statutory authority to superintend the operations of the Executive Branch.

## II.  The Majority's APA Holding Also Warrants En Banc Review

The en banc Court should also review the panel's incorrect holding that it could be arbitrary or capricious for an agency to "fail[] to consider alternatives," 121 F.4th at 15, to a policy that the President—exercising authority vested specifically in him—has directed the agency to implement.

Contrary to the majority's understanding, the relevant question is not whether the implementing rule is "subject to judicial review under the APA," 121 F.4th at 15. It is. The rule may be reviewed to determine whether the presidential directive it implements is statutorily authorized and whether the agency acted arbitrarily or capriciously in resolving issues the President left open, like the geographic reach of the minimum-wage requirement. But an agency cannot "consider alternatives," *id.*, to a policy that the President has adopted—exercising authority that Congress vested specifically in him—and directed the agency to implement.

The panel's misapprehension may have reflected its concern that our position would "allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen," 121 F.4th at 15. It would not. As our brief made clear (at 41-42), an agency's exercise of its own delegated authority is subject to APA review even if the President tells the agency how to exercise that authority. The relevant power here, however, is not delegated to an agency; Congress vested it expressly in the President. 40 U.S.C. § 121(a). Because "the President is not an 'agency'" within the meaning of the APA, *Dalton v. Specter*, 511 U.S. 462, 470 (1994), the President's exercise of his authority under § 121(a)—even as implemented by an

agency—cannot be subject to APA standards of decisionmaking.  *See, e.g.,*
Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001)
(distinguishing a challenge "to an action delegated to an agency head but
directed by the President," as to which "the review provisions usually ap-
plicable to that agency's action should govern," from "a challenge to an ac-
tion that Congress has committed to the sole discretion of the President").

The decisions of this Court that the majority invoked are consistent
with these principles.  In *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017) (per
curiam), *rev'd on other grounds*, *Trump v. Hawaii*, 585 U.S. 667 (2018), this
Court did not apply arbitrary-and-capricious review to a presidentially de-
termined ban on the entry of certain foreign nationals; it reviewed that action
only for statutory and constitutional authority.  *See id.* at 683-698.  And in
*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)—which
addressed an agency rule that a noncitizen "entering 'along the southern
border'" could "not be granted asylum" if he was "'subject to a presidential
proclamation … suspending or limiting'" entry at that border, *id.* at 754—
the Court reviewed only the rule under the arbitrary-and-capricious stand-
ard, not the presidential proclamation referenced in the rule.  Indeed, the

Court took pains to note that the challenged "rule of decision" was "not an exercise of the President's authority." *Id.* at 773.

In short, it was not arbitrary and capricious for the Department of Labor to decline to second-guess the President's exercise of policymaking discretion vested specifically in him.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
   *Attorney General*

GARY M. RESTAINO
  *United States Attorney*

MARK B. STERN

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *daniel.l.winik@usdoj.gov*

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** No. 23-15179 _____

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[ x ] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,194 **.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** */s/ Daniel Winik* _____    **Date** December 20, 2024 _____