No. 23-15179

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF NEBRASKA, et al.,

Plaintiffs-Appellants,

v.

JULIE A. SU, IN HER OFFICIAL CAPACITY AS
ACTING U.S. SECRETARY OF LABOR, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Arizona (No. 2:22-cv-00213)
The Honorable John J. Tuchi

## BRIEF OF AMICI CURIAE ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES' PETITION FOR REHEARING OR REHEARING EN BANC

ALEX HEMMER
SARAH A. HUNGER
Deputy Solicitors General
SAMANTHA SHERMAN
Assistant Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for Amici States

*(Additional counsel on signature page)*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ii

IDENTITY AND INTEREST OF AMICI STATES ................................. 1

ARGUMENT ........................................................................................... 3

    The Case Should Be Reheard En Banc. .......................................... 3

CONCLUSION ...................................................................................... 13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bradford v. U.S. Dep't of Labor*, 101 F.4th 707 (10th Cir. 2024) ....... 2, 12

## STATUTES, ORDERS, AND REGULATIONS

40 U.S.C. § 101 *et seq.* ................................................................... 1

Exec. Order No. 14,026, Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 22,835 (Apr. 27, 2021) .................................. 1, 2

Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 67,126 (Nov. 24, 2021) ........................................................... *passim*

Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2025, 89 Fed. Reg. 79644 (Sept. 30, 2024) ..................................................... 2

## OTHER AUTHORITIES

Brenner, Mark D. & Stephanie Luce, *Living Wage Laws in Practice: The Boston, New Haven and Hartford Experiences*, Pol. Econ. Rsch. Inst. (2005), https://bit.ly/3sdPTyn ......................................... 8

Elmore, Andrew J., *Living Wage Laws & Communities: Smarter Economic Development, Lower Than Expected Costs* (Nov. 2003), https://bit.ly/4gxuyUE ................................................................... 11

Fairris, David, et al., *Examining the Evidence: The Impact of the Los Angeles Living Wage Ordinance on Workers and Businesses*, L.A. Alliance for a New Econ. ................................................................. 10

Manzo, Frank, et al., *The Effects of the Chicago Minimum Wage Ordinance: Higher Incomes With Little to No Impact on*

*Employment, Hours, and Businesses in the First Two Years*, Ill. Econ. Pol'y Inst. (June 2018), https://bit.ly/41JxucH .................... 12

Maryland Dep't of Legis. Servs., *Impact of the Maryland Living Wage* (2008), https://bit.ly/3qxXFTo ........................................ 11

Oka, Tatsushi & Ken Yamada, *Heterogeneous Impact of the Minimum Wage*, 58 J. of Hum. Res. 334 (July 2019), https://bit.ly/3sdPTyn ........................................................ 9

Ormiston, Russell, *et al.*, *New York's Prevailing Wage Law*, Econ. Pol'y Inst. (Nov. 1, 2017), https://bit.ly/3OELewP ..................................... 9

Reich, Michael & Denis Sosinskiy, *Sectoral Wage-Setting in California* (Inst. for Rsch. on L. & Emp., Working Paper No. 104-24, Sept. 2024), https://bit.ly/4goqTIp ........................................... 12

Rinz, Kevin & John Voorheis, *The Distributional Effects of Minimum Wages: Evidence from Linked Survey and Administrative Data* (2018), https://bit.ly/3YFpWUM ........................................ 7

Ruffini, Krista, *Worker Earnings, Service Quality, and Firm Profitability: Evidence from Nursing Homes and Minimum Wage Reforms*, 106 Rev. of Econ. & Stats. 1477 (2024). ....................... 5, 6

The Shift Project, *Early Effects of California's $20 Fast Food Minimum Wage: Large Wage Increases With No Effects on Hours, Scheduling, or Benefits* (Oct. 2024), https://bit.ly/4goxqmD .......... 12

Sonn, Paul K. & Tsedeye Gebreselassie, *The Road to Responsible Contracting* (2009) ................................................. 5, 9, 10

Wolfers, Justin & Jan Zilinsky, *Higher Wages for Low-Income Workers Lead to Higher Productivity*, Peterson Inst. for Int'l Econ. (Jan. 13, 2015), https://bit.ly/45pXpo0 ........................................... 5

**IDENTITY AND INTEREST OF AMICI STATES**

The States of Illinois, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington ("amici States") submit this brief in support of Defendants-Appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Ninth Circuit Rule 29-2(a).

Amici States have an interest in the public welfare, which includes promoting fair wages and protecting the financial security and well-being of their residents. The presidential and agency actions at issue in this case advance this interest by requiring that certain federal contracts include a clause setting a minimum hourly wage for employees working on or in connection with the contract. In April 2021, President Biden exercised his authority under the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 101 *et seq.*, to issue an executive order increasing the minimum wage for employees of federal contractors from $10.10 per hour—a rate established in 2014 via executive order and follow-on rulemaking—to $15.00 per hour. *See*

Exec. Order No. 14,026, Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 22,835 (April 27, 2021).[1]  Consistent with the executive order, in November 2021, the U.S. Department of Labor promulgated a final rule implementing the order.  86 Fed. Reg. 67,126 (Nov. 24, 2021).  Since this rule took effect in 2022, it has benefited hundreds of thousands of workers across the Nation.  *Id.* at 67,194.

Plaintiffs—several States acting in their capacities as federal contractors—challenged the rule and order on the grounds that, among other things, they exceeded the Executive's authority under FPASA and are arbitrary and capricious under the Administrative Procedure Act. Op. 9.[2]  The district court rejected those challenges, but a divided panel of this court reversed.  Op. 32.  As the United States explains, Pet. 2, the panel opinion directly conflicts with the Tenth Circuit's opinion in another challenge to the same rule and order, *Bradford v. U.S. Dep't of*

_____

[1]  Executive Order 14,026 specified that the minimum hourly wage will increase annually to track the Consumer Price Index.  As of January 1, 2025, the minimum hourly wage will be $17.75.  *See* Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2025, 89 Fed. Reg. 79644 (Sept. 30, 2024).

[2]  All citations to "Op. __" refer to the panel's November 5, 2024 opinion in this case.

*Labor*, 101 F.4th 707 (10th Cir. 2024), and thus warrants rehearing en banc under Federal Rule of Appellate Procedure 40(b)(2)(C). Amici States write separately to emphasize that rehearing is also warranted under Rule 40(b)(2)(D) because this case involves issues of "exceptional importance." The panel opinion threatens the economic interests of hundreds of thousands of workers across the United States, including workers in many amici States. Indeed, the impact of the panel opinion could be far-reaching, given the panel's choice to "vacate the rule under the APA," Op. 32, rather than merely enjoin it as to the plaintiff States in their contractor capacity. Amici States thus urge this Court to grant rehearing en banc.

## ARGUMENT

**The Case Should Be Reheard En Banc.**

Amici States agree with the United States that en banc review is appropriate in this case, given the importance of the rule and the order and the potential impact of the case on workers across the Nation. As the Department explained in promulgating the rule, an extensive body of research shows that minimum wage requirements like the one set out in the rule benefit both workers and the economy as a whole. That

conclusion is bolstered by amici States' own experiences implementing similar policies for contracts awarded at the state and local level. The panel opinion vacating the federal rule jeopardizes those benefits, exposing hundreds of thousands of workers employed by federal contractors to pay cuts and depriving local communities of the positive externalities that accompany higher wages. For that reason, this case involves an issue of "exceptional importance" and the Court should grant rehearing en banc. Fed. R. App. P. 40(b)(2)(D).

1. To begin, numerous studies and reports, including those relied on by the Department, have shown that by paying employees higher wages, employers improve the morale, productivity, and performance of employees; reduce turnover; and are able to attract higher quality workers. 86 Fed. Reg. at 67,212-14. These benefits, in turn, lead to improved services and better consumer experiences. *Id.* These findings are well-documented: Improvements in worker efficiency, recruitment, and retention have been found across many different sectors, including air travel, policing, retail, manufacturing,

and construction.[3]  These significant benefits are jeopardized by the panel's opinion concluding that the Executive exceeded its authority under FPASA, and that the Department acted arbitrarily and capriciously, in promulgating the rule and order.  Op. 11-25, 27-32.

The government's choice to require certain federal contractors to be paid a higher minimum wage is amply supported by the literature on minimum wage increases and has yielded significant benefits not only for workers, but for the economy more broadly.  For instance, a recent study of minimum wage increases in nursing homes directly linked those increases to improved worker performance and efficiency.[4]  The study found that "higher minimum wages induc[ed] better performance among current workers" and improved service quality through increased retention.[5]  Among other indicators of better performance, the

---

[3]  *E.g.*, Paul K. Sonn & Tsedeye Gebreselassie, *The Road to Responsible Contracting* 3-4 (2009), https://bit.ly/3s54ZpN (collecting studies); Justin Wolfers & Jan Zilinsky, *Higher Wages for Low-Income Workers Lead to Higher Productivity*, Peterson Inst. for Int'l Econ. (Jan. 13, 2015), https://bit.ly/45pXpo0 (same).

[4]  Krista Ruffini, *Worker Earnings, Service Quality, and Firm Profitability: Evidence from Nursing Homes and Minimum Wage Reforms*, 106 Rev. of Econ. & Stats. 1477 (2024).

[5]  *Id.* at 1478.

study noted improvements in the health and safety of nursing home residents, including fewer health inspection violations and deaths each year.[6] In fact, the study estimates that in 2013 (one of the years it examined), there would have been approximately 15,000 fewer nursing home deaths had comparable wage increases been implemented in nursing homes across the country.[7]

There is also evidence that these benefits endure well beyond the initial wage increase. According to a 2019 report, "wage raises increase productivity for up to two years after the wage increase." 86 Fed. Reg. at 67,213. The nursing home study similarly reported that health and safety improvements—in particular, the lower rate of deaths—persisted after the initial increase.[8] Increased wages can also facilitate retention and recruitment, as the Department explained. 86 Fed. Reg. at 67,213. According to a study cited by the Department in promulgating the rule, even a 1% wage increase at a Fortune 500 company resulted in reduced turnover, increased recruitment, and increased productivity. *Id.* All of

---

[6] *Id.* at 1485-87.

[7] *Id.* at 1487.

[8] *Id.* at 1488-89.

these benefits are threatened by the panel majority's conclusion that the rule and order are invalid.

The panel opinion, if left to stand, will have particularly significant consequences for workers who are living below or near the poverty line. The Department explained in promulgating the rule that it anticipated that the rule would have the effect of reducing poverty for employees of certain federal contractors, especially those in historically underpaid or otherwise disadvantaged groups. *Id.* at 67,214-15. A recent study indicates that increasing the minimum wage provides net benefits to workers living in poverty, even when accounting for potential negative effects of a minimum wage increase on employment opportunities, such as reduced hours or fewer available positions.[9] It further found that these improvements are meaningful; in fact, the authors suggest that increasing the minimum wage during the Great Recession would have "blunt[ed] the worst of the income losses."[10]

---

[9] Kevin Rinz & John Voorheis, *The Distributional Effects of Minimum Wages: Evidence from Linked Survey and Administrative Data* 20-22 (2018), https://bit.ly/3YFpWUM.

[10] *Id.* at 21.

The Department also explained that minimum wage increases are important for groups that face disproportionate income inequality, such as women, people of color, younger workers, and less educated workers. 86 Fed. Reg. at 67,214-15 (collecting studies).  For example, according to a 2019 study, "less-educated, less-experienced, and female workers are more directly affected by a rise in the minimum wage than more-educated, more-experienced, and male workers."[11]  A case study of firms covered by Boston's living wage law likewise concluded that the "living wage beneficiaries are . . . primarily women and people of color."[12]  As the Department explained, increasing the wage of federal contractors directly benefits these groups because "many of the contracts that [are] covered by this rule can be found in industries characterized by low pay and workforces largely comprised of" disadvantaged communities.  86 Fed. Reg. at 67,215 (internal quotations omitted).  The panel opinion jeopardizes these important benefits, warranting rehearing en banc.

---

[11]  Tatsushi Oka & Ken Yamada, *Heterogeneous Impact of the. Minimum Wage*, 58 J. of Hum. Res. 334, 349 (July 2019), https://bit.ly/3sdPTyn.

[12]  Mark D. Brenner & Stephanie Luce, *Living Wage Laws in Practice: The Boston, New Haven and Hartford Experiences*, Pol. Econ. Rsch. Inst., 45 (2005), https://bit.ly/4f9yt8P.

Indeed, many amici States and their localities have realized these benefits in their own communities by implementing similar policies for their contractors, often described as "living wage laws."[13] Those States and localities have found that such measures "create better quality jobs for communities" and "improve[ ] the contracting process both by reducing the hidden public costs of the procurement system, and by shifting purchasing towards more reliable, high road contractors."[14] As one example, "[r]esearch by independent, academic economists indicates that New York's prevailing wage law is a uniquely valuable component of state policy that simultaneously uplifts residents and communities while imposing minimal, if any, cost on taxpayers."[15] Likewise, a study of the "Los Angeles living wage law found that staff turnover rates at firms affected by the law averaged 17 percent lower than those at firms

---

[13] Sonn, *supra* note 2, at 13 (describing state and local "living wage laws").

[14] *Id.*

[15] Russell Ormiston et al., *New York's Prevailing Wage Law*, Econ. Pol'y Inst. (Nov. 1, 2017), https://bit.ly/3OELewP.

that were not, and that the decrease in turnover offset 16 percent of the cost of the higher wages."[16]

2.      Although the majority held that the rule and order are arbitrary and capricious in part because the Department chose not to implement a more modest minimum wage increase, or to exercise its discretion to implement the increase more slowly, Op. 32, the Department explained that the benefits of the rule's wage increase outweighed any additional costs the increase might impose on employers or the public, thus justifying its decision.  Indeed, the Department reviewed literature examining the impact of minimum wage increases on prices to the public and concluded that, although the "size of price increases will vary based on the company and industry," the extent of the price increases at issue here have been "overstated" by commentators opposed to the rule.  86 Fed. Reg. at 67,207.  In reaching that conclusion, the Department also accounted for the "various benefits [employers] will observe, such as increased productivity and reduced

_____

[16]  Sonn, *supra* note 2, at 14 (citing David Fairris et al., *Examining the Evidence: The Impact of the Los Angeles Living Wage Ordinance on Workers and Businesses*, L.A. Alliance for a New Econ. (2005)).

turnover," which could, in turn, improve the quality of services and "attract more customers and result in increased sales." *Id.*

The experience of amici States and their localities bears out the Department's conclusion that any costs associated with the rule's increase in the minimum wage would be minimal. A study analyzing the effects of living wage ordinances in fourteen local jurisdictions concluded that "reported increases in service contract prices were consistently very small—generally ranging between 0.003% and 0.079% of the localities' budgets."[17] A Johns Hopkins University study likewise found that contract costs increased by only 1.2% in Baltimore, the first locality to implement a living wage requirement for city contractors, upon review of 26 contracts "compared before and after the living wage law was implemented."[18] And studies of the effects of state and local minimum wage laws are to the same effect: Chicago's ordinance raising the minimum hourly wage from $8.25 to $10.50 between 2014 and 2016

---

[17] Andrew J. Elmore, *Living Wage Laws & Communities: Smarter Economic Development, Lower Than Expected Costs* 6 (Nov. 2003), https://bit.ly/4gxuyUE.

[18] Maryland Dep't of Legis. Servs.*, Impact of the Maryland Living Wage* 5 (2008), https://bit.ly/3qxXFTo.

yielded wage increases for 330,000 workers without any negative

impact "on total employment or the growth of private business

establishments,"[19] and recent studies of California's law setting a $20

minimum wage for fast food workers concluded that the wage bump had

no negative impact on employment in that sector.[20]

All this shows exactly what the Department explained when it

promulgated the rule:  The minimum wage requirement advances

economy and efficiency in federal procurement while simultaneously

promoting the welfare of workers and their communities.  The panel

opinion threatens these significant benefits.  If allowed to stand, it will

permit federal contractors to cut workers' wages in order to boost their

---

[19] Frank Manzo et al., *The Effects of the Chicago Minimum Wage Ordinance:  Higher Incomes With Little to No Impact on Employment, Hours, and Businesses in the First Two Years*, Ill. Econ. Pol'y Inst., 22 (June 2018), https://bit.ly/41JxucH.

[20] The Shift Project, *Early Effects of California's $20 Fast Food Minimum Wage: Large Wage Increases With No Effects on Hours, Scheduling, or Benefits* 1 (Oct. 2024), https://bit.ly/4goxqmD (joint study by Harvard and UC San Francisco concluding that there was no evidence "that employers turned to understaffing or reduced scheduled work hours to offset the increased labor costs"); Michael Reich & Denis Sosinskiy, *Sectoral Wage-Setting in California* 4-5 (Inst. for Rsch. on L. & Emp., Working Paper No. 104-24, Sept. 2024), https://bit.ly/4goqTIp (UC Berkeley study concluding that data "suggest that the policy has not had adverse effects on employment").

profits or to underbid the competition. And these pay cuts will place additional financial stress on workers, particularly those who are already at or below the poverty line. These pay cuts will likewise roll back the efficiency and productivity gains the federal government and the public have enjoyed as a result of the minimum wage requirement. The Court should grant rehearing en banc to eliminate the conflict between this case and *Bradford* and ensure that the benefits of the minimum wage rule and order are realized.

## CONCLUSION

For these reasons, this Court should grant rehearing en banc.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
SARAH A. HUNGER
Deputy Solicitors General
SAMANTHA SHERMAN
Assistant Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603

(312) 814-5526
alex.hemmer@ilag.gov

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Ste. 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
August, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
201 3rd Street NW
Albuquerque, NM 87109

JOSHUA H. STEIN
*Attorney General*
*State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

December 23, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(b)(4) and Circuit Rule 29-2(c)(2) because it contains 2,406 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

December 23, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER